# UNPUBLISHED CASES

2023 WL 6406220
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Nicholas COLLIAS, et al., Plaintiffs,

v.

MOTORCITY CASINO, Defendant.

2:22-CV-12650-TGB-EAS
|
Signed September 30, 2023

**Attorneys and Law Firms**

Brendan John Childress, Noah S. Hurwitz, Hurwitz Law PLLC, Ann Arbor, MI, for Nicholas Collias, Mark Dalloo, Kenneth Duff, Ramon Hana, Joseph Hissom-Galanty, Rita King, Nicole Leone, Beatrix Murel, Kevin Pollack, Mattia Safadi, Susie Stokes, Audonte Walker, Nihad Zora, Denise Terry, Todd Milo Runyon.

Kathleen M. Gatti, Nicholas A. Huguelet, Terry W. Bonnette, Nemeth Bonnette Brouwer, PC, Detroit, MI, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

**(ECF NO. 8)**

TERRENCE G. BERG, UNITED STATES DISTRICT JUDGE

**\*1** During the COVID pandemic in 2021, after the vaccine had become available, MotorCity Casino in Detroit adopted a vaccine requirement for certain employees. MotorCity's policy set a deadline by which all employees would need to be vaccinated or they would lose their jobs. The policy allowed for exceptions based on religious reasons, but MotorCity retained the discretion whether to accept or reject such reasons, and a number of employees who refused the vaccination for religious reasons were fired.

This lawsuit is brought against MotorCity, now the Defendant, by former employees, now the Plaintiffs, who were terminated after refusing to comply with MotorCity's mandatory COVID-19 vaccination policy. Their complaint alleges that MotorCity violated Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA") by failing to accommodate their religious opposition to receiving the COVID-19 vaccine. Plaintiffs contend that Title VII and ELCRA required MotorCity to exempt them from the vaccination mandate because of their religious beliefs.

MotorCity filed a motion asking the Court to dismiss several claims of Plaintiffs' complaint. Specifically, Defendants say that under the requirements of Federal Rule of Civil Procedure 12(b)(6) three sets of claims must be dismissed: (1) the Title VII failure to accommodate claims raised by Plaintiffs Nicholas Collias, Nicole Leone, and Kenneth Duff; (2) the Title VII retaliation claims raised by all Plaintiffs; and (3) the ELCRA claims raised by all Plaintiffs. Defendant's Mot. to Dismiss, ECF No. 8. The Court agrees with some of Defendant's contentions, but not all. Consequently, for the reasons detailed below, MotorCity's motion to dismiss is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

On October 6, 2021, MotorCity informed "all current non-union associates" of its COVID-19 vaccination mandate. Plaintiffs' Amended Complaint, ECF No. 7, PageID.40. The vaccination policy required non-union employees to provide proof of vaccination by October 22, 2021, or alternatively, to file religious and/or medical accommodation requests by October 15, 2021. *Id.* at PageID.41. Under the policy, non-union employees who failed to get vaccinated or obtain an accommodation waiver would be terminated on October 22, 2021. *Id.*

Plaintiffs were non-union associates subject to the vaccination policy who worked in four casino departments: Slots, Pit, Cage, and Transportation. Defendant's Reply, ECF No. 14, PageID.241. Shortly after being notified of the policy, all Plaintiffs filed requests for religious accommodation with MotorCity except Plaintiffs Collias and Leone. ECF No. 7, PageID.42–44. Collias and Leone did not request religious accommodation because they believed that doing so would be futile. *Id.* at PageID.43. Collias and Leone allege that they were under this impression "because they both encountered discrimination and/or learned of the discrimination through personal observation." *Id.*

MotorCity required Plaintiffs to fill out a Request for Accommodation Form to document their specific religious

beliefs and how those beliefs conflicted with the vaccination policy. *Id.* at PageID.44; ECF No. 12-1, PageID.213–17. When Plaintiffs completed the Accommodation Form, MotorCity's Human Resources department conducted interviews with Plaintiffs regarding their answers. ECF No. 7, PageID.47; ECF No. 12, PageID.190. During the interview, MotorCity asked questions to assess whether Plaintiffs' religious beliefs were the reason for their requested accommodation. ECF No. 7, Page.ID.47–48. These questions included:

> **\*2** Do you have any science-based concerns about the vaccine? What is the religious nature of your concerns about the vaccine? ... Why are you requesting an accommodation to the vaccine? Do you have any political concerns about the vaccine? ... What stance have your religious leaders taken on the COVID-19 vaccine? How does accepting the COVID-19 vaccine conflict with your beliefs?

*Id.*

On October 22, 2021, MotorCity terminated Plaintiffs Collias and Leone because they failed to provide proof of vaccination and did not request any religious accommodation. *Id.* at PageID.42–43. The other Plaintiffs (including Duff) did make requests for religious accommodation, but MotorCity denied their requests. MotorCity's denial letters explained that despite Plaintiffs' sincere beliefs, providing a vaccination exemption would impose an undue hardship on the company. *Id.* at PageID.51. MotorCity then terminated [1] those Plaintiffs whose accommodation requests were denied because they failed to submit subsequent proof of vaccination. *Id.* at PageID.58.

Plaintiffs filed this lawsuit on January 6, 2023. Before bringing suit, all Plaintiffs except Duff filed timely charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue. *Id.* at PageID.39.

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a lawsuit or claim where the defendant establishes the plaintiff's "failure to state a claim upon which relief can be granted." Consideration of a Rule 12(b)(6) motion is generally confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint or the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

In evaluating the motion, courts "must construe the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true and determine whether plaintiffs undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Though this standard is liberal, it requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of her grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). The plaintiff must also plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678–79).

## III. DISCUSSION

### A. Plaintiffs Collias's and Leone's Title VII Failure to Accommodate Claims
**\*3** To succeed on a Title VII failure to accommodate claim, Plaintiffs must show: "(1) that the employee holds a sincere religious belief that conflicts with an employment requirement, (2) that the employee informed

the employer about the conflict, and (3) that the employee was discharged or disciplined for failing to comply with the requirement." *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 355–56 (6th Cir. 2020); *see also What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (May 15, 2023), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ("Employees must tell their employer if they are requesting an exception to a COVID-19 vaccination requirement because of a conflict between that requirement and their sincerely held religious beliefs.").

MotorCity argues that Plaintiffs Collias and Leone cannot succeed on a failure to accommodate claim because they never filed a request to inform MotorCity of their need for religious accommodation. ECF No. 8, Page.ID.78. Plaintiffs insist that they need not have made an accommodation request because it would have been futile. ECF No. 12, PageID.193.

In support of their futility argument, Plaintiffs cite *Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905 (E.D. Mich. 2015). In *Deister*, the court noted that "there is some authority that suggests an employer could be liable for failure to accommodate even if the employee has not requested an accommodation." *Id.* at 925. But *Deister* did not address futility with respect to a religious accommodation claim. Instead, *Deister* involved a disability accommodation claim where the court explained that "when a request would be futile, we have excused the failure to make it *when the need for an accommodation was obvious to the employer.*" *Id.* (emphasis added) (quoting *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004)). In the context of disability accommodations, the futility exception accounts for the inability of some persons with disabilities to effectively request accommodation while the need for it is obvious. *Id.* at 927. But Plaintiffs provide no substantive support for extending the futility exception to religious accommodations. The Court thus declines to permit a futility exception under these circumstances.

Even if a futility exception was available for religious accommodation claims where the employer is aware of the employee's religious belief and the need for accommodation is somehow obvious, Plaintiffs cannot invoke such an exception here. First, Plaintiffs' vague and unsupported allegation that they "did not submit religious accommodation requests because they were told doing so would not be successful" does not plausibly show that MotorCity did not intend to comply with Title VII. ECF No. 7, PageID.43.

Moreover, Collias alleges that MotorCity was aware that he "is a devout Greek Orthodox Christian" and that his "beliefs precluded vaccination." ECF No. 7, PageID.42. But to illustrate that Collias's need for accommodation was not obvious to MotorCity, MotorCity cites a publication from the hierarchs at the Greek Orthodox Church encouraging followers to get vaccinated. ECF No. 8, PageID.79. Plaintiffs contend that in referencing a church's guidance to followers, Defendant inappropriately questions their religious beliefs. ECF No. 12, PageID.195. Although the Court must only consider the well-pleaded allegations in the complaint, and take them as true when considering a motion to dismiss, in pointing to the Greek Orthodox Church's pro-vaccination stance, however, MotorCity highlights that even awareness of Collias's religion—as alleged in the complaint—would not necessarily or reasonably provide notice to an employer of a need for accommodation. At bottom, Collias's reliance on a conclusory statement that MotorCity was aware of his religious-based objection to the vaccine without any supporting allegations and his failure to make an accommodation request are fatal to his Title VII accommodation claim.

**\*4** Lastly, Leone states that she is "devoutly religious and opposed the vaccine since she suffered a debilitating injury as a vaccine side effect during childhood." *Id.* at PageID.43. But Leone's admission that her opposition to the vaccine was based on an adverse health reaction to a childhood vaccination contradicts her claim that she required *religious* accommodation. In fact, by stating her objection in terms of health concerns, Leone did not provide any indication that her religious views required an accommodation. *See Wessling v. Kroger Co.*, 554 F. Supp. 548, 552 (E.D. Mich. 1982) (finding that the plaintiff's accommodation "was not in terms of a request for an accommodation of her religious practices," such that the employer "did not have proper notice of her request for a religious accommodation"). Therefore, even if religious accommodation claims were subject to a futility exception, Leone cannot invoke it here when her objection was not stated in religious terms.

Accordingly, Defendant's motion to dismiss Plaintiffs Collias's and Leone's Title VII failure to accommodate claims is granted.

**B. Plaintiff Duff's Title VII Claims**

MotorCity moves to dismiss Plaintiff Duff's Title VII failure to accommodate and retaliation claims because he failed to timely file an EEOC charge. ECF No. 8, PageID.81. In response, Duff points to the law interpreting the requirements of the single filing rule, saying that his claims should be allowed to "piggyback" off other Plaintiffs' EEOC charges, which were timely. ECF No. 12, Page.ID.197.

Title VII requires an employee to file an EEOC complaint before bringing an employment discrimination lawsuit. *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 839 (6th Cir. 1994). This filing requirement exists to provide the EEOC with (1) "sufficient information so that it may notify prospective defendants" and (2) "the opportunity to eliminate the alleged unlawful practices through informal methods of conciliation." *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 195 (6th Cir. 1995). Still, in certain circumstances, an employee who fails to file an EEOC charge may meet this requirement under what is called the single filing rule—provided that other plaintiffs have made timely EEOC complaints.

In adopting the single filing rule, the Sixth Circuit noted that "[t]he rationale behind the 'single filing rule' is the belief that it would be wasteful for numerous employees with the same grievances to file identical complaints with the EEOC." *Id.* at 840; *see also Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 196–97 (6th Cir. 1995) ("The single filing rule serves to prevent a wooden application of the administrative charge requirement where the ends of the requirement have already been satisfied."). The single filing rule applies "where a substantially related non-filed claim arises out of the same time frame as a timely filed claim," such that an employee who failed to file an EEOC charge "need not satisfy Title VII's filing requirement to recover." *Wilson Metal*, 24 F.3d at 840.

MotorCity argues that Duff should not be permitted to take advantage of the single filing rule for two reasons. First, MotorCity maintains that "Duff fails to allege any facts to plausibly support the proposition that either MotorCity or the EEOC were on notice that there may have been liability as to [him]." ECF No. 8, PageID.83. Second, MotorCity insists that due to the individualized nature of accommodation claims, these claims should not be subject to the single filing rule at all. *Id.* Duff responds that MotorCity had notice of the alleged discrimination because he filed a request for accommodation with MotorCity and 13 other Plaintiffs filed EEOC charges with substantially similar claims arising from the same policy. ECF No. 12, PageID.198–200.

Plaintiff Duff has plausibly alleged that MotorCity had requisite notice of his claims. MotorCity does not dispute that Duff's claim, which was not filed with the EEOC, is substantially related to the claims of those 13 Plaintiffs who did file EEOC charges. Indeed, like Plaintiffs who filed EEOC charges, Duff was a non-union employee who requested religious accommodation after MotorCity issued its mandatory vaccination policy, was denied the accommodation, and was subsequently terminated for failing to get vaccinated. Moreover, as Plaintiffs point out, MotorCity admits that Duff filed a request for religious accommodation through its internal procedures. Defendant's Answer, ECF No. 9, PageID.152. Duff's request referenced Title VII's protections for religious employees and cited religious-based concerns for his objection. ECF No. 12, PageID.199.

**\*5** Nonetheless, MotorCity argues that because Duff worked in the Transportation department, he should not be allowed to rely on EEOC charges filed by Plaintiffs who all worked in different work units. ECF No. 14, PageID.240–41. Defendants are correct that the size of the work unit can affect whether the employer had sufficient notice of an employee's complaint. For a "modestly sized" work unit, the "similarity of grievances suffices" to meet the single filing rule's notice objectives. *Peeples v. City of Detroit*, 891 F.3d 622, 632 (6th Cir. 2018). But if the work group is "larger, 'there must be some indication that the grievance affects a group of individuals defined broadly enough to include those who seek to piggyback on the claim.' " *Id.* (quoting *Howlett*, 49 F.3d at 195). Here, MotorCity's policy impacted every non-union employee in all work units. In other words, the policy itself was a "grievance" affecting a broad group of individuals who are all permitted to piggyback on the filed EEOC charges. *See Cerjanec v. FCA US, LLC*, No. 17-10619, 2018 WL 3729063, at *11 (E.D. Mich. Aug. 6, 2018) (Michelson, J.) (applying single filing rule for a plaintiff with non-filed disparate impact claims based on a policy affecting all salaried employees at Fiat Chrysler Automobiles).

Relatedly, applying the single filing rule to Duff's claim has no effect on the EEOC's ability to promote conciliation here: 13 Plaintiffs gave the EEOC opportunities to resolve their complaints through such informal channels. Given that the EEOC failed to reconcile the nearly identical charges in 13 other instances, little would be gained from having Duff file the same charges—it would seem to be a waste of resources. As the Fifth Circuit aptly summarized in *Oatis v. Crown Zellerbach Corp.*, "[i]f it is impossible to reach a settlement with one discriminate, what reason would there be to assume

that the next one would be successful[?]" *398 F.2d 496, 498 (5th Cir. 1968)*.

MotorCity's argument that the single filing rule cannot be applied to religious accommodation claims fares no better. In support, MotorCity cites just one case: *Smith v. Pyro Mining Co.*, 827 F.2d 1081 (6th Cir. 1987). In *Smith*, the court explained that in the religious accommodation context, "what may be a reasonable accommodation for one employee may not be reasonable for another." *Id.* at 1085. But *Smith* involved the reasonableness of the employer's accommodation and did not address whether the single filing rule should apply to multi-plaintiff religious accommodation cases. The *Smith* case is inapposite; it does not support MotorCity's position.

From the Court's own review, it does not appear that any federal court has specifically foreclosed reliance on the single filing rule for accommodation-based claims. In *Jarboe v. Maryland Department of Public Safety and Correctional Services*, No. 12-572, 2013 WL 1010357 (D. Md. Mar. 13, 2013), a District of Maryland court applied the single filing rule to permit a putative class of Maryland prisoners to rely on the administrative exhaustion of three plaintiffs. The *Jarboe* plaintiffs were all prisoners with disabilities who alleged that they were denied accommodations in violation of the ADA. *Id.* at *1. In denying the defendant's motion to dismiss the claims of plaintiffs who failed to exhaust administrative remedies, the *Jarboe* court explained that "although the extent of plaintiffs' disabilities and requested accommodations may vary to some degree, all of the plaintiffs are profoundly deaf and complain about substantially similar alleged failures to accommodate their disability in common aspects of prison life." *Id.* at *15. Accordingly, the court held that "application of the single-filing rule is appropriate in such circumstances." *Id.*

The single filing rule is arguably more germane to the religious accommodations at issue here than the disability accommodations in *Jarboe.* While Duff's specific religious beliefs may differ from those of other Plaintiffs', the accommodations sought for individuals who have not been vaccinated against COVID-19 would be both uniform and largely predetermined by the Centers for Disease Control and the Occupational Safety and Health Administration. *See Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace*, OSHA (June 10, 2021), https://www.osha.gov/coronavirus/safework. Given that the religious objections of all Plaintiffs are substantively similar and the accommodation sought (exemption from

vaccination) was identical, the single filing rule can be applied. Therefore, MotorCity's motion to dismiss Plaintiff Duff's Title VII religious accommodation claims is denied.

### C. Plaintiffs' Title VII Retaliation Claims

**\*6** To establish a prima facie case of retaliation under Title VII, a plaintiff must show:

> 1) [she or] he engaged in activity that Title VII protects; 2) defendant knew that [she or] he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists.

*Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). Plaintiffs contend that requesting religious accommodations constitutes a protected activity for which they were terminated. ECF No. 12, PageID.202–04. MotorCity argues that Plaintiffs cannot establish a prima facie retaliation case because requesting a religious accommodation is not a protected activity. ECF No. 8, PageID.84–86.

The parties make diametrically opposed arguments regarding whether requesting an accommodation is a protected activity because there is something of an intra-circuit split on the issue. In 2003, the Sixth Circuit decided *Creusere v. Board of Education*, which found that the plaintiff "was clearly engaged in a protected activity by requesting religious accommodation." 88 F. App'x 813, 821 (6th Cir. 2003). But in 2020, in *Stanley v. ExpressJet Airlines*, the Sixth Circuit stated that "[a] request for an accommodation does not constitute protected activity under Title VII, which clearly delineates two options: opposition to discriminatory practice or participation in an investigation." 808 F. App'x 351, 358 (6th Cir. 2020).

Courts in this district appear to rely on *Stanley* as controlling. For example, in *Garczynski v. Accident Fund Insurance Co.*, No. 22-12615, 2023 WL 3437294 (E.D. Mich. May 12, 2023), a case involving a COVID-19 vaccination policy also brought by Plaintiffs' counsel, the Honorable Gershwin A. Drain closely examined the relative persuasiveness of *Creusere*

and *Stanley*. Judge Drain noted that in *Creusere*, the Sixth Circuit did not engage in any substantive legal analysis before deeming the request for religious accommodation a protected activity. *Id.* at \*3. But by contrast in *Stanley*, "the Sixth Circuit assessed the text of Title VII and determined that a request for an accommodation does not qualify as a protected activity under the statute," making *Stanley* "far more persuasive on this issue." *Id.* Likewise, the Honorable Nancy G. Edmunds recently cited *Stanley* to note that requesting a religious accommodation does not constitute protected activity. *Smith v. COBX Co.*, No. 22-12836, 2023 WL 2578945, at \*2 (E.D. Mich. Mar. 20, 2023). Other Sixth Circuit district courts have likewise rejected *Creusere* in favor of *Stanley*. *See Hymes v. Sec'y of the Air Force*, No. 21-304, 2023 WL 1819106, at \*9 (S.D. Ohio Feb. 7, 2023); *Edwards v. City of Cincinnati*, No. 22-503, 2023 WL 145898, at \*5 (S.D. Ohio Jan. 10, 2023).

This Court has not identified any Sixth Circuit cases adopting *Creusere*'s approach. Given the soundness of the reasoning in *Stanley*, and the unanimity of the district courts in this circuit following it, the Court concludes that the rule in *Stanley* forecloses Plaintiffs' Title VII retaliation claims because requesting religious accommodation is not a protected activity.

 \*7  But even assuming for the sake of argument that requesting a religious accommodation constitutes a protected activity, Plaintiffs' prima facie case still fails because they cannot demonstrate that their *accommodation requests* (the putative protected activity) were the but-for cause of their termination. In *Lucky v. Cobx Co.*, another COVID-19 vaccination policy case brought by Plaintiffs' counsel, the court concluded that the plaintiffs could not show that requesting a religious accommodation was the but-for cause of their termination. No. 22-12514, 2023 WL 3359607, at \*3 (E.D. Mich. May 10, 2023) (Roberts, J.). Under nearly identical circumstances, the *Lucky* court concluded that "[the plaintiff's] own words, coupled with the terms of Defendant's policy, show that Defendant terminated her because she refused to get vaccinated against COVID-19, not because she requested an accommodation." *Id.* Furthermore, the court emphasized that the plaintiff did not allege that "had she gotten vaccinated, she still would have been suspended and terminated because she had requested a religious exemption." *Id.* Instead, "[i]t was not [the plaintiff's] request for accommodation that resulted in her termination, but her failure to get the COVID-19 vaccine *after her request for accommodation was denied.*" *Id.*

Just as in *Lucky*, MotorCity's vaccination policy made clear that "[a]ny Non-Union Employee who has not received the First Shot ... prior to October 22 ... will be terminated as of that date." ECF No. 7, PageID.41. Additionally, MotorCity's accommodation denial letter warned Plaintiffs that "failure to comply with [the vaccination] requirement will result in termination of your employment." *Id.* at PageID.51. And like the *Lucky* plaintiff, all Plaintiffs here who requested accommodations were not terminated upon making the accommodation request, but only after their requests were denied and they refused vaccination. Moreover, Collias and Leone, the two plaintiffs who did not even request accommodation were terminated *despite them not requesting a religious accommodation.* ECF No. 7, PageID.43. And like all other Plaintiffs, Collias and Leone were eventually terminated for failing to get vaccinated.

Even if Plaintiffs were found to have engaged in protected activity by requesting religious accommodation, they do not plausibly allege that these requests for accommodation were the but-for cause of their termination. Therefore, and for the reasons given previously, the Court must grant MotorCity's motion to dismiss Plaintiffs' Title VII retaliation claims.

### D. Plaintiffs' ELCRA Discrimination Claims

MotorCity moves to dismiss all Plaintiffs' ELCRA religious discrimination claims on the ground that Plaintiffs have failed to allege essential elements of disparate treatment. ECF No. 8, Page.ID.90. The analysis for disparate treatment claims under ELCRA is the same as under Title VII. *Thomas v. Autumn Woods Residential Health Care Facility*, 905 F. Supp. 414, 419 (E.D. Mich. 1995). To make a prima facie case for disparate treatment, the plaintiff must show that they were a member of a protected class and that they were treated differently than similarly situated employees who are not members of a protected class, but who engaged in similar conduct. *Pitts v. Michael Miller Car Rental*, 942 F.2d 1067, 1070 (6th Cir. 1991).

To show that an employee was similarly situated, Michigan courts require the plaintiff to demonstrate that " 'all of the relevant aspects' of his employment situation were 'nearly identical' to those of [another employee's] employment situation." *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 70 (Mich. 1997) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Such relevant aspects include salary, benefits, experience, and work performance. *Id.* The Michigan Court of Appeals has also specifically noted that whether a putative comparator has the same union or

non-union status as the plaintiff is dispositive to the similarly situated analysis. *See Watson v. Genesys Reg'l Med. Ctr.*, No. 352134, 2021 WL 935678, at *21 (Mich. Ct. App. Mar. 11, 2021) (finding that the plaintiff failed to identify a similarly situated comparator because "[the plaintiff] was a member of the union and ... [t]here is no evidence as to [a purported comparator's] status as a union member or non-union member").

**\*8** Federal courts have also considered a comparator's union membership status in determining whether the plaintiff is "similarly situated." In *Arnold v. Marous Brothers Construction*, the Sixth Circuit upheld the district court's dismissal of the plaintiff's Title VII case because he did show that "he was replaced by or treated differently than similarly situated non-protected workers." 211 F. App'x 377, 381 (6th Cir. 2006). After the plaintiff, a Black non-union employee, walked off of the job site, the employer brought in two white union employees to do his job. *Id.* The *Arnold* court concluded that the white union employees did not actually replace the plaintiff, nor could the plaintiff show that he was "treated differently" than similarly situated employees. *Id.* Accordingly, the plaintiff's prima facie case failed as a matter of law. *Id.*

More pointedly in *Davis v. Ineos ABS (USA) Corp.*, a Southern District of Ohio court explained that "no discriminatory intent may be inferred from defendant's decision to treat differently union members and non-union members" for Title VII disparate treatment claims. No. 09-773, 2011 WL 1114409, at *11 (S.D. Ohio Mar. 24, 2011). Because union employees are uniquely situated in the workplace, they cannot be comparators for non-union employees who are treated differently. *Id.* (citing *Marshall v. Western Grain Co., Inc.*, 838 F.2d 1165, 1170 (11th Cir. 1988)); *see also Gaskins v. Rock-Tenn Corp.*, 982 F. Supp. 2d 760, 777 (S.D. Ohio 2013) ("Although Plaintiff [a non-union employee] protests that a union employee should be viewed as an equal to him, the undersigned disagrees.").

Plaintiffs have not plausibly alleged that they are similarly situated to other non-vaccinated non-union employees who did not request religious accommodations. Plaintiffs assert that MotorCity treated them differently from union employees, vendors, and customers. ECF No. 7, Page.ID.38. But none of these groups can be considered "similarly situated" to Plaintiffs under ELCRA. Vendors and customers are not MotorCity employees at all. And as discussed above, union employees cannot be considered "similarly situated" to Plaintiffs as non-union employees. Indeed, Plaintiffs have not alleged that MotorCity treated any employees who made non-religious accommodation requests more favorably than Plaintiffs who sought religious accommodation. Plaintiffs' prima facie case of disparate treatment under ELCRA fails, and Defendant's motion to dismiss Plaintiffs' ELCRA claims is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 8) is **GRANTED in part** and **DENIED in part**.

Accordingly, therefore,

The claims of Plaintiffs Nicholas Collias and Nicole Leone under Count I are hereby **DISMISSED** with prejudice.

The claims of Plaintiff Kevin Duff, and of all other Plaintiffs under Count I, remain in the case and are not dismissed. Counts II and III are **DISMISSED** with prejudice as to all Plaintiffs.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6406220

## Footnotes

1    Although Plaintiffs allege that Collias and Leone were terminated on October 22, 2021, they do not make clear whether and when any other Plaintiffs were terminated. For example, Plaintiffs' amended complaint suggests that despite terminating Collias and Leone, MotorCity placed all other Plaintiffs on unpaid suspensions beginning November 12, 2021. ECF No. 7, PageID.53. Elsewhere, it is alleged that MotorCity terminated the

other Plaintiffs on October 30, 2021. *Id.* at PageID.58. Because MotorCity does not appear to dispute that Plaintiffs were terminated, *see* ECF No. 8, PageID.72, for the purposes of resolving this motion, the Court will assume that all Plaintiffs were terminated sometime on or after October 22, 2021.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

41 Fair Empl.Prac.Cas. (BNA) 421

1986 WL 398289
United States Court of Appeals, Sixth Circuit.

DORR
v.
FIRST KENTUCKY NATIONAL CORP.

No. 84-5067.
|
Jul. 17, 1986.

Appeal from the U.S. District Court for the Western District
of Kentucky. Reversed and remanded.

**Attorneys and Law Firms**

Abby R. Rubenfeld and Mark Scherzer, New York, N.Y., for
appellant.

John S. Reed, Donald S. Ray, and Margaret E. Keane
(Greenebaum, Doll & McDonald), Louisville, Ky., for
appellees.

Evan Wolfson, Brooklyn, N.Y., for amicus curiae.

Before KEITH, MERRITT, and JONES, Circuit Judges.

**Opinion**

JONES, Circuit Judge:

 *1 Samuel F. Dorr appeals the dismissal of his Title VII
employment discrimination suit, which alleged that he was
forced to resign from his position at the defendant bank
by the action of bank officials directed against his religious
activities. The activities at issue were Dorr's membership in
and presidency of a local chapter of Integrity, an organization
that is affiliated with the Episcopal Church and that advocates
equal rights for homosexual men and women within the
church and in society as a whole. Despite Dorr's contention
that his involvement in Integrity arose out of his deep
religious convictions, the district court found, at the close of
plaintiffs evidence, that Dorr did not sincerely believe that
his religion "required" him to serve as president of Integrity,
and therefore those activities were not motivated by sincere
religious beliefs. The court also found that Dorr did not
adequately apprise his employer of the religious nature of
his activities, as required by Title VII to prove religious
discrimination. Because we hold that the court's first finding
is clearly erroneous and its second finding is based upon an

improper legal standard, we reverse and remand for further
proceedings.

I

Dorr was raised in, and has been a lifelong adherent to the
teachings of, the Episcopal Church. In the words of the trial
court, Dorr "appeared to be a deeply religious man who was
well informed about the doctrines of the Episcopal church."
Dorr acknowledged to himself that he was a homosexual
in 1967 or 68 when, at the end of a brief marriage, he
began a relationship with another man. Significantly, his
first public announcement of his sexual identity came in the
early seventies when he revealed the fact to his Episcopal
priest. In response to Dorr's concerns about the acceptance of
homosexuality by the church, the priest assured him that he
would be welcome in the church and at the communion rail.

Integrity is a nationwide organization with chapters in a
number of cities. Its members are mostly homosexuals and
mostly Episcopalians. The district court quoted an Integrity
pamphlet which stated that the organization's "primary goal ...
is to help its members discover and affirm that [they] can
be both gay and Christian." Dorr's first contact with the
organization occurred in 1978 when, while vacationing in
Chicago, he attended a mass held by Integrity at an Episcopal
church. Dorr testified that the acceptance and sense of
community he felt at the mass had a profound effect upon
him and led him to begin an Integrity chapter in Louisville.
Dorr was apparently the prime catalyst in the formation of the
Louisville Chapter, which was organized in conjunction with
a local chapter of Dignity, a parallel Catholic organization.
Canon Simrill, a pastor at Dorr's Episcopal church, aided Dorr
in forming the chapter and participated in the first meeting,
which was held at the church. Dorr was elected president of
the Integrity/Dignity Chapter.

 *2 Dorr had begun working for the defendant bank in 1962
and rose through the ranks to become an officer in 1970 and
a vice-president in January 1981. Since 1973 he had held the
position of branch manager. In November of 1981 Dorr for the
first time told his supervisor, defendant Edwin Shader, that he
was gay, that he was president of Integrity/Dignity, and that
he anticipated taking public positions on issues affecting the
gay community. Dorr told Shader that Integrity/Dignity was
an organization of gay Episcopalians and Catholics and gave
him two pamphlets explaining the purpose of the group. One

Case 2:23-cv-10808-JJCG-DRG ECF No. 13-21, PageID.162 Filed 11/21/23 Page 12 of 113
Jones v. First Kentucky Nat'l Corp., Not Reported in F.2d (1986)
41 Fair Empl.Prac.Cas. (BNA) 421

of the pamphlets contained the passage quoted by the district court above.

The bank had a policy that prohibited employees from engaging in outside activities that might undermine public confidence in the bank. Aware that Dorr's activities might violate this policy, Shader notified his superior, defendant Franklin O'Reilly, by telephone and in a memorandum, of his conversation, with Dorr. The memorandum related Dorr's statements that Integrity/Dignity was an organization of gay Christians that "strives to gain acceptance in our culture and allow the group to worship together as Christians." Shader did not send to O'Reilly the pamphlets Dorr had given him.

O'Reilly discussed the matter with his superiors and the bank's legal counsel and a meeting was then arranged between Dorr, O'Reilly, and defendant Vaughn Timberlake, the bank's personnel director. At the meeting Dorr affirmed his intention to be publicly active as president of Integrity. He was then told that, to remain with the bank, he would have to resign as president but could retain his membership in Integrity so long as it did not become public knowledge. In the meantime, the officials would try to find him a less visible position at the bank. Dorr testified that he told O'Reilly and Timberlake that his Integrity activities were "a calling, ... an area of ministry." O'Reilly denied at trial that Dorr made any reference to his religious beliefs. Dorr met with O'Reilly again a few days later and resigned from the bank.

In April 1982 Dorr filed a complaint with the Equal Employment Opportunity Commission alleging religious discrimination. The EEOC dismissed the complaint and Dorr filed this action in February 1983.

## II

Title VII, the Equal Employment Opportunity Act, 42 U.S.C. § 2000e et seq. (1982), makes it an "unlawful employment practice for an employer" to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's ... religion...." 42 U.S.C. § 2000e-2(a)(1). The Act defines the term "religion" to include:

> **\*3** all aspects of religious observation and practice, as well

as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employees ... religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

In the context of this lawsuit, in order to establish a prima facie case of religious discrimination, Dorr must show 1) that his religious practice conflicted with a requirement of his employment; 2) that he informed the bank of the conflict, and of the religious nature of his activities; and 3) that the job action taken against him resulted from his failure, because of his beliefs, to comply with the bank's requirements. See *Brown v. General Motors Corp.,* 601 F.2d 956, 959, 20 FEP Cases 94 (8th Cir.1979); see also *Redmond v. GAF Corp.,* 574 F.2d 897, 901, 17 FEP Cases 208 (7th Cir.1978). The employer may rebut this prima facie case either by disproving the elements listed above, or by showing that it had made sufficient efforts to accommodate Dorr's religious practices or could not do so without undue hardship. See *McDaniel v. Essex International, Inc.,* 571 F.2d 338, 343, 16 FEP Cases 904 (6th Cir.1978). The dismissal of Dorr's claim came at the end of his proof; therefore the issue of accomodation was not reached and is not before us. The two bases for the dismissal were that Dorr had failed to establish the religious nature of his involvement with Integrity and, alternatively, that Dorr had not proven that he had notified his employer about this religious character.

## A.

The district court, relying primarily on Dorr's testimony and pre-trial deposition, found that Dorr's participation in Integrity "was not motivated by 'sincerely held' religious beliefs or practices...." In so finding, the court did not question, nor do the defendants, the sincerity of Dorr's religious beliefs in general or the sincerity of his belief in, and desire to work for, the goals of Integrity. Rather the court found that Dorr's Integrity activities were not an outgrowth of his religious beliefs.

[1] This circuit has not had occasion to set forth the standard for determining whether a practice or belief is "religious" within the meaning of 42 U.S.C. 2000e(j). Any contention

Case 2:23-cv-10808-JJCG-DRG ECF No. 13-21, PageID.163 Filed 11/21/23 Page 13 of 113
Jones v. First Kentucky Nat'l Corp., Not Reported in F.2d (1986)
41 Fair Empl.Prac.Cas. (BNA) 421

that Dorr's involvement with Integrity cannot be religious because the organization is geared towards the particular needs of homosexuals is foreclosed by our decision in *Brown v. Johnson,* 743 F.2d 408, 411 (6th Cir.1984), cert. denied, 105 S.Ct. 1190 (1985) ( "Government interference with a prisoner's religious practices cannot be justified merely because a particular faith is sympathetic to the religious needs of homosexuals."). While section 2000e(j) may be most often employed to protect an employee's refusal to work on teh Sabbath, "[i]t is clear from the language of [the provision] that it applies to all religious observances and practices and is not limited to claims of discrimination based on requirements of Sabbath work." *McDaniel,* 571 F.2d at 342. We agree with the Seventh Circuit that to determine what is religious in the meaning of the statute, the proper questions are (1) whether the belief or practice asserted is "religious" in the "person's own scheme of things," and (2) whether it is "sincerely held." *Redmond,* 574 F.2d at 901 n. 12 (citing *Welsh v. United States,* 398 U.S. 333 (1970), and *United States v. Seeger,* 380 U.S. 163 (1969)). It is not for a court to evaluate the legitimacy of a belief that is claimed to be religious. *Fowler v. Rhode Island,* 345 U.S. 67, 70 (1953); *Redmond,* 574 F.2d at 900.

**\*4** [2] The district court recited these standards in the midst of its opinion but it erred in applying them. The court characterized Dorr's testimony at trial as asserting that his leadership and activity were required by his beliefs, and then discredited this testimony based on Dorr's deposition in which he indicated that his religion did *not* 'require' him to serve as president of Integrity and take a public stance on gay rights. The court saw an inconsistency in these two positions and from this determined that Dorr's beliefs as stated at trial-- that his participation was required--were not sincerely held. The court properly refrained from inquiring into whether Dorr's religion in fact required his Integrity activities, see *Redmond,* 547 F.2d at 900; rather, the court judged whether Dorr sincerely believed it did.

The difficulty in the court's treatment of this issue is its focus on what Dorr believed was "required" of him. The concept of religion embraced by the statute is not, we think, one of an external set of forces and rules that compel an individual to act one way or another. *See United States v. Seeger,* 380 U.S. 163, 186-87 (1965). To speak of what Dorr believes is required of him--a concept raised in questioning by opposing counsel, not by Dorr--is to be concerned with too narrow a portion of religious belief. The question is not one of compulsion, but of motivation. *See Redmond,* 574 F.2d at 900. Therefore, to find that Dorr does not sincerely believe that he is required to serve

as Integrity's President does not complete the inquiry; that participation may still be motivated by his religious beliefs. Put another way, his sincerely held religious beliefs may motivate his activity even though they do not require it.

As far as can be determined from the district court's opinion, its ruling that Dorr's Integrity activity was not motivated by sincerely held religious beliefs was based solely on its finding that he was required to participate. The trial court's ruling was based on the wrong factual inquiry and, therefore, is clearly erroneous.

### B.

The district court's alternative basis for dismissal--that the bank was not informed of the religious nature of Dorr's Integrity activities--was likewise tainted by the application of an improper inquiry.

[3] The statute places upon the employer the duty to make a reasonable accommodation of its employee's religious practices. *Chrysler Corp. v. Mann,* 561 F.2d 1282, 1286, 15 FEP Cases 788 (8th Cir. 1977), cert. denied, 434 U.S. 1039, 16 FEP Cases 501 (1978). Clearly, then, to invoke the protection of Title VII, the employee must take steps to insure that his employer is informed of his religious needs. *Id.* Thus, proof that the employer was so informed is part of the employee's prima facie burden.

**\*5** The trial court erroneously viewed this element of the prima facie case as requiring that Dorr must show that the bank had acted with "discriminatory animus," that is, that the bank had discriminated against him *because* of his religious beliefs. The statute makes no such requirement; it is enough that, for whatever motive, the bank discharged or demoted Dorr because of his activities that it knew to be religious.

[4] We are not able to make use of the trial court's underlying findings in considering the proper issue. In finding that the bank officials lacked discriminatory animus, the court was concerned with what those officials subjectively understood about the nature of Dorr's activities. For instance, the court appeared to excuse defendant Shader's failure to read and pass on the Integrity pamphlets that Dorr had given him because Shader did not "comprehend [[[ ] that he might be affecting [Dorr's] religious convictions." The court found significant Shader's testimony that "Homosexualism and religion seem like they're opposites, to me. I can't put them together,"

Case 2:23-cv-10808-JJCG-DRG ECF No. 13-21, PageID.164 Filed 11/21/23 Page 14 of 113
Jones v. First Kentucky Nat'l Corp., Not Reported in F.2d (1986)
41 Fair Empl.Prac.Cas. (BNA) 421

Shader's statement shows the inappropriateness of applying a subjective standard to the question of whether the employer was informed. By considering the issue of religion, Shader was obviously aware that Dorr claimed there were religious aspects to Dorr's participation in Integrity, but he either refused to or was unable to accept the legitimacy of that claim because of his own views of religion. Just as the court is forbidden to judge the legitimacy of a plaintiff's religious beliefs, *Fowler,* 345 U.S. at 70, the employer's liability should not turn on its subjective evaluation of its employee's asserted religious views. We hold, therefore, that the issue of whether an employer was informed of an employee's religious need for accommodation should be determined under an objective standard: Would a reasonable employer have concluded, from the information given by the employee, that the employee's beliefs or practices for which accommodation is sought are religious in nature? Because the district court looked to the subjective conclusions of the bank's officers, it must reconsider this portion of its findings.

Dorr asks us to hold as a matter of law that the bank was sufficiently informed because the Integrity pamphlets he gave to Shader made clear the religious nature of Integrity. The bank responds that the pamphlets were not passed on by Shader to the officers who made the decisions about Dorr's employment, but Dorr argues that this was Shader's, not his own failing and should not be held against him. Were Shader the only contact Dorr was able to have with bank decision-makers, we would attach great importance to the information given to Shader. However, Dorr was given an opportunity to meet directly with Shader's superiors to explain his position. Once he was given this direct access, Dorr had, we think, a responsibility to insure that those officials had all the information he wished to present. Therefore, the question whether the bank was informed should be judged on remand based on the information actually received from Shader and Dorr by those who made the decision. We, of course, express no opinion whether this information was or was not sufficient to apprise a reasonable employer that Dorr's activities were religious in nature.

**\*6** The judgment dismissing Dorr's claim is REVERSED and the case is REMANDED to the district court. On remand the district court will reconsider the two issues raised under the standards we have set forth and determine whether further proceedings are necessary.

*Dissenting Opinion*

MERRITT, Circuit Judge, dissenting:

**\*6** Because I believe that the majority misapplies the "clearly erroneous" standard to the facts of this case, I respectfully dissent:

The record before this Court amply supports the District Court's finding that the defendant bank was unaware that Dorr's advocacy of gay rights and his activities as president of Integrity/Dignity were based on his religious convictions. Dorr testified repeatedly at trial that he "doubt[ed] seriously" he had told bank officials that being president of Integrity was a practice or a requirement of his religion. (App. 139-40; 141; 142)

Dorr also testified that it was "quite possible" he described Integrity as "a gay rights organization" which "fight[s] for the rights ... of homosexuals" to defendants O'Reilly and Timberlake of the bank. (App. 173-74)

Defendant O'Reilly, in response to a question from Dorr's counsel, testified that at no time did the bank see this "as a religious issue." (App. 273) Rather, it is clear that the bank was concerned about the fact that its customers "would consider it [Dorr's stance on gay rights] an unpopular movement." (App. 283) And it is clear that Title VII affords no protection to an employee who is fired for being a homosexual or for advocating gay rights. *DeSantis v. Pacific Telephone & Telegraph,* 609 F.2d 327, 19 FEP Cases 1493 (9th Cir.1979).

The District Court which had, of course, the opportunity to observe each witness and weigh the live testimony, found that Dorr never made "it clear to these officials of the bank that he felt his *religious* rights were being impinged upon and he was being discriminated against." (App. 320; emphasis supplied) As for Dorr's testimony on this point, the court concluded that it was "exceedingly weak, and ... not at any variance" with the testimony of the defendants. (App. 320)

I am convinced, following a close review of the record, that these findings of the District Court should not be upset. Unlike the District Court we did not have the opportunity to evaluate credibility first-hand. Instead, we must rely on the printed word. It is for this reason precisely that courts of appeal are required to accept a trial court's findings of fact unless

41 Fair Empl.Prac.Cas. (BNA) 421

clearly erroneous. *Anderson v. City of Bessemer City, North Carolina,* 105 S.Ct. 1504, 37 FEP Cases 396 (1985). In order to reject those findings, we must find that the District Court has committed a serous mistake in the fact finding process. I see no evidence of that.

**\*7** Because I would affirm the district court on this ground I see no need to reach the question of religious "requirement" versus religious "motivation."

**All Citations**

Not Reported in F.2d, 1986 WL 398289, 41 Fair Empl.Prac.Cas. (BNA) 421

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6038016
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Michael ELLISON, et al., Plaintiffs,
v.
INOVA HEALTH CARE SERVICES, et al., Defendants.

No. 1:23-cv-00132 (MSN/LRV)
|
Signed September 14, 2023

**Attorneys and Law Firms**

Nicholas Nelson, Pro Hac Vice, Samuel Diehl, Pro Hac
Vice, CrossCastle PLLC, Minneapolis, MN, Charles Bennett
Molster, III, The Law Offices of Charles B. Molster III PLLC,
Washington, DC, for Plaintiffs Michael Ellison, Andrea
Graham, Arin Jenkins.

Nancy North Delogu, Washington, DC, Alexander Paul
Berg, Lauren Marie Bridenbaugh, Tysons Corner, VA, for
Defendants Inova Health System Foundation, Inova Health
Care Services.

**AMENDED MEMORANDUM OPINION** [1]

Michael S. Nachmanoff, United States District Judge

**\*1** This matter comes before the Court on Defendants'
Motion to Dismiss or, in the alternative, Motion to Strike
Class Claims (Dkt. No. 37). For the reasons stated below, that
motion will be granted in part and denied in part.

## I. BACKGROUND

Stemming from the COVID-19 pandemic, this case involves
a hospital's efforts to respond to the rapidly changing
circumstances of this public health crisis and how those
efforts allegedly impacted its employees' exercise of their
religious beliefs.

### A. Factual Background

In July 2021, Defendant Inova Health announced that it would
require all hospital employees to receive the COVID-19
vaccine. Dkt. No. 23 ¶ 24 ("Am. Compl."). However,
that mandate was not absolute: employees unable to be

vaccinated for medical reasons or unwilling to be vaccinated
for religious reasons could request either a permanent or
temporary exemption from the otherwise mandatory policy.
*Id.* ¶ 26. And, by and large, when an employee requested an
exemption, it was granted within a few days. *Id.* ¶ 29.

But, in November 2021 (and in response to continuing
pandemic-related concerns), the United States Centers for
Medicare and Medicaid ("CMS") issued a mandate requiring
all medical care providers and their employees to be
vaccinated. Dkt. No. 38 at 3–4. The CMS mandate also
outlined procedures for how covered healthcare providers
were to evaluate exemption requests—procedures that were
far more robust than the ones Inova implemented during
the initial phases of its vaccination policy. *Id.* at 4. Inova
was therefore required to update its policy, meaning that
previously granted exemption requests needed to be re-
evaluated. *Id.*

In February 2022, Inova announced that any employee who
had previously been granted an exemption from the vaccine
policy needed to reapply so that their request could be
evaluated in light of the new policy. *Id.* at 4–5. Inova admitted
that it was "going back on its word" but explained that it was
obligated to do so under the CMS mandate, which required
exemption requests to be scrutinized more closely. *Id.*; Am.
Compl. ¶ 37.

After the implementation of the new policy, Plaintiffs Michael
Ellison, Arin Jenkins, and Andrea Graham all reapplied for
religious exemptions, asserting that various tenets of their
Christian faith prevented them from receiving the vaccine.
Am. Compl. at 13–14, 17–18, 22–23. Specifically, Ellison (a
data-analyst) claimed that he could not receive the vaccine
because he was required to treat his body as a temple of
the Holy Spirit and was not to ingest anything that could
potentially harm it. *Id.* ¶ 81. Ellison also holds a religious
objection to abortion and, by extension, objected to the
COVID-19 vaccines because they were developed using fetal
cell lines. *Id.* ¶ 83. Next, Jenkins (a staff nurse) also stated
that his faith required that he treat his body as a temple of
God and that, as a result, he could take the vaccine only if,
after prayer, he received approval from God. *Id.* ¶¶ 148, 152.
Finally, after originally requesting a medical exemption based
on her intention to become pregnant, Graham (an emergency
room nurse) also asserted that her body was a temple, that her
healthcare decisions were guided by prayer, and that she had
not received authorization from God to take the vaccine. *Id.*
¶¶ 116, 119, 121. Graham also claimed that she was unable to

comply with the policy because she had a religious objection to the use of fetal cell lines in the development of the vaccine. *Id.* ¶ 117. Each of the Plaintiffs' requests were denied. *Id.* ¶¶ 95, 128, 165.

### B. Procedural History

**\*2** Between March 2022 and December 2022, each of the Plaintiffs either resigned or were terminated for failure to comply with the hospital-wide vaccination policy. Am. Compl. ¶¶ 100, 134, 169. Each also filed their charges with the EEOC. *Id.* ¶¶ 101, 135, 171. And each received a right-to-sue letter. *Id.* ¶¶ 103, 137, 172. [2]

Then, in January 2023, Plaintiffs filed a class-action complaint (Dkt. No. 1), which was later amended on April 4, 2023. *See generally* Dkt. No. 23 (Amended Complaint). That operative Complaint divides the claims between two proposed classes, the "Religious Discrimination Class" and the "Permanent Exemption Class." Am. Compl. ¶ 179.

The Religious Discrimination Class—represented by all Plaintiffs—alleges that Inova violated both Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act ("VHRA") by, among other things, firing employees or refusing to hire applicants based on their religious exercise. *See id.* ¶¶ 201–56.

The Permanent Exemption Class—represented by Ellison and Jenkins—alleges that Inova created a binding contract when it granted "permanent" exemptions to induce each class member to continue working at Inova. *See id.* ¶¶ 257–64. In the alternative, the Permanent Exemption Class argues that Inova's promise of permanent exemptions is nonetheless enforceable because the promise created a quasi-contract that blocks the hospital's attempt to change course. *Id.* ¶ 262.

On April 18, 2023, Inova filed a motion to dismiss Plaintiffs' claims or strike the class allegations. *See* Dkt. No. 37. Plaintiffs responded on May 2. Dkt. No. 40. Inova replied. Dkt. No. 41. The Court held oral argument on May 26. Dkt. No. 43. And today, the Court will grant Defendant's motion in part and deny it in part.

## II. LEGAL STANDARDS

*Motion to Dismiss.* The Federal Rules of Civil Procedure provide that a court may dismiss a complaint when the plaintiff has failed to state a claim for which the court may grant relief. Fed. R. Civ. P. 12(b)(6). Thus, to state a viable

claim, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level," and the pleading must contain "enough facts to state a claim to relief that is plausible on its face" and "nudge [the] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff must allege "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). Instead, the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. A plaintiff's failure to allege an essential element of their claim warrants dismissal. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, ––– U.S. ––––, 140 S. Ct. 1009, 1019, 206 L.Ed.2d 356 (2020).

**\*3** *Motion to Strike.* A court may strike class allegations from a pleading. *See* Fed. R. Civ. P. 12(f)(2), 23(d)(1)(D). A court should do so before discovery only "if the allegations are facially and inherently deficient." *Knapp v. Zoetis Inc.*, No. 3:20-cv-191, 2021 WL 1225970, at \*10 (E.D. Va. March 31, 2021).

## III. DISCUSSION

### A. Plaintiffs' Religious-Discrimination Claims

#### 1. Title VII

Plaintiffs' principal argument is that Defendants, by rejecting requests for religious exemptions from the vaccine requirement, violated Title VII's requirement that an employee's religious beliefs be accommodated. Am. Compl. ¶¶ 201–28. With one exception, the Court disagrees.

Title VII makes it unlawful for covered employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges [of] employment, because of such individual's ... religion." 42 U. S. C. § 2000e-2(a)(1) (1964 ed.). And although, as originally enacted, the statute did not spell out what it meant by discrimination "because of ... religion," the EEOC has interpreted that provision to mean that employers were obligated "to make reasonable accommodations to the religious needs of employees" whenever that would not work an "undue hardship on the conduct of the employer's

business." *See Groff v. DeJoy*, 600 U.S. 447 (2023) (slip. op., at 4–5) (citing 29 CFR § 1605.1).[3] Thus, to make out a plausible failure-to-accommodate claim under Title VII, a plaintiff must plead, and ultimately show, that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (citations omitted); *see also EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008) (same) ("*Firestone Fibers*").[4]

**\*4** The issue before the Court is whether Plaintiffs have adequately pleaded their *prima facie* case. Defendants move to dismiss Plaintiffs' claims on the ground that Plaintiffs have not alleged the first element—that they hold a religious belief that conflicts with the vaccination requirement. Specifically, Defendants contend that Plaintiffs have failed to show that their objections to the vaccine requirement are based on a "sincerely held" religious belief or practice. *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 142–43 (4th Cir. 2017).

As Defendants point out, Title VII does not protect just any belief. To be protected, an employee's belief must be religious in nature. *McManus v. Bass*, No. 2:05-cv-117, 2006 WL 753017, at \*4 (E.D. Va. Mar. 21, 2006) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("*Yoder*"); *see also Holt v. Hobbs*, 574 U.S. 352, 360–61, 135 S.Ct. 853, 190 L.Ed.2d 747 (2015) (noting, in the First Amendment context, that a "request for an accommodation must be sincerely based on a religious belief and not some other motivation"). Of course, courts are in no position to "question the centrality of particular beliefs or practices of faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). Indeed, the determination of whether a plaintiff's beliefs are religious must not turn upon a judicial perception of the belief or practice in question. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *see also United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (noting that courts are not free to reject beliefs because they consider them "incomprehensible"). The Court must therefore determine whether the Plaintiffs' purported beliefs are both (1) "sincerely held" and (2) "religious" in nature. *Welsh v. United States*, 398 U.S. 333, 339, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

### i. Sincerity

To start, the Court finds that each Plaintiffs' beliefs are sincerely held as there is no evidence introduced at this stage of the proceedings that suggests that the beliefs have been concocted for litigation or are otherwise disingenuous.[5] For that reason, the Court will direct its focus to the question of religiosity.

### ii. Religiosity

However, the Court will nonetheless reject all but one of Plaintiffs' claims as it finds that they are not rooted in concerns that are religious in nature.

Whether one's beliefs and practices are religiously motivated is of course a difficult question for courts of law to decide. *Doswell v. Smith*, 139 F.3d 888 (4th Cir. 1998). For that reason, courts must be sure to avoid any "predisposition toward conventional religions" as to ensure that unfamiliar or unconventional beliefs are not incorrectly labeled as "secular." *Id.* (citing *Africa v. Pennsylvania*, 662 F.2d 1025, 1031 (3d Cir. 1981)). Still, "the very concept of ordered liberty precludes allowing every person to make his [or her] own standards on matters of conduct in which society as a whole has important interests." *Yoder*, 406 U.S. at 215–16, 92 S.Ct. 1526. Indeed, "[a] system of religious beliefs, however, is distinct from a way of life, even if that way of life is inspired by philosophical beliefs or other secular concerns." *Versatile v. Johnson*, No. 3:09-cv-120, 2011 WL 5119259, at \*4 (E.D. Va. Oct. 27, 2011) (internal quotation omitted). Thus, in determining whether an employee's beliefs are religious in nature, courts have analyzed whether the beliefs in question (1) "address fundamental and ultimate questions having to do with deep and imponderable matters," (2) are "comprehensive in nature," and (3) "are accompanied by certain formal and external signs." *Africa*, 662 F.2d at 1032.[6] It is also worth noting that the religiosity inquiry is a necessarily individualized one. *Cf.* EEOC Compliance Manual at § (a)(1) (explaining that deciding whether a belief or practice is religious requires a "case-by-case inquiry"); *see also Dachman v. Shalala*, 9 F. App'x 186, 191-93 (4th Cir. 2003) (holding that an employee was required to accommodate a plaintiff who requested time off to observe the sabbath but noting that the same would not be true if the plaintiff's request

was spurred by secular obligations like household chores). Therefore, the Court will separately evaluate the claims raised by each of the three Plaintiffs.

### a. Body-as-a-Temple Claims

**\*5** ***Ellison.*** In Ellison's request for exception, he claims that, as a Christian, he has a right to refuse the vaccine. Specifically, he claims that the Bible requires Christians to treat their bodies as "temple[s] of the Holy Spirit," meaning that he is "compel[led]" to care for his mind and body. Dkt. No. 40-3 at 3. [7] And because, in his view, taking the COVID-19 vaccine would "introduce to [his] body a medication that could induce harm," he claims that complying with the hospital's policy would be "antithetical to [his] desire to honor God." *Id.* Notably, Ellison supports his claim through references to his "personal analyses" of CDC and FDA databases that he believes prove that "there is a 28 times more likely chance of adverse reactions from the COVID-19 vaccines in the last 15 months, than from any of the other 50+ vaccinations." *Id.* Ellison also provided "supplemental information" four months after submitting his initial request to be exempted from the new policy. Dkt. No. 40-4 at 2. [8] In his renewed request Ellison first re-asserted the argument about his body being a temple and the need to keep it "protected and undefiled." *Id.* at 3. He also stated (for the first time) that he prayed about the vaccine and that "the answer that [God] revealed was that [he] must protect [his] temple from the vaccine and refuse it." *Id.*

Based on Ellison's own stated reason, the Court finds that, though couched in religious terms, Ellison refused the vaccines based on concerns of vaccine safety. District courts have routinely rejected similar claims. *See, e.g., Passarella v. Aspirus, Inc.,* Nos. 22-cv-342, 22-cv-392, 2023 WL 2455681, at \*2-7 (W.D. Wis. Mar. 10, 2023) (finding that exemption requests "predicated fundamentally on [ ] concerns with the safety of the vaccine and [plaintiffs'] right to bodily integrity"—even if based on the "belief that [plaintiff's] body is a temple" and "ratified by prayer"—are fundamentally "medical judgments ..., not matters of religious belief").

Accordingly, Ellison's body-as-a-temple claims will therefore be dismissed.

***Jenkins.*** Jenkins also claims that the Christian Bible requires him to treat his body as a "temple of the Holy Spirit." Dkt. No. 40-2 at 2. In his words, Jenkins believes that "it is a God-

given responsibility and requirement for [him] to protect the physical integrity of his Body." *Id.* And he further explained that he does so by "pray[ing] over every decision [he] make[s] concerning his body or [his] health" Dkt. No. 40-2 at 2.

That statement fails to establish a sincere religious objection under the *Africa* standard laid out above. Jenkins's belief that if, after his prayer, "God answers and interdicts [his] participation" (*id.*), amounts to the type of "blanket privilege" that undermines our system of ordered liberty. *Africa*, 663 F.2d at 1031. Certainly, if taken to its logical extreme, Jenkins's claim would serve as a "limitless excuse for avoiding all ... obligations." *See Finkbeiner v. Geisinger Clinic,* 623 F. Supp. 3d 458, 465 (M.D. Penn. 2022) (applying *Africa* and rejecting religious-discrimination claims concerning COVID-19 requirements because holding otherwise would "count everything [the plaintiff] believes about healthy living as religious practice").

Accordingly, Jenkins's body-as-a-temple claims will therefore be dismissed.

***Graham.*** Like Jenkins, Graham claims that "her faith requires her to refuse any particular form of medical treatment ... unless and until she has sought and received God's permission to accept it, through prayer." Am. Compl. ¶ 110. [9] However, like Jenkins's, that would confer the same sort of blanket privilege that courts must reject. *See Finkbeiner*, 623 F. Supp. 3d at 465.

**\*6** Accordingly, for the reasons discussed above, Graham's claims will also be dismissed.

### b. Abortion-Based Claims

***Ellison.*** Ellison's supplemental letter also included a paragraph concerning the use of "aborted fetal cell lines" in the development and testing of some of the vaccines. Dkt. 40-4 at 2. In that letter, he stated that he had a "sincerely held religious belief in the sanctity of human life" and that —because he "sincerely believe[d] that the use of these bodily remains renders these vaccines unclean,"—he could not comply with the policy for that reason. *Id.* [10]

With respect to this claim, the Court finds that Ellison has adequately linked his objection to a sincerely held religious belief. In his request, he refers to verses in the Christian Bible that, in his view, support the notion that "life begins

at conception," and he goes on to explain that, because "every life is sacred," "[a]ny action that would ... generate a future demand for fetal cell tissue, violates the core religious beliefs that [he] hold[s] dear." *Id.* Ellison continues that he believes his faith did not allow him to "benefit from a human being whose life was taken by the hands of another," and thus, in his view, receiving the vaccine would amount to sin. *Id.* Based on these statements, Ellison's exemption request provides sufficient allegations regarding his subjective personal beliefs, how those beliefs are related to his faith, and how those beliefs form the basis of his objection to the COVID-19 vaccination.

For that reason, that claim is adequate to survive a motion to dismiss. *See Aliano v. Twp. of Maplewood*, No. 22-cv-5598, 2023 WL 4398493, at *7 (D.N.J. July 7, 2023) (denying a motion to dismiss when the plaintiff identified the textual source of the anti-abortion belief and explained how their understanding of the verse led them to conclude that receiving the COVID-19 vaccine conflicted with their faith).[11]

**\*7** *Graham.* Graham also claims that her religious aversion to abortion prevents her from getting the COVID-19 vaccine. Am. Compl. ¶ 117. However, except for a single conclusory statement, Plaintiff has not shown how that aversion is based on Graham's religious beliefs. As explained above, plaintiffs must provide more than conclusory allegations that a belief is religious; they must allege facts explaining how a subjective belief is religious in nature and connect their objection to that belief.

Graham has not done so. The only information before the Court concerning her abortion-based objection to the vaccine is found in a single numbered paragraph of the Plaintiffs' Amended Complaint. *See* Am. Compl. ¶ 117 ("Ms. Graham also has religious objections to abortion, and to receiving vaccines that were testing [sic] or produced using materials derived from abortion."). That conclusory statement fails to provide a sufficient connection between Graham's objection to the COVID-19 vaccines—that they were "tested or developed using cell lines derived from aborted fetuses," *id.* ¶ 118—and her subjective religious beliefs. Graham did not provide any additional information regarding the nature of *her* Christian beliefs, including how receiving the COVID-19 vaccine would violate those beliefs. Again, before treating a belief as "religious," the Court must assess whether Graham's belief is based on her "own scheme of things"—regardless of what is widely accepted in her stated religion. *See Ambrose v. Gabay Ent & Assocs., P.C.*, No. 12-cv-5453, 2013 WL

4195387, at *3–5 (E.D. Pa. Aug. 15, 2013). It is Graham's *subjective* religious belief that is protected; and, for that reason, she must provide information concerning the religious nature of that belief and how it is connected to her objection to the COVID-19 vaccine. *See Blackwell v. Lehigh Valley Health Network*, No. 22-cv-03360, 2023 WL 362392, at *8 (E.D. Pa. Jan. 23, 2023) (dismissing a plaintiff's claims because the plaintiff "fail[ed] to plead any additional information about the religious nature of her beliefs" beyond identifying an organized religion she belonged to and claiming her objection arose from that organized religion).

Because Graham has failed to do so, her abortion-based claim will be dismissed. *See Aliano*, 2023 WL 4398493, at *10 (granting a motion to dismiss when a plaintiff alleged only that the vaccine contained fetal cell lines, that the plaintiff was a Roman Catholic, that abortion conflicted with Roman Catholic teachings, and that the COVID-19 vaccine therefore conflicted with their religious beliefs).

### 2. Virginia Human Rights Act

Plaintiffs also bring claims under the VHRA, claiming that Defendants violated the statute by not accommodating Plaintiffs' religious beliefs. Am. Compl. ¶¶ 229–56. However, as explained below, that statute does not require employers to provide such accommodations.

Unlike Title VII—which expressly allows plaintiffs to bring failure-to-accommodate claims against their employer—the VHRA does not contain any such language. *Compare* Va. Code § 2.2-3901(E) (VHRA's definition of religious discrimination); *with* 42 U.S.C. § 2000e(j) (Title VII's definition of religious discrimination); *see also* Dkt. No. 40 at 13 (Plaintiffs conceding that "the VHRA's definition of religion does not include the words 'reasonable accommodation' "). Instead, the statute prohibits employers only from taking adverse action against an employee based on their "outward expression of their religious faith." *See* Va. Code § 2.2-3901(E).

**\*8** Despite the law's silence on the issue, Plaintiffs contend that this prohibition necessarily requires employers to accommodate religious exercise. Dkt. No. 40 at 12. However, reading such a requirement into the statute would run counter to the traditional methods of statutory construction. *Cf. Bates v. United States*, 522 U.S. 23, 29, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997) (noting that courts should "resist reading

words or elements into a statute that do not appear on its face"). Moreover, in addition to noting what the Virginia General Assembly did not say, the Court acknowledges what it did. Before amending the section pertaining to religious discrimination (in 2022), the state legislature added language that unambiguously gave pregnant employees (in 2020) and disabled employees (in 2021) the right to bring failure-to-accommodate claims against their employers. *See* Va. Code § 2.2-3909 (pregnancy); Va. Code § 2.2-3905.1 (disability). And—as the Fourth Circuit has explained—"where [the legislature] includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that [the legislature] acts intentionally and purposefully in the disparate inclusion or exclusion." *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). With that guidance, the Court is not free to adopt Plaintiffs' construction of the law at issue. Not only is the burden to accommodate Plaintiffs' religious beliefs not apparent on the face of the statute, but Virginia's legislature has made the deliberate decision not to create such a requirement—despite having done so in other sections of the same statute.

Therefore, Plaintiffs' VHRA claims will be dismissed. [12]

### B. Plaintiffs' Contract Claims

The Permanent Exemption Class's claims fail as well. Ellison, Jenkins, and the putative members of their class allege that Defendants were contractually obligated to honor the "permanent" exemptions that the employees were given under the original vaccination policy and that Defendants breached that contract when they revoked those exemptions. Am. Compl. ¶¶ 257–64. Alternatively, Plaintiffs contend that, even if granting the exemptions did not create an enforceable contract, Defendants are nonetheless liable under equitable promissory estoppel principles. Am. Compl. ¶ 262. Neither theory holds up under scrutiny.

### 1. Breach-of-Contract

To support a breach-of-contract claim under Virginia law, a plaintiff must sufficiently plead that (1) the defendant had a legally enforceable obligation, (2) the defendant failed to perform that obligation, and (3) the plaintiff was harmed as a result. *See Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 784 S.E.2d 296, 299 (Va. 2016). However, because the Court

finds that Plaintiffs fail to satisfy the first element, it will not reach the second or third.

Forming a contract (*i.e.*, the "legally enforceable obligation") requires three basic ingredients: offer, acceptance, and consideration. *See Jones v. Peacock*, 267 Va. 16, 591 S.E.2d 83, 87 (Va. 2004). And although the Court notes that Plaintiffs have not adequately alleged any of the three requirements, today's opinion will address only Plaintiffs' failure to show that they provided valuable consideration.

**\*9**  Plaintiffs assert that a contract was formed when Defendants offered "permanent" exemptions from the vaccine requirement and employees accepted that offer by continuing to work for the hospital. Am. Compl. ¶ 32. However, even accepting those allegations as true, the very essence of a contract is that it places bilateral obligations on the parties to that agreement. *C.G. Blake Co. v. W.R. Smith & Son*, 147 Va. 960, 133 S.E. 685, 688 (Va. 1926) ("[A] contract implies mutual obligations."). In other words, the consideration element generally requires a finding that each party agreed to take on a legal obligation (*i.e.*, do something that they were not already required to do). *See* Restatement (Second) of Contracts § 71 ("To constitute consideration, a performance or a return promise must be bargained for. A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."); *see also Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256 (N.Y. 1891) (foundational case on the consideration requirement). As such, the Court must determine what obligations (if any) Plaintiffs took on in exchange for Defendants' alleged promise to permanently exempt the employees from the hospital's vaccination requirement. Having carefully reviewed the allegations in the Amended Complaint, the Court finds that there were none.

Plaintiffs suggest that there was consideration because they implicitly agreed to continue working for Inova and not to pursue employment elsewhere. Dkt. No. 40 at 17–19. However, even if that was enough to establish consideration, it is difficult to reconcile that legal theory with the facts of this case. Again, parties must take on *new* obligations. Plaintiffs here have not.

Under Plaintiffs' theory of consideration, they provided consideration by continuing to work for the hospital. *Id.* However, before the exemptions were provided, Plaintiffs were under no obligation to continue reporting to work

and Inova could likewise terminate their employment at any point and for any reason. *See Giles v. Wines*, 262 Va. 68, 546 S.E.2d 721, 723 (Va. 2001) ("In Virginia, an employment relationship is presumed to be at-will ... and may be terminated by the employer or employee for any reason upon reasonable notice."). And, Plaintiffs concede that, after the exemptions were provided, "[t]here would be no remedy [if employees stopped reporting to work after receiving an exemption] because [exempted employees] were not obligated to do that." Dkt. No. 44 at 46:19–20. [13] Thus, because Plaintiffs remained free to unilaterally sever the employment relationship both before and after the alleged agreement, the Court finds that they did not provide the consideration necessary to create a binding agreement. [14] And because the Court finds that any agreement between the parties was not supported by valuable consideration, it must also conclude that Plaintiffs' breach-of-contract claims fail to provide a basis for relief.

**\*10** Plaintiffs' breach-of-contract claims will therefore be dismissed.

### 2. Promissory Estoppel

Pleading in the alterative, Plaintiffs also argue that Defendants were nonetheless obligated to honor the "permanent" exemptions under the doctrine of promissory estoppel. Generally, that common law doctrine is rooted in equitable principles and prevents a defendant from backing out of promises—even though that promise did not create a binding contract. And in Virginia, "[t]he cause of action based on promissory estoppel consists of four elements, recently defined as: (1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee." *Mongold v. Woods*, 278 Va. 196, 677 S.E.2d 288, 292 (Va. 2009).

On this front, Plaintiffs argue that, by issuing "permanent" exemptions, Defendants created the expectation that Plaintiffs' employment relationship with the hospital would be terminated only for cause in exchange for the employees not seeking jobs elsewhere. Am. Compl. ¶ 262. However, under Virginia law, there is a strong presumption against such for-cause relationships and in favor of at-will employment. *See Norfolk S.R. Co. v. Harris*, 190 Va. 966, 59 S.E.2d 110, 114 (Va. 1950) ("It is settled doctrine in [Virginia] that where no specific time is fixed for the duration of an employment,

there is a rebuttable presumption that it is an employment at will, terminable at any time by either party."). Thus, in the absence of a clear agreement to the contrary, courts are to presume that all employment is terminable at the will of either party. *See Norfolk*, 59 S.E.2d at 114; *see also Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E. 2d 915, 917–18 (Va. 1987) ("[A] pleading seeking to recover damages for the termination of a contract of employment, the terms of which give rise to no fair inference of a specific period for its intended duration, and which is not supported by any substantial additional consideration ... is demurrable.").

Plaintiffs do not provide any evidence of such an agreement in this case. Instead, they suggest that the agreement was "understood" as Defendants' attempt to induce the employees to keep working for the hospital. *See* Am. Compl. ¶ 261; Dkt. No. 40 at 17. However, that is not enough. Considering the presumption that must be applied, Plaintiffs fail to establish that Defendants could *reasonably* expect the employees to believe not only that their employment conditions were substantially altered, but that the hospital would do so implicitly.

Because the doctrine of promissory estoppel requires such a showing, Plaintiffs' promissory estoppel claims must therefore be dismissed.

### C. Class Claims

Finally, Plaintiffs' class allegations will be stricken. Under Rule 23, one or more members of a putative class may sue as representative parties on behalf of all if they satisfy the following threshold requirements: (1) numerosity; (2) commonality; (3) typicality; (4) adequacy of representation, and (5) ascertainability. *See Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021) (citing Fed. R. Civ. P 23(a)). Once those threshold requirements are met, putative class members must also satisfy Rule 23(b) by showing that either: (a) individual actions would risk inconsistent or non-dispositive judgments, (b) that they are seeking class-wide injunctive or declaratory relief, or (c) that there are common legal or factual questions that predominate over any other concerns affecting individual members. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003) (citing Fed. R. Civ. P. 23(b)).

**\*11** Moreover, the Supreme Court has made clear that it is "quite obvious[ ]" that "the mere claim by employees of the same company that they have suffered a Title VII injury ... gives no cause to believe that all their claims can productively be litigated at once." *Wal-Mart*, 564 U.S. at

*Ellison v. Inova Health Care Services, Slip Copy (2023)*

350, 131 S.Ct. 2541; *see also Adams v. Bethlehem Steel Corp.*, 736 F.2d 992, 995 (4th Cir. 1984) ("In a very broad and loose sense, any member of any [protected] class who [allegedly] suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but clearly that is not [grounds to permit a matter to proceed as a class action].").[15] And most relevant to this case, The Fourth Circuit has explained that:

> As the statutory language of [Title VII] makes clear, this is not an area for absolutes. Religion does not exist in a vacuum in the workplace. Rather, it coexists, both with intensely secular arrangements such as collective bargaining agreements and with the intensely secular pressures of the marketplace. Hence the import of the statutory term "accommodate." The provision's use of the terms "reasonably" and "undue hardship" likewise indicates that this is a field of degrees, not a matter for extremes. Both terms are "variable ones," dependent on the extent of the employee's religious obligations and the nature of the employer's work requirements.

*Firestone Fibers*, 515 F.3d at 312.

With that in mind, the Court finds that—because it is clear that Plaintiffs cannot satisfy Rule 23's "commonality" element—Plaintiffs cannot pursue their lone remaining claim (failure to accommodate abortion-based objections to the vaccine policy, *see supra* pp. 10–11) on a class basis.

To establish commonality, a plaintiff must show their claims depend upon a common contention that makes class-wide resolution possible—*i.e.*, the putative class must share a question whose answer will resolve an issue that is central to the validity of each employees' claims in one stroke. *See Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021) (citing *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541). However, the Court notes that, given the personal nature of religious beliefs, Plaintiffs' claims do not lend themselves to

common resolution. *See* EEOC Compliance Manual § 12(A) (1) (explaining that determining whether a belief or practice is religious "is [ ] a situational, case-by-case inquiry"); *id.* ("The same [belief or practice] in one case might be subject to reasonable accommodation under Title VII because an employee engages in the [belief or] practice for religious reasons, and in another case might not be subject to reasonable accommodation because the practice is engaged in for secular reasons."); *see also* EEOC Compliance Manual § 12(A) (3) (explaining that "where an alleged religious observance, practice, or belief is at issue, a case-by-case analysis is required"). Specifically, Plaintiffs' failure-to-accommodate theory would require the Court to ask whether each putative class member's abortion-based objection to the COVID-19 vaccine was based on *their own* religious beliefs. *See Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15. As exemplified both above and in the caselaw, the answer to that question may vary from person to person. *See supra* Part III(A)(1)(ii)(b) (finding that, while Ellison's abortion-based objections to the COVID-19 vaccine were religiously based, Graham's facially identical objections were not); *see also Aliano*, 2023 WL 4398493, at *7–10 (finding that one plaintiff's abortion-based objections to the COVID-19 vaccine were based on their religion but another plaintiff's abortion-based objections to the COVID-19 vaccine were not).

**\*12** Given that these critical questions must be answered on an individualized basis, the Court concludes that it is apparent from the Amended Complaint that the purported class cannot be certified. Plaintiffs' class allegation will therefore be stricken from the Amended Complaint. *See Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541 ("Dissimilarities within the proposed class" often "impede the generation of common answers.").

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss or, in the alternative, Motion to Strike Class Claims (Dkt. No. 37) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that Count I is **DISMISSED** only as to Plaintiffs Jenkins and Graham; it is further

**ORDERED** that Count II is **DISMISSED** as to all Plaintiffs; it is further

**ORDERED** that Count III is **DISMISSED** as to all Plaintiffs; and it is further

**ORDERED** that Plaintiffs' class allegations (¶¶ 179–200) are **STRICKEN** from Plaintiffs' Amended Complaint.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6038016

---

## Footnotes

1    The order docketed at ECF No. 48 remains unchanged.

2    There is a dispute about Graham's exhaustion of her claims concerning the termination of her employment. *See* Dkt. No. 38 at 11. However—because exhaustion is not a jurisdictional bar under Title VII, *see Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), and because, for the reasons below, the Court will dismiss those claims on their merits—the Court need not address Defendants' exhaustion arguments.

3    On June 30, 2023, Plaintiffs submitted a Notice of Supplemental Authority, bringing *Groff* to the Court's attention. *See* Dkt. No. 46. While the Court recognizes that the case represents the Supreme Court's most recent decision on the issue of Title VII religious discrimination, the Court concludes that *Groff* does not have any bearing on the resolution of the instant motion. That decision, however, may become relevant at the summary judgment stage, when the Court will evaluate whether accommodating Ellison's request would have placed an undue burden on Defendants. *See generally Groff*, 600 U.S. 447 (slip op.) (evaluating the "undue burden" standard that is triggered only after a plaintiff makes a *prima facie* showing of discrimination).

4    The second and third prongs of this test are not at issue in this case. There is no dispute that Plaintiffs brought their objections to the vaccination requirement to the hospital's attention by submitting exemption requests. It is undisputed that Plaintiffs faced adverse employment action because of their decisions to remain out-of-compliance with the policy after their exemption requests were denied. The Court's analysis will focus only on the first question: whether Plaintiffs had a bona fide religious belief that conflicted with Inova's vaccination requirement.

5    In their papers, Defendants point out that, when the vaccine requirement was first implemented, Graham requested a temporary *medical* exemption based on her intention to get pregnant in the immediate future. *See* Am Compl. ¶ 119. In their view, that alone is reason to doubt the sincerity of her present assertion that she objects to the hospital's policy on religious grounds. *See* Dkt. No. 38 at 16–17. However—considering both the procedural posture of this case and its rejection of Graham's claims under the "religiosity" prong—the Court will take Graham at her word.

6    *Africa* is a non-binding decision from the Third Circuit. However, although the Fourth Circuit has not formally adopted the standard, both this Court and the appellate court have cited *Africa* with approval when describing the "useful indicia" for evaluating whether beliefs are religious rather than secular. *See, e.g.*, *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986); *Versatile v. Johnson*, No. 3:09-cv-120, 2011 WL 5119259, at *5 (E.D. Va. Oct. 27, 2011), *aff'd*, 474 F. App'x 385 (4th Cir. 2012). The Court also notes that neither party objects to the use of the standard laid out in *Africa*. *See* Dkt. No. 44 at 18:11–15 (Defendants agreeing that *Africa* sets out the appropriate test at oral argument); *id.* at 53:13–15 (Plaintiffs acquiescing).

7    Generally, at the motion to dismiss stage, court are limited to considering only the allegations contained in the plaintiff's complaint. However, because the Amended Complaint expressly refers (and thus incorporates) to Plaintiffs' exemption requests, the Court is free to consider them at this stage. *See A.C. v. Henrico Cnty. Sch. Bd.*, 610 F. Supp. 3d 857, 860 (E.D. Va. 2022) (noting that courts may consider documents that are either explicitly incorporated into the complaint by reference or those attached to the complaint as exhibits).

8    Ellison claims that felt compelled to submit a new letter after concluding that the medical and scientific concerns in his earlier request "may have overshadowed [his] primary religious convictions." Dkt. No. 40-4 at 2.

9    Graham's exemption request is not a part of the record. For that reason, the Court will evaluate the reasons given solely in the Amended Complaint.

10   In support of this contention, Ellison cites Romans 14:14 of the Christian Bible which states that: "I know, and am persuaded by the Lord Jesus, that there is nothing unclean of itself: but to him that esteemeth anything to be unclean, to him is unclean."

11   The Court notes the similarity between abortion-based objections to the contents of the most accessible COVID-19 vaccines and other faith-based objections to other vaccines or other medicines that contain ingredients derived from pork, beef, or other animal products. *See* Tara M. Hoesli, et al., *Effects of Religious and Personal Beliefs on Medication Regimen Design*, 34 Orthopedics 292, 292 (2011) (noting that "[m]ore than 1000 medications contain inactive ingredients derived from pork or beef, the consumption of which is prohibited by several religions"). For that reason, courts faced with those questions have held that faith-based objections to medications based on their ingredients are a proper basis for Title VII relief. *See, e.g., Haley v. Cmty. Hosp.*, No. 2:21-cv-141, 2023 WL 403722, at *6 (N.D. Ind. Jan. 25, 2023) (finding that a plaintiff stated a *prima facie* case for religious discrimination when he refused to take the influenza vaccine due to concerns that it contained pork products or other unclean ingredients that conflicted with his religious beliefs).

That said, the Court also notes that—just as non-porcine and non-bovine alternatives are being made available to avoid the problems with religious-based objections to pork and beef—COVID-19 vaccines that were not developed using fetal cell lines have been available for more than a year. *See* U.S. Food and Drug Administration, FDA Authorizes Emergency Use of Novavax COVID-19 Vaccine, located at: *https://tinyurl.com/yu85kdmk* (July 13, 2022). However—although an employer would need only widen its list of accepted vaccinations to include the non-objectionable vaccines in order to accommodate an employee's abortion-based aversion to the COVID-19 vaccine today—Defendants' policy in this case required that hospital employees receive a vaccine manufactured by Pfizer, Moderna, or Johnson & Johnson. Am. Compl. ¶ 25. For that reason, the Court concludes, at this stage in the proceedings, that Ellison has adequately alleged the policy at issue conflicted with his sincerely held religious beliefs.

12   This decision is also consistent with those of other federal district courts that have faced similar claims brought under similar anti-discrimination laws:

As discussed in the parties' briefing and at the May 26 hearing, the District of Minnesota has held that —because "[i]n contrast [to Title VII], the [Minnesota statute] ... does not include any language requiring an employer to provide any religious accommodation" and because of "the [Minnesota statute]'s explicit requirement to provide one type of accommodation (disability) but not the other (religion)"—the plaintiff's failure-to-accommodate claims were not cognizable. *See Aronson v. Olmsted Med. Ctr.*, No. 22-cv-1594, 2023 WL 2776095, at *3–5 (D. Minn. Apr. 4, 2023) (COVID-19 vaccination case).

And as pointed out in Defendants' Notice of Supplemental Authority (Dkt. No 47), the Western District of Tennessee has also held that—because the "language of the [Tennessee law] differed from that found

in Title VII" and "there is no explicit language in the [Tennessee law] imposing a duty to accommodate religious beliefs"—the court would not read such a requirement into the statute. *Johnson v. Tyson Foods, Inc.*, No. 21-cv-1161, 2023 WL 3901485, at *3–4 (W.D. Tenn. June 8, 2023) (COVID-19 vaccination case).

13   This fatal concession came when Plaintiffs' counsel was pressed on the issue at the Court's May 26 hearing.

14   Fighting this conclusion, Plaintiffs cite a string of cases that purportedly support a finding that Plaintiffs' decision to continue working at Inova was enough consideration to support the contract. However, contrary to Plaintiffs' strained readings of those cases, they are distinguishable or otherwise unpersuasive.

For example, Plaintiffs erroneously rely upon *Larkman v. Dynalectron Corp.* for the assertion that "[a]n employee's continued employment" is sufficient consideration to rebut a presumption of at-will employment. 831 F.2d 291, 291 (4th Cir. 1987). However, *Larkman* stands for the proposition that, when the promise of a *certain, fixed period* of employment is in dispute, the employee may present evidence of an implied contract where their continued employment serves as consideration. *See id.* That makes *Larkman* different than this case, where it would be irrational to presume that both parties understood use of the word "permanent" as transforming the nature of employment by creating a promise to employ Plaintiffs "permanently."

Plaintiffs similarly mischaracterize *Barger v. Gen. Elec. Co.*, 599 F. Supp. 1154 (W.D. Va. 1984). *Barger* and the cases it cites focus on *explicit* promises where an employee *expressly* agreed that they would continue working in exchange for the benefit. *Id.* at 1160 (citing *Kiser v. Amalgamated Clothing Workers*, 169 Va. 574, 585, 194 S.E. 727 (1938) *and Sea-Land Serv., Inc. v. O'Neal*, 224 Va. 343, 297 S.E.2d 647 (1982)). Here, Plaintiffs made no such promise.

15   The current stage of the proceedings is not lost on the Court. Although the Court does not have the benefit of the discovery, there are times that the issues are clear enough at the pleading-stage to determine that a case is not appropriate for class relief. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting that "[s]ometimes the issues are plain enough from the pleadings" to make class determinations); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 109–10, 116 (4th Cir. 2013) (affirming dismissal of class allegations in complaint that were "insufficient to satisfy the commonality standard set forth in *Wal-Mart*"); *Knapp v. Zoetis, Inc.*, No. 3:20-cv-191, 2021 WL 1225970, at *10 (E.D. Va. Mar. 31, 2021) (noting that a court may grant a motion to strike class certification before discovery if the "allegations are facially and inherently deficient")

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3390820
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Justin FRIEND, Plaintiff,

v.

ASTRAZENECA
PHARMACEUTICALS LP, Defendant.

Civil No. SAG-22-03308
|
Signed May 11, 2023

**Attorneys and Law Firms**

Francis J. Collins, Kahn Smith and Collins PA, Baltimore, MD, for Plaintiff.

Lincoln Owens Bisbee, Daniel A. Kadish, Pro Hac Vice, Sara E. DeStefano, Pro Hac Vice, Morgan Lewis and Bockius LLP, New York, NY, Stephen Kemp Dixon, Morgan, Lewis & Bockius LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

Stephanie A. Gallagher, United States District Judge

**\*1** Plaintiff Justin Friend ("Plaintiff") filed a Complaint against his former employer, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), alleging religious discrimination and violations of the Americans with Disabilities Act ("ADA"). ECF 1. AstraZeneca has filed a Motion to Dismiss for failure to state a claim. ECF 17. This Court has reviewed that motion, along with the opposition and reply. ECF 24, 33. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, this Court will grant AstraZeneca's Motion to Dismiss, ECF 17, and accordingly will deny Plaintiff's motion to consolidate this case with another pending action, ECF 27.

### I. FACTUAL BACKGROUND

The facts contained herein are derived from Plaintiff's Complaint and taken in the light most favorable to Plaintiff as the non-moving party. Plaintiff began working at AstraZeneca in March, 2020 as a Senior Facilities Engineer of Operations. ECF 1 ¶ 2. He originally worked remotely for several months until he reported back to the workplace part-time. *Id.* ¶¶ 24-25. In August, 2021, AstraZeneca implemented a COVID-19 vaccination requirement for all U.S. employees. *Id.* ¶ 2.

The requirement allowed accommodations for employees who averred that they could not be vaccinated for medical, religious, or "other" reasons. *Id.* Under that requirement, when claiming an accommodation, Plaintiff selected "other." *Id.* ¶ 16. Beginning in 2022, however, AstraZeneca required its employees to submit written proof of (1) vaccination or (2) a necessary medical or religious exemption. *Id.* ¶ 3. "Other" was no longer a permissible category for accommodation.

In February, 2022, Plaintiff requested a religious exemption from the vaccination requirement, using AstraZeneca's Religious Reasonable Accommodation Request Form. *Id.* ¶¶ 4, 18. On the form, when asked for the nature of his objections to the vaccine requirement, Plaintiff wrote: "The current vaccines available are only in the Emergency Use Authorization (EUA) state. Recent data shows that the efficacy of the current vaccines is low, specifically for an individual as myself whom has tested positive prior and contains antibodies granting natural immunity against" COVID-19. ECF 17-2. AstraZeneca responded with an email denying his exemption request, stating that Plaintiff was, "among other reasons ... not qualified for a reasonable accommodation." ECF 1 ¶ 22. AstraZeneca provided no further elaboration or opportunity to appeal. *Id.* Instead, AstraZeneca terminated Plaintiff's employment on April 29, 2022. *Id.* ¶ 29.

Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") in August of 2022, alleging unlawful religious discrimination, and in December of 2022, alleging disability discrimination. *Id.* ¶¶ 11, 13. He received right to sue letters in response to both charges. *Id.* ¶¶ 12, 14. This lawsuit ensued.

### II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

**\*2** Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of

Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions[.]" (quotation omitted)); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Here, AstraZeneca attached Plaintiff's Religious Reasonable Accommodation Request Form to its motion. ECF 17-2. AstraZeneca notes that the form is incorporated into Plaintiff's Complaint by repeated reference. *See, e.g.*, ECF 1 ¶¶ 19, 41. Federal courts may consider documents incorporated into a complaint by reference without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Specifically, the Court may consider documents attached to motions to dismiss as long as they are "integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Here, Plaintiff has not contested the authenticity of the Accommodation Request Form and refers to it in the Complaint as the premise for his religious discrimination and disability discrimination claims. The form and its contents can therefore be properly considered at the motion to dismiss stage, without converting this motion into one for summary judgment.

## III. ANALYSIS

### A. Religious Discrimination (Count One)

**\*3** Plaintiff claims religious discrimination pursuant to Title VII of the Civil Rights Act of 1964 because AstraZeneca failed to accommodate his religious objection to vaccination. The elements of such a claim require a Plaintiff to plead facts plausibly suggesting "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting *Philbrook v. Ansonia Bd. Of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)); *see also Booth v. State of Maryland*, 337 F. App'x 301, 308-309 (4th Cir. 2009). While Plaintiff's Complaint asserts that he "had bona fide religious beliefs that conflicted with AstraZeneca's COVID-19 vaccine mandate," ECF 1 ¶ 36, it alleges no facts to allow this Court to assess what Plaintiff's religious beliefs are and how they conflict.

Even more importantly, when considering a motion to dismiss pursuant to Rule 12(b)(6), the court accepts a plaintiff's well-pleaded allegations as true except where they are contradicted by an exhibit. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). While Plaintiff asserts that he "informed AstraZeneca of this belief in his request for religious accommodations," ECF 1 ¶ 37, on its face, Plaintiff's form makes no reference to any religious belief or basis for his exemption request. Rather, it cites his views on the effectiveness of the vaccine and the current status of its FDA approval. ECF 17-2. And he expressly declines in the form to provide any information about his religious beliefs or the way in which they might conflict with the vaccine policy. *See id.* ("Disclosure of the extent of my Religious practice is not employer privileged information. My conscious mind allows for rational decision making and practicing my own beliefs...."). These types of assertions (which are little more than a declaration that Plaintiff has the right to make his own decisions) do not constitute religious beliefs, even where religion is more expressly invoked. *See, e.g.*, *Finkbeiner v. Geisinger Clinic*, Civ. No. 4:21-CV-01903, 2022 WL 3702004, at *4 (M.D. Pa. Aug. 26, 2022) (granting motion to dismiss a religious accommodation claim based on Plaintiff's assertion of a "God given right to make her own choices" since such a position, if deemed a bona fide religious belief "would amount to a blanket privilege and a limitless excuse for avoiding all unwanted obligations" (cleaned up)); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 200 F. Supp. 3d 553, 560-61 (E.D. Pa. 2016), *aff'd*, 877 F.3d 487 (3d Cir. 2017) (rejecting assertions that an objection to vaccination based on safety and efficacy concerns, along with a contention that consenting to vaccination would violate his conscience about right and wrong, amounted to religious beliefs).

Ultimately, because Plaintiff's form failed to document or to inform AstraZeneca about any religious beliefs, AstraZeneca cannot have failed to accommodate them. [1] *Cary v. Carmichael*, 908 F. Supp. 1334, 1344 (E. D. Va. 1995)*, aff'd sub nom. Cary v. Anheuser-Busch, Inc.*, 116 F.3d 472 (4th Cir. 1997) ("If an employer has not been given adequate notice of an employee's religious conflict, then *ipso facto* the religious animus that the statute was designed to prevent cannot have existed."). In the absence of any other allegations that Plaintiff's religious beliefs were communicated to AstraZeneca in some other fashion, his religious discrimination claim must be dismissed.

## B. ADA Claims

### 1. "Regarded as Disabled" Claim (Count Three)

**\*4** Plaintiff's Complaint contains two claims for violation of the ADA. Initially, this Court must address a threshold issue: Does Plaintiff qualify for the ADA's protections?

The ADA protects qualified individuals with a disability. "An individual is disabled under the ADA ... if he or she: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Davis v. University of North Carolina*, 263 F.3d 95, 99 (4th Cir. 2001) (citations omitted); *see also* 42 U.S.C. § 12102(1). "An impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Examples of "major life activities" include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." *Id.* § 1630.2(i)(1)(i). Ultimately, "[t]he determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (citations omitted).

Plaintiff asserts in his Complaint that he is "regarded as" having a disabling condition by AstraZeneca in that AstraZeneca "regarded him as disabled because he had the medical status of being unvaccinated." ECF 1 ¶ 54. That position is unavailing. Initially, Plaintiff has not alleged facts showing he was regarded as having any physical or mental impairment that substantially limits a major life activity. Plaintiff suggests that society has imposed limitations on the major life activities of unvaccinated individuals by prohibiting them from entering facilities and participating in social events. *Id.* But any such limitations are caused by societal rules, not by the vaccination status of those subject to those rules. Vaccination status itself poses no hindrance to the performance of any tasks. *Jorgenson v. Conduent Transp. Sols., Inc.*, Civil No. SAG-22-01648, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023). And vaccination status stems from a personal choice, not from a physical or mental impairment. *See, e.g.*, *Speaks v. Health*

*Sys. Mgmt. Inc.*, Civ. No. 22-CV-00077, 2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022) (noting that refusing to get an employer-mandated vaccine reflects a personal choice and is not an " 'impairment' of any sort"); *Johnson v. Mount Sinai Hosp. Grp., Inc.*, Civ. No. 22-CV-2936-AMD, 2023 WL 2163774, at *6 (E.D.N.Y. Feb. 22, 2023) ("The decision to vaccinate or not to vaccinate is a personal choice, while a disability under the ADA is not something a person chooses.")

Further, Plaintiff has alleged no facts indicating that AstraZeneca classified him or regarded him as having any impairment that limits a major life activity. Merely requiring Plaintiff to follow a COVID-19 policy applicable to all employees does not support the inference that AstraZeneca classified Plaintiff as disabled under the ADA. *See Speaks*, 2022 WL 3448649, at *5 (rejecting claim that defendant classified plaintiff as impaired under the ADA by requiring her to comply with a mandatory COVID-19 vaccination policy, because plaintiff's position "would mean that [defendant] considered all its employees to have an 'impairment,' which is of course not a plausible inference"). AstraZeneca's decision to protect its workplace by requiring vaccination does not plausibly reflect a determination or belief that any of its employees are disabled or impaired. *See id.*; *Jorgenson*, 2023 WL 1472022, at *4.

**2. Medical Examination or Inquiry Claim (Count Two)**

**\*5** The ADA subsections Plaintiff cites in Count Two, 42 U.S.C. § 12112(d)(4)(A) and 29 C.F.R. § 1630.13(b), prohibit an employer from requiring a medical examination or making inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity. AstraZeneca's inquiry about vaccination status, however, did not constitute a medical examination or an inquiry about a disability or disabling condition. As noted above, both vaccinated and unvaccinated people are able to perform their work and engage in major life activities without impairment or limitation. Thus, an inquiry about vaccination status does not implicate any disability. *See Jorgenson*, 2023 WL 1472022, \*5 (rejecting claim that requiring employees to

disclose their COVID-19 vaccination status violated Part 1630.13(b), because that requirement "did not constitute a medical examination or inquiry about a disability or disabling condition").The EEOC agrees with this analysis in its guidance:

> When an employer asks employees whether they obtained a COVID-19 vaccination, the employer is not asking the employee a question that is likely to disclose the existence of a disability; there are many reasons an employee may not show documentation or other confirmation of vaccination besides having a disability. Therefore, requesting documentation or other confirmation of vaccination is not a disability-related inquiry under the ADA, and the ADA's rules about making such inquiries do not apply.

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, at K.9, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K; *see also id.* at K.1 ("[T]he EEO laws do not prevent employers from requiring documentation or other confirmation that employees are up to date on their vaccinations."). The ADA subsections cited by Plaintiff, then, are inapposite and Count Two will also be dismissed.

**IV. CONCLUSION**
For the reasons set forth above, Defendant's Motion to Dismiss, ECF 17, will be GRANTED. [2] Plaintiff's motion to consolidate cases, ECF 27, will be denied as moot because this case will be CLOSED. A separate Order follows.

**All Citations**

Slip Copy, 2023 WL 3390820

### Footnotes

1      Plaintiff's attempt to frame this case as a failure by AstraZeneca to "start from the proposition that the employee's religious views were sincerely held," ECF 24-1 at 11, is unpersuasive. No religious views were communicated to AstraZeneca, so no determination could have been made regarding their sincerity. This case is therefore readily distinguishable from the line of cases Plaintiff cites, in which courts addressed whether the validity or sincerity of proffered religious beliefs could be determined at the motion to dismiss stage of the litigation. *See* ECF 24-1 at 14-18 (Plaintiff's brief discussing such cases).

2      While this Court declines to expressly foreclose amendment by dismissing Plaintiff's claims with prejudice, it notes the apparent futility of amendment absent (with respect to the religious discrimination claim) an allegation of some other communication of Plaintiff's religious beliefs to AstraZeneca prior to his termination. Any motion seeking leave to amend this Complaint must satisfactorily address this futility issue.

---

**End of Document**                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6214863
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lori GARDNER-ALFRED and Jeanette Diaz, Plaintiffs,
v.
FEDERAL RESERVE BANK
OF NEW YORK, Defendant.

22-cv-1585 (LJL)
|
Signed September 25, 2023

**Attorneys and Law Firms**

Andrew M. St. Laurent, Megan Elizabeth Dubatowka, Harris St. Laurent & Wechsler LLP, New York, NY, John G. Balestriere, Mandeep S. Minhas, Matthew William Schmidt, Balestriere Fariello, New York, NY, for Plaintiffs.

Daphne T. Ha, Katherine Rosemary Steele Landy, Alex Leonard, Federal Reserve Bank of New York, New York, NY, for Defendant.


OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

   *1    Plaintiffs Lori Gardner-Alfred and Jeanette Diaz ("Plaintiffs") bring claims against their former employer, the Federal Reserve Bank of New York (the "FRBNY," the "Bank," or "Defendant"), for the termination of their employment following their failure to comply with the requirement that employees be vaccinated against the Covid-19 virus. Dkt. No. 24. Plaintiffs claimed religious exemptions, which were denied by Defendant. Defendant moves, pursuant to Federal Rule of Civil Procedure 56, for an order granting it summary judgment and dismissing Plaintiffs' operative complaint. Dkt. No. 158.

For the following reasons, the motion for summary judgment is granted for each of Plaintiffs' claims.


**BACKGROUND**

The following facts are drawn from the parties' statements of material facts submitted pursuant to Local Rule 56.1 and the materials submitted in connection with the motion. Dkt. Nos. 164, 171-2, 175. The facts are undisputed unless otherwise indicated. The record is construed in favor of the nonmoving party.


**I. The Relevant Parties**
Defendant is an operating arm of the United States' central bank, the Federal Reserve System. Dkt. No. 164 ¶ 1; Dkt. No. 171-2 ¶ 1.

Plaintiff Lori Gardner-Alfred ("Gardner-Alfred") was an employee of the FRBNY for approximately thirty-six years, and held several titles over that time period, including, most recently, as a Senior Executive Specialist working for the FRBNY's Executive Vice President ("EVP") of People & Engagement. Dkt. No. 171-2 ¶ 86. In that position, she facilitated and coordinated communications between the EVP of People and Engagement and other areas of the FRBNY, maintained the EVP of People and Engagement's calendar, organized and scheduled meetings and events for the EVP of People and Engagement, electronically reserved conference rooms and video conference meetings for the EVP of People and Engagement, and coordinated travel and reimbursements for the EVP of People and Engagement. Dkt. No. 171-2 ¶ 89. Plaintiff Jeanette Diaz ("Diaz") began her employment with the FRBNY approximately twenty-nine years ago, held several titles over that time period, and most recently served as Senior Executive Specialist, providing direct administrative support to the EVP of Information Technology. Dkt. No. 171-2 ¶¶ 87–88. Diaz's job responsibilities were largely similar to Gardner-Alfred's. *Id.* ¶ 89.

As set forth below, Gardner-Alfred and Diaz were fired from their positions at the FRBNY on March 14, 2022. *Id.* ¶ 103.


**II. Defendant's Vaccination Policy**
The FRBNY has a Pandemic Steering Committee ("PSC") which acts as an incident response team during a pandemic event. Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5. The PSC was co-chaired by Lacey Dingman and Helen Muccioli, both of whom are members of Defendant's Executive Committee. Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5. The PSC met regularly starting in January 2020 to discuss the FRBNY's response to Covid-19. Dkt. No. 164 ¶ 5; Dkt. No. 171-2 ¶ 5. The FRBNY extensively monitored Covid-19 infection levels and medical guidance regarding Covid-19 throughout the pandemic. Dkt. No. 164 ¶ 6; Dkt. No. 171-2 ¶ 6. The PSC regularly reviewed compilations of relevant data that included, for example,

hospitalizations and intensive care unit statistics in New York City, local vaccination rates, the number of staff on-site, and reported Covid-19 infections among FRBNY employees. Dkt. No. 164 ¶ 7; Dkt. No. 171-2 ¶ 7. There were points of the pandemic when the number of reported infections among staff surged, including in late 2021, and compensating measures were required at times to continue workflows. Dkt. No. 164 ¶ 8; Dkt. No. 171-2 ¶ 8. Covid-19 has caused over 6.8 million deaths, with more than 755 million confirmed cases worldwide. Dkt. No. 164 ¶ 3; Dkt. No. 171-2 ¶ 3.

*2  At the onset of the COVID-19 pandemic in March 2020, Defendant implemented a remote work policy for its employees and most FRBNY employees, including Plaintiffs, began working remotely. Dkt. No. 171-2 ¶¶ 9, 94. On June 4, 2021, Defendant notified its employees that it would soon require them to return to office on a part-time basis. Dkt. No. 164 ¶ 10; Dkt. No. 171-2 ¶ 10; Dkt. No. 162-2. On August 2, 2021, Defendant announced it would be implementing a COVID-19 vaccination policy (the "Vaccination Policy") requiring every FRBNY employee to be fully vaccinated against Covid-19. Dkt. No. 164 ¶ 11; Dkt. No. 171-2 ¶ 11; *see also* Dkt. No. 160 ¶ 7; Dkt. No. 171-6 at ECF p. 3. The Vaccination Policy allows for certain religious and medical accommodations. Dkt. No. 164 ¶ 11; Dkt. No. 171-2 ¶ 11. Specifically, the Vaccination Policy states that accommodations "may be granted, as required by law, for employees unable to obtain a vaccine due to a medical condition or sincerely held religious belief that precludes receiving the COVID-19 vaccine." Dkt. No. 24-2. Further, the Vaccination Policy states that "[a]n employee requesting an accommodation based on religious belief must complete a religious accommodation request form and submit it to the People Relations team. The employee must clearly explain why receiving the COVID-19 vaccination would be contrary to their religious beliefs and may be required to provide supporting information." *Id.* The Vaccination Policy also notes that persons who do not comply may be terminated. *Id.* As stated in the FRBNY's Covid-19 Vaccine Policy Frequently Asked Questions, Defendant required vaccination because it determined that "[b]ased on the extensive medical data available, the most effective way to prevent getting or spreading COVID-19 is to get vaccinated," and "[i]n requiring vaccinations, [the FRBNY is] able to meet [its] goals of trying to keep everyone healthy while being able to continue operating despite the uncertainty the pandemic presents." Dkt. No. 164 ¶ 13; Dkt. No. 171-2 ¶ 13; *see also* Dkt. No. 160 ¶ 8.

Plaintiffs, however, declined to receive any vaccination against Covid-19 and asserted that their refusal was due to their religious beliefs. Dkt. No. 24 ¶ 1. Gardner-Alfred submitted a Notification of Vaccination Exemption ("Notification") by Affidavit on August 9, 2021. Dkt. No. 24-3; Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21. Diaz submitted a request for accommodation on September 1, 2021. Dkt. No. 24-4; Dkt. No. 171-2 ¶ 48. On October 1, 2021, Defendant informed both Plaintiffs that it was "temporarily" granting their requests for an accommodation through November 30, 2021, at which time it would reassess the request "to determine whether and how the Bank may be able to continue accommodating you at that time as we continue to evaluate health and safety conditions related to the pandemic that impact the Bank." Dkt. No. 24-5 at ECF p. 2–3.

On November 1, 2021, Defendant set a return to work date of January 10, 2022. Dkt. No 24-13 at ECF p. 19. On November 29, 2021, Defendant notified both Plaintiffs that their requests for an accommodation would not be granted once employees returned to the office, that their accommodations for the Vaccination Policy would end on January 7, 2022, and that if they did not receive a complete series of a Covid-19 vaccine by December 26, 2021, they would "receive additional information on [their] departure from the Bank ...." Dkt. No. 24-13 at ECF pp. 25, 48; Dkt. No. 164 ¶ 78; Dkt. No. 171-2 ¶ 78. Defendant stated that the temporary accommodation that previously had been granted to each Plaintiff had been reassessed "based on an evaluation of health, safety and population conditions related to the pandemic that impacts the mission of the Bank," including "the increasing number of employees returning to the Bank in January, the return of external visitors, and your essential job functions (including the frequency of your interaction with external visitors and others at the Bank and your proximity to others while conducting your job responsibilities)." Dkt. No. 24-13 at ECF pp. 25, 48; Dkt. No. 164 ¶ 78; Dkt. No. 171-2 ¶ 78. At the time the exemption requests were under consideration, the number of reported infections among staff was surging. Dkt. No. 164 ¶ 8; Dkt. No. 171-2 ¶ 8; Dkt. No. 160 ¶ 14.

Diaz responded to the notification by asking, among other things, whether if she showed proof of vaccination after December 26, 2021, and before January 7, 2022, she would still be terminated. Dkt. No. 24-13 at ECF p. 51. The FRBNY replied to Diaz on December 10, 2021, stating that Diaz could not be accommodated by permitting her to work remotely because some of her job duties required her to be physically

present at the FRBNY and "doing so poses increased safety risks to the Bank, and its employees, as well as to its external visitors, with whom your job requires you to have face-to-face interactions." *Id.* at ECF p. 56. The FRBNY requested that Diaz let it know whether she decided to become vaccinated but that if she did not become vaccinated on or after January 7, 2022, she would receive further information about her separation from the FRBNY. *Id.* The FRBNY repeated its position that Diaz could not be accommodated by remote work in communications on December 23, 2021, January 5, 2022, and February 3, 2022. *Id.* at ECF pp. 58, 60, 62. [1]

**\*3** In assessing religious accommodation requests under the Vaccination Policy, the FRBNY's People and Engagement Group assembled specific facts relevant to assessing the risk of Covid-19 spread and operational disruption posed by each individual who requested an accommodation. Dkt. No. 164 ¶ 61; Dkt. No. 171-2 ¶ 61. Personnel in the People and Engagement Group interviewed individuals relevant to assessing requests, including those who sought religious accommodations and their managers. Dkt. No. 164 ¶ 62; Dkt. No. 171-2 ¶ 62. The facts were contemporaneously recorded on an Excel spreadsheet. Dkt. No. 164 ¶ 62; Dkt. No. 171-2 ¶ 62. With respect to the question whether she would engage in any face-to-face interaction with others upon her return to the Bank, the Excel spreadsheet records for Gardner-Alfred that the FRBNY considered that Gardner-Alfred was expected to greet visitors to Dingman's tenth floor office, which was shared by Mucciolo and Mucciolio's executive assistant, and to escort visitors throughout the Bank. Dkt. No. 160-3 at ECF p. 5. The spreadsheet also indicated that Gardner-Alfred worked with other executive assistants on the tenth floor and routinely visited the second floor to engage with People and Engagement colleagues. *Id.* With respect to whether Gardner-Alfred would have individuals coming to her workspace or would be moving about the floor or floors and going to others' workspaces, it recorded: "Lori would have others coming to her workplace [sic], she would also be moving about the floor and other floors and also, on occasion, would need to go into a meeting with messages or to ask Lacey [Dingman]/ Matt [Wagner] to step out of a meeting for an urgent call or matter." *Id.* For the same questions, it recorded that Diaz "[p]rovides administrative support to Group Head; sits in a shared office suite with another Group Head and executive assistant. Interacts with visitors for both Group Heads in suite and other assistants on the 10th floor." *Id.* at ECF p. 2. It further recorded: "Other people would be coming to her workspace, and she would move around the 10th floor as well as other locations in the building. She may also need to

escort guests/visitors on the 10th floor and the building." *Id.* The Excel spreadsheet records for both individuals that the interactions were necessary for them to do their jobs. *Id.* at ECF pp. 2, 5.

The FRBNY has granted medical and religious accommodations to its Vaccination Policy. Dkt. No. 171-6 at ECF pp. 6–8. Other employees have worked from home in "special situations." *Id.* at ECF p. 10. Plaintiffs were the only Senior Executive Specialists who requested religious accommodations and both were informed that they could not be accommodated once employees returned to the office. Dkt. No. 164 ¶ 79; Dkt. No. 171-2 ¶ 79. No FRBNY employee who worked on the executive floor was granted a religious accommodation from the Vaccination Policy once employees returned to the office. Dkt. No. 164 ¶ 80; Dkt. No. 171-2 ¶ 80.

Because Plaintiffs continued to refuse to be vaccinated against COVID-19, their employment at the FRBNY was terminated on March 14, 2022. Dkt. No. 171-2 ¶ 103.

### III. Gardner-Alfred's Request for Religious Accommodation

Gardner-Alfred claims to be a member of the Temple of Healing Spirit, which is a belief system that she describes as "oppos[ing] the invasive techniques of traditional Western medicine." Dkt. No. 163-3 at 12; Dkt No 164 ¶ 16; Dkt. No. 171-2 ¶ 16; Dkt. No. 171-7 at ECF p. 3. For Gardner-Alfred, the Covid-19 vaccines and Covid-19 tests, by reasons of their "invasive," "Western," "foreign," and "mankind" nature, run counter to her religious beliefs. Dkt. No. 163-6 at 9, 16. She claims to believe in the sanctity of her body and that it should not be defiled. Dkt. No. 164 ¶ 17; Dkt. No. 171-2 ¶ 17. She also alleges that, because of her religious beliefs, she does not undergo invasive Western medical techniques or take medications, including Covid-19 vaccines, and cannot take Covid-19 tests. Dkt. No. 164 ¶ 18; Dkt. No. 171-2 ¶ 18.

Gardner-Alfred submitted to the FRBNY a Notification of Vaccination Exemption on August 9, 2021. Dkt. No. 24-3 at ECF p. 3. The request for accommodation contained a signed affidavit, dated August 7, 2023. *Id.*; Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21. That document contained a "Presentation of Facts" that first referenced the Free Exercise Clause of the First Amendment; the New York State Constitution; Title VII of the Civil Rights Act of 1964; Title 21 of the "Fed. Food Drug & Cosmetic Act," Title 18 U.S.C., Section 242 "Deprivation of Rights Under Color of Law"; and the Supreme Court Decision " 'Frazee v. Illinois / Dept. of Empl.

Security', 489 U.S. 829 (1989)." Dkt. No. 24-3 at ECF p. 3; *see also* Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21. It then stated, in part:

> I file by lawful Right this 'Notification of Vaccination Exemption' (by Affidavit)—exemption to include all vaccinations, all injections of foreign proteins, prophylaxis and testing, Tests for Diseases; ... which include (but are not limited to) any and all inoculations, Oral or Inhaled Vaccines, Epidermal Patches, and any other way(s) that live or killed Bacterium, Viruses ... obtained from human babies electively aborted; Pathogens, Germs, Animal and/or human DNA and related blood byproducts, or other natural or genetically engineered Microorganisms that would be introduced into or upon Me, because the practice of Vaccination (et.al [sic]) is contrary to My sincere and conscientiously held Religious Beliefs and Convictions, and violates the Free Exercise of these Principles."

**\*4** Dkt. No. 24-3 at ECF p. 3; *see also* Dkt. No. 164 ¶ 21; Dkt. No. 171-2 ¶ 21. The Notice of Vaccination Exemption did not mention the Temple of the Healing Spirit. Dkt. No. 164 ¶ 32; Dkt. No. 171-2 ¶ 32. Although it stated that exhibits would be available upon request, Dkt. No. 24-3 at ECF p. 3, it did not attach any exhibits.

Gardner-Alfred's claim for a religious exemption is supported by, and based upon, a July 25, 2021 letter (the "July 25, 2021 Letter") from the Temple of the Healing Spirit with an address in "Deland city, Florida Republic." Dkt. No. 163-4. The letter is addressed "To whom it may concern;" and begins: "Ms. Lori Gardner-Alfred is a member in excellent standing with our Church, and as such, are [sic] bound by the moral and ethical tenets of conduct that guide and govern our Congregation." *Id.* (citing 1 Corinthian 3:16–17; 1 Corinthian 6:19–20; 2 Corinthian 7:1). It continues as follows:

> Because of her deeply held religious beliefs and convictions, Ms. Gardner-Alfred is extremely concerned about her participation in certain surgical/medical/pharmaceutical procedures, that radically conflict with said beliefs and convictions, viz, Vaccinations/Inoculations; Time Tests or Montaux [sic] TPPD Skin Tests; HIV AIDS/COVID-19 Tests ....
>
> Therefore, Pursuant to the "Free Exercise Clause" within the Bill of Rights to the de jure 1787 Constitution of these united [sic] States of America ... [w]e the Church herewith submit this letter in support of Ms. Gardner-Alfred's Notification of Vaccination Exempt. (by

Affidavit), because the practice of Vaccination (et al.) is contrary to her/our sincere and conscientiously held religious beliefs and practices, and violates the free exercise of these principles.

*Id.* The letter is signed by "[Rev. Dr.]: Phillip: Valentine ©™ All Rights Reserved." *Id.*

It is not disputed that Gardner-Alfred paid $487 to Valentine in exchange for both the affidavit attached to the Notice of Vaccine Exemption and the July 25, 2021 Letter as part of a "vaccination exemption package." Dkt. No. 164 ¶ 22; Dkt. No. 171-2 ¶ 22. [2] Valentine advertises this package on Facebook for sale to the public. Dkt. No. 159-3; Dkt. No. 164 ¶ 23; Dkt. No. 171-2 ¶ 23. In December 2022, after this litigation had commenced, an independent investigator hired by Defendant, with no affiliation with Valentine or the Temple of the Healing Spirit, successfully purchased the vaccination exemption package simply by calling Valentine by phone and paying the requested $475 fee plus $12 for shipping and handling ($487 total). Dkt. No. 159-4; Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25. The vaccination exemption package came with a letter ostensibly signed by Valentine that is nearly identical to the July 25, 2021 Letter. It is on the letterhead of the Temple of the Healing Spirit, with an address in "Deland City, Florida Republic," and is signed "[Rev. Dr.]: Phillip: Valentine ©™ All Rights Reserved." Dkt. No. 159-5. It states that "Mr. Adam Deutsch is a member in excellent standing with our Church, and as such, is bound by the moral and ethical tenets of conduct, that guide and govern our Congregation," with the same citations to Corinthians. *Id.* It then recites similar (but not identical) language in support of "Mr. Deutsch's Notification of Vaccination Exemption (by Affidavit)," indicating that "the practice of Vaccination, and/or, participation in unreliable, inaccurate, 'prejudicial' medical testing, is contrary to his/our sincerely held religious beliefs, and compelling him to do so, violate[s] the free exercise of said beliefs, pursuant to the 'Free Exercise Clause' added to the Bill of Rights (1791) ...." *Id.*

**\*5** Valentine told the investigator that, since 1983, he has sold "per year, about three or four hundred" vaccination exemption packages. Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25; *see generally* Dkt. No. 159 ¶¶ 5–12. [3] Defendant's investigator not only did not have any affiliation with the Temple of Healing Spirit or Valentine before calling him in December 2022, but he had never previously spoken to Valentine and, after receiving the vaccination exemption package in January 2023, he did not have any

other conversations with Valentine, did not maintain any connection to or affiliation with the Temple of the Healing Spirit, and was not asked to engage in any activity in order to join the Temple of the Healing Spirit or to receive the vaccination package, besides paying the $487 fee. Dkt. No. 164 ¶ 27; Dkt. No. 171-2 ¶ 27. The investigator was not asked to participate in any Temple of the Healing Spirit activities, speak to anyone affiliated with the Temple of the Healing Spirit, or learn or indicate agreement with any Temple of the Healing Spirit teachings. Dkt. No. 164 ¶ 27; Dkt. No. 171-2 ¶ 27.

At deposition, Gardner-Alfred claimed to have been a member of the Temple of the Healing Spirit for over twenty years. Dkt. No. 163-3; Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30. She testified that she joined the Temple of the Healing Spirit "to be more in align [sic] in the traditions of my ancestors" and because of its emphasis on "holistic healing" and the "spiritual, natural way of living." Dkt. No. 163-3 at ECF p. 3; Dkt. No. 171-7 at ECF p. 4. [4] She testified that as a member of the Temple of the Healing Spirit, she meditates and prays a lot, and does "prayer practice in terms of my diet." Dkt. No. 163-3 at ECF p. 3; Dkt. No. 171-7 at ECF p. 4. However, at deposition, Gardner-Alfred could not recall the name of a single person who attended a service or meeting of the Temple of the Healing Spirit with her or who attended a virtual service with her. Dkt. No. 171-2 ¶ 30; Dkt. No. 171-7 at ECF p. 17. She testified that she attended services virtually, Dkt. No. 171-7 at ECF p. 6, but she also testified that no link had ever been sent to her, *id.*, and could not produce any emails with links to virtual services, Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30; Dkt. No. 163-3 at 6–7; Dkt. No. 97-4. [5] She admitted to never having seen the Temple of the Healing Spirit's description of its "ecumenical doctrine." Dkt. No. 164 ¶ 31; Dkt. No. 171-2 ¶ 31. [6]

**\*6** According to Gardner-Alfred, because of her religious beliefs, she "doesn't put foreign, mankind medicines in her body." Dkt. No. 163-3 at ECF p. 9. In her testimony, she claimed to have "oppose[d] the invasive techniques of traditional Western medicine" as much as she could. *Id.* at ECF p. 12. When asked if she "consider[ed] COVID tests to be an invasive technique of Western medicine," Gardner-Alfred responded, "Yes." *Id.* at ECF p. 16. Her professed religious tenet appears to be a matter of convenience. Although she testified at deposition that she "[doesn't] put foreign, mankind medicines into [her] body," and that she does not "take medications in order to prevent" illness, she has put "foreign, mankind medicines" in her body both before

and after she was asked—but refused—to take the Covid vaccine; over the ten years prior to her termination from the FRBNY, she received injections and took several prescription medications. Dkt. No. 163-3 at ECF pp. 9–10, 27–28. She has had an anesthesia injection, two septocaine injections, dental implants, punctual eye plugs (after acknowledging that they involved foreign material), [7] several biopsies, and a bunionectomy. Dkt. No. 163-3 at ECF pp. 32, 37, 40, 45; Dkt. No. 164 ¶ 34; Dkt. No. 171-2 ¶ 34. She admitted to taking "two or three tablets" of ivermectin as a "[p]reventative measure[ ]," Dkt. No. 150 at 53, and purchasing medical supplements from an individual named Gary Null, Dkt. No. 164 ¶ 35; Dkt. No. 171-2 ¶ 35. Gardner-Alfred denied that she considered the medications to be "invasive techniques of Western medicine," but when queried on the basis for that conclusion, she stated merely "[i]t's my opinion." Dkt. No. 171-7 at ECF p. 12.

Additionally, it is undisputed that in November 2021, after Gardner-Alfred had filed her affidavit in support of her request for a religious accommodation to the Vaccination Policy that stated her opposition to Covid-19 tests, she took a Covid-19 test. Dkt. No. 163-3 at ECF p. 16. She testified that at the time in November 2021 that she took the Covid-19 test she considered it to be an invasive technique of Western medicine. *Id.* When asked how she reconciled taking a Covid-19 test when she believed it was an invasive technique of Western medicine, she initially responded "[b]ecause I took it myself." Dkt. No. 171-7 at ECF pp. 10–11. She then backtracked and stated that when she took the Covid-19 test she did not believe it was an invasive technique of Western medicine. *Id.* at ECF p. 11. Gardner-Alfred offered as an example of a "foreign. Mankind medicine" that she was prohibited from taking, "the vaccines and the ingredients." Dkt. No. 171-7 at ECF pp. 7–8. When asked what ingredients were in the vaccine, she testified "[a]borted fetuses, and I just can't think of all of them off the top of my head, but that one certainly stands out." *Id.* at ECF p. 8.

### IV. Diaz's Request for Religious Accommodation

Diaz claims to be a baptized Catholic. Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39. She also is opposed to the Covid-19 vaccine. She attended an August 22, 2021 webinar entitled "How to Survive COVID" given by an individual named Garry Null. Dkt. No. 164 ¶ 44; Dkt. No. 171-2 ¶ 44. The seminar materials included a URL list with links to twelve documents including: "White Paper—Experimental Covid Vaccines;" "Review of Ivermectin Efficacy;" and a document from Children's Health

*Gardner-Alfred v. Federal Reserve Bank of New York, Slip Copy (2023)*

Defense "Preventing Vaccine Mandates Toolkit." *Id.* From October 2021 through March 2022, Diaz subscribed to at least eight email newsletters from anti-vaccination sources from which she received several hundred emails from sources opposing the vaccine on secular grounds. Dkt No. 164 ¶ 50; Dkt. No. 171-2 ¶ 50. [8] Diaz sent similar messages to others containing secular concerns about the Covid-19 vaccines. Dkt. No. 164 ¶ 51; Dkt. No. 171-2 ¶ 51. On December 22, 2021, she sent an email to Gardner-Alfred in which the letters of "Delta" and "Omicron" (two Covid-19 variants) were rearranged to spell "Media Control." Dkt. No. 164 ¶ 52; Dkt. No. 171-2 ¶ 52.

**\*7** Diaz wanted a medical accommodation and submitted a request for one, but because she and her doctor "did not agree on the vaccine," she abandoned her attempt to avoid vaccination on medical grounds. Dkt. No. 164 ¶ 46; Dkt. No. 171-2 ¶ 46. On August 30, 2021, eight days after the Null webinar, Diaz spoke to her pastor by phone and followed up by email, asking him to help her obtain a religious exemption from the Vaccination Policy. Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47. She asked him to sign a template letter for a religious accommodation request that she found on the internet from the Colorado Catholic Conference, an organization with which she has no affiliation. Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47. Her pastor refused to sign the Colorado Catholic Conference letter and responded to her the next day with a statement from the Archdiocese of Newark, which read: "It is important to note that the Archdiocese of Newark does not provide for an exemption on religious grounds from receiving the vaccine .... As such, it is not possible for a Catholic to claim an exemption from vaccination on religious grounds." Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 163-11. The letter stated, "[a] Catholic may claim a personal exemption on grounds of conscience." Dkt. No. 163-11.

Diaz signed the internet template letter herself and the next day, September 1, 2021, Diaz submitted it with her request for a religious accommodation. Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 24-4. The internet template letter from the Colorado Catholic Conference stated that Diaz was "a baptized Catholic seeking a religious exemption from an immunization requirement." Dkt. No. 24-4. The letter states that "[t]he Catholic Church teaches that a person may be required to refuse a medical intervention, including a vaccination, if his or her conscience comes to this judgment." *Id.* The letter explains that the Catholic Church "does not prohibit the use of most vaccines, and generally encourages

them to safeguard personal and public health," but it adds that "if a Catholic comes to an informed judgment that he or she should not receive a vaccine, then the Catholic Church requires that the person follow this judgment of conscience and refuse the vaccine." *Id.* It cites the Catechism as "clear" that "Man has the right to act in conscience and in freedom so as personally to make moral decisions" and "must not be forced to act contrary to his conscience [or] prevented from acting according to his conscience, especially in religious matters." *Id.* More specifically, it notes that "[a]n individual Catholic may invoke Church teaching to refuse a vaccine that used abortion-derived cell lines at any stage of the creation of the vaccine" and "might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality." *Id.* It explains that "[t]herapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods." *Id.* It adds: "The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention, not by public health authorities or by other individuals who might judge differently in their own situation." *Id.*

Diaz objects to vaccines "created using human cell lines derived from abortion." Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39. She testified at deposition that her objection is to vaccines that "contain," "are manufactured with," or are "produced with" aborted fetal cell lines. Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40. She further testified that the Covid-19 vaccine violated her religious beliefs because "the COVID vaccine is produced with aborted fetal cell lines," Dkt. No. 163-6 at ECF p. 3, and that if a medication was not made with aborted cell lines and her doctor recommended it, she would take it, Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41. Her doctor wanted her to get vaccinated and she has no objection to vaccines "that don't contain aborted fetal cell lines" or "are not manufactured with aborted fetal cell lines." *Id.*

**\*8** Diaz testified that she follows the teachings of her Archdiocese on religious teachings except with respect to vaccines. Dkt. No. 171-3 at ECF p. 4. Specifically, she testified that she did not follow the Archdiocese's guidance with respect to vaccines,

> Because the Catholic church teaches
> that I am to follow my moral conscious

[sic], and because the Catholic church also teaches that it's pro-life. And the Catholic church also teaches on the 5th Commandment, thou should not kill. So that would be contradicting to me that the Catholic church teaches all these things, yet the vaccine that's derived from aborted cell lines, and where I can make it my moral duty, and where I can also follow my moral conscious [sic] as the Catholic church teaches. So, to me, it's contradictory.

*Id.* at ECF pp. 4–5. When asked what she meant by consulting her moral conscience, Diaz answered: "I had to pray about it and read my bible." *Id.* at ECF p. 6.

In the decade from August 2012 through August 2022, Diaz filled and refilled prescription medications roughly forty times for fourteen different medications. Dkt. No. 164 ¶ 55; Dkt. No. 171-2 ¶ 55. She also received a pain medicine injection. *Id.* Diaz admits that she has over the past ten years taken medications without first checking if they were manufactured with aborted fetal cell lines. Dkt. No. 164 ¶ 56; Dkt. No. 171-2 ¶ 56. She testified that if she did not know if something was made using aborted fetal cell lines, she could take it. Dkt. No. 164 ¶ 56; Dkt. No. 171-2 ¶ 56.

At deposition, Diaz could not recall knowing anything about the Covid-19 vaccines, including whether there was any actual connection between aborted fetal cell lines and the vaccines, when she made her initial religious accommodation request. Dkt. No. 164 ¶ 57; Dkt. No. 171-2 ¶ 57. She testified that she could not remember whether she considered whether there was a vaccine that was not produced with aborted fetal cell lines when she made her accommodation request, that she could not remember whether she knew anything about the Covid-19 vaccines, and she could not remember whether before September 2021 she did any research on the Covid-19 vaccines. Dkt. No. 163-6 at ECF p. 4–5.

The mRNA Covid-19 vaccines produced by Pfizer and Moderna are neither manufactured with nor contain aborted cell lines. Dkt. No. 164 ¶ 58; Dkt. No. 171-2 ¶ 58; Dkt. No. 163-1 at 11. They do not use any fetal cell cultures in order to manufacture or produce the vaccine. Dkt. No. 163-1 at 11. The mRNA vaccines themselves do not contain any aborted

fetal cells or fetal cell cultures, nor are they manufactured or produced with such cells or cell cultures. *Id.*[9]

## PROCEDURAL HISTORY

On February 23, 2022, Plaintiffs (who at that time were still employed by the FRBNY and were proceeding pro se) commenced actions in New York State Supreme Court against Defendant. Dkt. No. 1-1. Plaintiffs alleged that the Vaccination Policy was "clearly discriminatory, arbitrary, and capricious [and] not supported by scientific knowledge and fact but fear and intimidation [and not] based on [Plaintiffs'] ability to perform [their] job functions." *Id.* at ECF p. 11. Plaintiffs sought an immediate injunction barring Defendant from firing them (the "TRO"). *Id.* at ECF pp. 13, 39. That same day, Justice Frank of the New York State Supreme Court granted Plaintiffs an *ex parte* restraining order directing the FRBNY to show cause on March 7, 2022, why Plaintiffs should not be granted a permanent injunction restraining the FRBNY from firing Plaintiffs. *Id.* at 4–5.

 **\*9**  The action was removed to this Court on February 25, 2022. Dkt. No. 1. On March 2, 2022, the FRBNY moved to dissolve the TRO. Dkt. No. 7. The Court granted that request. Dkt. No. 15. The Court held that the state court's entry of the TRO did not satisfy the requirements of Federal Rule of Civil Procedure 65. *Id.* at 6. The Court also found that Plaintiffs had not shown irreparable harm justifying the issuance of a preliminary injunction. *Id.* at 7–8. In particular, the Court noted that while Plaintiffs' argument that they would suffer irreparable harm hinged on the loss of their First Amendment freedoms,

> Plaintiffs' petitions here, however, do not allege any violation of their First Amendment freedoms; their operative pleadings assert no Free Exercise claims. Rather, they challenge the vaccination policy not as impinging on their free exercise of religion but because it is "clearly discriminatory, arbitrary, and capricious," and "is not supported by scientific knowledge and fact but fear and intimidation."

*Id.* at 8 (citation omitted). The Court also noted that the economic harm of losing a job is not of the type of harm that usually warrants injunctive relief as it can be compensable with money damages. *Id.* After the Court granted the request, the FRBNY terminated the employment of both Plaintiffs. Dkt. No. 24.

On April 5, 2022, Plaintiffs, now proceeding with the assistance of counsel, filed an amended complaint (the "Amended Complaint") against the Defendant. *Id.* In that Amended Complaint, Plaintiffs alleged that the termination of their employments violated the Religious Freedom Restoration Act ("RFRA"); the Free Exercise Clause of the First Amendment; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et al.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Administrative Code, § 8–101 *et seq.* *Id.*

On April 19, 2022, Plaintiffs moved the Court for a preliminary injunction reinstating their employment. Dkt. Nos. 27–30. Defendant moved to dismiss the Amended Complaint and opposed Plaintiff's request for a preliminary injunction on May 3, 2022. Dkt. Nos. 31–33. On May 10, 2022, Plaintiffs filed a reply memorandum of law in further support of their motion for a preliminary injunction and a memorandum of law in opposition to the motion to dismiss the Amended Complaint, along with a supporting declaration. Dkt. Nos. 34–36. On June 10, 2022, Defendant filed a reply memorandum of law in support of the motion to dismiss the Amended Complaint. Dkt. No. 37.

On June 28, 2022, the parties submitted a joint letter to the Court agreeing to consolidate the hearing on Plaintiffs' motion for a preliminary injunction with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Dkt. No. 41. On July 20, 2022, the Court granted that request. Dkt. No. 43. Trial is now scheduled for December 11, 2023. Dkt. No. 187.

On January 18, 2023, the Court granted in part and denied in part Defendant's motion to dismiss. Dkt. No. 83. The Court granted the motion to dismiss with respect to Plaintiffs' claims under NYSHRL and NYCHRL and denied the motion to dismiss with respect to Plaintiffs' claims under RFRA, the Free Exercise Clause of the First Amendment, and Title VII. *Id.*

Defendant moved for summary judgment of the Amended Complaint on June 15, 2023. Dkt. No. 158. On the same day, Defendant filed its Rule 56.1 Statement and a memorandum of law in support of the motion for summary judgment. Dkt. Nos. 164–65. On July 6, 2023, Plaintiffs filed a memorandum of law in opposition to Defendant's motion

for summary judgment, which included as an attachment Plaintiffs' Response to Defendant's 56.1 Statement. Dkt. No. 171. Defendant filed a reply memorandum of law in support of the motion for summary judgment on July 20, 2023, along with a reply to Plaintiff's Response to Defendant's 56.1 Statement. Dkt. Nos. 174–75. [10]

## LEGAL STANDARDS

### I. Summary Judgment Standard

**\*10**  Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeusert Co.*, 537 F.3d 140, 145 (2d Cir. 2008). To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

In cases involving claims of discrimination, "an extra measure of caution is merited in [granting] summary judgment ... because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial

evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,' " *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

Local Civil Rule 56.1 of the Southern District of New York sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c). In accordance with Local Rule 56.1, "the movant's statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record." *Rhee v. SHVMS, LLC*, 2023 WL 3319532, at *4 (S.D.N.Y. May 8, 2023) (citation and quotation marks omitted).

## II. Substantive Standards Under RFRA, Title VII, and the First Amendment

**\*11** Plaintiffs bring claims against Defendant under RFRA, Title VII, and the First Amendment. Dkt. No. 24. RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(a)–(b). In order to state a *prima facie* case under RFRA, a claimant must first establish that the challenged government policy would (1) substantially burden (2) a sincere (3) religious exercise. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which held that laws of general applicability that incidentally burden religion do not trigger strict scrutiny under the First Amendment's Free Exercise Clause. *Id.* at 883–90. RFRA's stated purpose and actual result is to reinstate the strict scrutiny standard of the Free Exercise analysis that the Supreme Court applied before its decision in *Smith*. *See* 42 U.S.C. § 2000bb(b).

Title VII of the Civil Rights Act prohibits discrimination in employment on the basis of religion and requires employers to reasonably accommodate an employee's religion unless doing so would constitute an undue hardship. 42 U.S.C. § 2000e *et seq.*; *see Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 64 (1977) ("The intent and effect of [including religion in Title VII] was to make it an unlawful employment practice under § 703(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."). To make out a *prima facie* violation of Title VII, plaintiffs must show that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (citing *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985)). If the plaintiff is able to make out a *prima facie* case of discrimination, "the burden shifts onto the employer to show that it cannot reasonably accommodate the plaintiff without undue hardship on the conduct of the employer's business." *Philbrook*, 757 F.2d at 481.

The Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of

religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The protections guaranteed by the Free Exercise Clause pertain "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). Such protections are not invoked in situations in which a neutral, generally applicable law incidentally burdens the exercise of religion. *See Cent. Rabbinical Congress of U.S. & Canada v. N.Y.C. Dept. of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (quoting *Smith*, 494 U.S. at 879). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia, PA.*, 141 S. Ct. 1868, 1877 (2021).

## DISCUSSION

Defendant moves for summary judgment on each of Plaintiffs' claims contained in the Amended Complaint, not previously dismissed by the Court. Dkt. No. 158. Defendant argues that Plaintiffs' religious beliefs are not sincerely held, that the Vaccination Policy did not impose a substantial burden on Plaintiffs' exercise of their religion, that the Vaccination Policy was neutral, generally applicable, and had a rational basis, that the Vaccination Policy was the least restrictive means of furthering compelling government interests, that granting Plaintiffs an accommodation from the Vaccination Policy would have caused undue hardship, and that Plaintiffs' claims fail under the doctrine of fraud on the court and unclean hands. Dkt. No. 165. The Court first addresses whether there is sufficient evidence from which a reasonable jury could find that Plaintiffs' objections to the Vaccination Policy were based in their sincerely held religious beliefs, and whether those beliefs conflicted with or were burdened by the Vaccination Policy. Having addressed those issues, the Court need not address whether the Vaccination Policy was the least restrictive means of furthering Defendant's compelling interest, whether the Vaccination Policy was neutral and generally applicable, and whether granting an accommodation would have caused an undue hardship.

### I. Defendant Is Entitled to Summary Judgment for Plaintiffs' Failure to Present a Genuine Issue of Fact That Their Opposition to the Vaccination Policy Is Based on Sincerely Held Religious Beliefs

**\*12** Defendant argues that summary judgment should be granted in its favor against the claims of each of Gardner-Alfred and Diaz for Plaintiffs' failure to show that enforcement of the Vaccination Policy against them would violate their sincerely held religious beliefs. Dkt. No. 165 at 14–19. Defendant does not dispute that each of Gardner-Alfred and Diaz are genuinely opposed to taking the vaccine. They have gone to great lengths to avoid becoming vaccinated, resisting the vaccine even in the face of knowledge that they might lose their jobs as a result. Defendant does argue, however, that the rooting of that opposition in religion is contrived. Dkt. No. 165 at 14–19. Moreover, Defendant argues that, even if the views of Gardner-Alfred and Diaz are based in religion, the Vaccination Policy does not require Plaintiffs to take action inconsistent with those views. *Id.* at 19–22.

The Court concludes that Defendant is entitled to summary judgment for failure of either Plaintiff to show that their asserted objections to the Vaccination Policy was based in sincerely held religious beliefs. For Gardner-Alfred, her opposition to the vaccine is based on a purported religion to which there is no evidence, other than her conclusory say-so, that she ever belonged, whose practices she never followed (with the exception of her opposition to the vaccine), and from which she obtained an "affidavit" that is available to anyone who would pay. For Diaz, her opposition is based on what she says is her reading of the Bible, without accompanying evidence that her religion subscribes to the beliefs underlying her objection or evidence that she herself subscribed to those beliefs either before or after she objected to the Vaccination Policy. For both Plaintiffs, Defendant has proffered evidence that their beliefs are rooted in non-religious objections to the vaccine, which Plaintiffs later tried to cloak in religious garb. Moreover, as discussed in Section II of this Discussion, the Court further concludes, based on the undisputed evidence on the record, that the Vaccination Policy does not conflict with Diaz's views, even if those views were sincerely rooted in religion.

The Court first discusses the legal standard applicable to the question whether the Plaintiffs' views were sincerely held religious ones. It next turns to the argument by both Plaintiffs that the question whether their views were sincerely held religious ones is not appropriate for resolution at the summary judgment stage. Having rejected that argument, the Court finally turns to the assessment of the evidence on the summary judgment record for each Plaintiff.

**A. The Legal Standard for Sincerely Held Religious Views**

Each of the claims brought by Plaintiffs—under RFRA, Title VII, and the First Amendment—requires them to establish the sincerity of their religious beliefs as the basis of their objections to the challenged policy. To qualify for protection under RFRA, the Supreme Court has held that "an asserted belief must be 'sincere.' " *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014); *cf. Holt v. Hobbs*, 574 U.S. 352, 360 (2015) (holding in context of Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the sister statute to the RFRA, that the plaintiff bears the burden of showing his request for an accommodation is "sincerely based on a religious belief and not some other motivation"). In the Title VII context, "[a] plaintiff in a [Title VII] case makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement...." *Philbrook*, 757 F.2d at 481 (citation omitted). Finally, the Second Circuit has held that a plaintiff's Free Exercise claim is precluded where she fails to demonstrate that her objection to the challenged policy is based on "genuine and sincere religious beliefs." *Caviezel v. Great Neck Public Schools*, 500 F. App'x 16, 18 (2d Cir. 2012) (quoting *Caviezel v. Great Neck Pub. Sch.*, 701 F. Supp. 2d 414, 430 (E.D.N.Y. 2010)); *see also Sherr v. Northport-East Northport Union Free School Dist.*, 672 F. Supp. 81, 94 (E.D.N.Y. 1987) ("It must also be demonstrated that the espoused beliefs are sincerely held and that the stated beliefs, even if accurately reflecting plaintiffs' ultimate conclusions about the advisability of inoculation of their children, do in fact stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired."). The Second Circuit has stated that "it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity—as opposed, of course, to the verity—of someone's religious beliefs in both the free exercise context, and the Title VII context. We see no reason for not regarding the standard for sincerity under Title VII as that used in free exercise cases." *Philbrook*, 757 F.2d at 481–82 (internal citations omitted).

**\*13**  The inquiry into sincerity of religious beliefs consists of two parts: "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). Analysis of a claimant's sincerity "seeks to determine an adherent's good faith in the expression of his religious belief," in order to "provide[ ] a rational means

of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.* (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 432 (2d Cir. 1981)). However, even where "the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.' " *United States v. Seeger*, 380 U.S. 163, 185 (1965). "[T]h[e] analysis is most useful where extrinsic evidence is evaluated." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441. "[A]n adherent's belief [is] not ... 'sincere' if he acts in a manner inconsistent with that belief ... or if there is evidence that the adherent materially gains by fraudulently hiding secular interests behind a veil of religious doctrine." *Id.*; *see Philbrook*, 757 F.2d at 482 (same); *see also E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 57 (1st Cir. 2002) ("Evidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity."). "A believer's sincerity is also evaluated in light of the religion's size and history, but this is not dispositive." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441 (citations omitted). Beliefs "animated by motives of deception and fraud ... must be subject to governmental invasion, lest our society abjure from distinguishing between the incantation of 'sincerely held religious beliefs' as a talisman for self-indulgence or material gain and those beliefs genuinely dictated by conscience." *Patrick*, 745 F.2d at 157.

In order to enjoy constitutional and statutory protection, the plaintiff's belief must not only be sincerely held, but must also be rooted in religion. "[O]nly beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion." *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 713 (1981). When inquiring into the religious nature of the beliefs, courts apply a "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Patrick*, 745 F.2d at 157 (citing *Thomas*, 450 U.S. at 713–15). The factfinder's inquiry is limited to a determination of whether "the beliefs professed ... are, in [the claimant's] own scheme of things, religious ...." *Seeger*, 380 U.S. at 185. But despite the broad, subjective test employed in this inquiry, courts are nonetheless clear that "a person's 'intellectual' concerns ... are not safeguarded." *Eatman v. United Parcel Service*, 194 F. Supp. 2d 256, 267–68 (S.D.N.Y. 2002) (quoting *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 440). Summary judgment on these grounds is appropriate where the beliefs in question are "so

clearly nonreligious in motivation, as not to be entitled to protection." *Thomas*, 450 U.S. at 715.

The requirement that a view be sincerely held and rooted in religion is critical to the effective functioning of civil society and to the respect in which religion is rightly owed in civil society. "[M]any [laws] affect certain groups unevenly, even though the law itself treats them no different from all other members of the class described by law." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 271–72 (1979). Some may feel burdened while others will believe themselves benefitted by any law or rule of general applicability. At the same time, however, the Supreme Court has long recognized that religion places a special role in our society and under our Constitution. "Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head." *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2432–33 (2022). For those who are adherents, religion gives meaning and purpose to life. Religion defines objectives, fosters community, instills ethical values, and can convert the pedestrian to the transcendent.

A rule that would permit a citizen to avoid a law or regulation of general applicability by the mere expedient of cloaking an exclusively political objection in a religious veil would disserve both civic society and religion. It would give anyone who disagrees with a law license to disobey by the mere invocation of the divine. It would also undermine the respect owed to religion if the views of those who are genuine adherents and who express faith could be co-opted by those who are merely out to avoid a civil obligation believed to be inconvenient or even harsh.

**B. Sincerity Is Suitable for Summary Judgment**

**\*14** Plaintiffs argue initially that, as a matter of law, the sincerity of their claimed religious beliefs is unfit for resolution at summary judgment because each of Plaintiffs' claimed "religious reasons for refusing the Covid-19 vaccine," and therefore the issue of whether they sincerely held such beliefs, necessarily raises "a credibility question that must be decided by the jury." Dkt. No. 171 at 1. In so arguing, Plaintiffs ask the Court to adopt a categorical rule that whenever a plaintiff asserts a religious reason for not complying with a civic obligation—no matter how contrived or conclusory the assertion—such plaintiff is entitled to a jury trial and, presumably if the jury agrees with the plaintiff, is entitled to a plaintiff's verdict.

Plaintiffs' argument finds no support in the law. Before a plaintiff is entitled to present a claim for the jury's determination, he or she must be able to demonstrate in response to a summary judgment motion that there exists a "genuine" factual dispute—meaning that sufficient evidence exists from which a reasonable jury could find in favor of that plaintiff on each challenged material element of the claim. *See McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Thus, properly framed, the question is not whether the Court finds the evidence offered by Plaintiffs to be more credible than that offered by Defendants. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The question, as properly framed, is whether a reasonable jury could find in Plaintiffs' favor based on the facts on the summary judgment record. *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017).

To prevail on any of her claims, each Plaintiff must demonstrate that the religious belief that she claims conflicted with the Vaccination Policy was sincerely held. If Plaintiffs survive summary judgment, that will be an issue for trial with the Plaintiffs required to offer evidence that their views were sincerely held, Defendant entitled to probe that assertion, and the jury required to sit in judgment. *See Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 433. To get to a jury, however, Plaintiffs must offer evidence from which a reasonable jury could determine that their views were other than animated by fraud and deception. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). The law " 'does not require the accommodation of personal preferences, even if wrapped in religious garb.' " *Hussein v. The Waldorf Astoria*, 134 F. Supp. 2d 591, 597 (S.D.N.Y. 2001) (Chin, J.) (quoting *Hussein v. Local 6*, 108 F. Supp. 2d 360, 370 (S.D.N.Y. 2000)). In other areas of law, the courts have not been hesitant to require more than a conclusory assertion before allowing a claim to go forward. *See Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (affirming district court's grant of summary judgment for defendants against claims of racial discrimination under Title VII); *Rodriguez v. County of Nassau*, 2023 WL 2667076, at \*10 (E.D.N.Y. Mar. 28, 2023) (granting summary judgment for defendants against

claims brought under the First and Fourteenth Amendments for allegedly illegal search and seizure); *Lievre v. JRM Construction Mgmt.*, 2019 WL 4572777, at \*8 n.8 (S.D.N.Y. Sept. 20, 2019) (granting summary judgment for defendants against claims of wrongful termination under the Family and Medical Leave Act and Americans with Disabilities Act). Thus, while the sincerity analysis must be treated with a "light touch," *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (quoting *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012), *as corrected* (Feb. 20, 2013)), Plaintiffs have offered no reason why the result should be any different when the question is the sincerity of their beliefs. While "it is unusual to grant a summary judgment motion when a party's intent is at issue," such relief is appropriate where "a reasonable jury could only find that [the plaintiff's] religious assertion was not bona fide," *Hussein*, 134 F. Supp. at 597, or where "no reasonable juror could conclude that Plaintiff had a sincerely held religious belief," *Bob v. Madison Sec. Grp., Inc.*, 2016 WL 6952259, at \*9 (S.D.N.Y. Nov. 28, 2016). *See also Sherr*, 672 F. Supp. at 96; *Eatman*, 194 F. Supp. at 267–68; *Bailey v. Associated Press*, 2003 WL 22232967 (S.D.N.Y. Sept. 29, 2003). [11]

### C. Defendant Is Entitled to Summary Judgment on Gardner-Alfred's Claims

**\*15** Defendant argues that no reasonable jury could find that Gardner-Alfred's objections to the vaccine were grounded in sincerely held religious beliefs. Dkt. No. 165 at 15–19. Defendant argues that there is no evidence Gardner-Alfred enjoyed any relationship with the Temple of Healing Spirit beyond paying for a vaccination exemption package and that her medical history, both before and after she made her request for a religious accommodation, is inconsistent with her alleged religious beliefs. *Id.*

Gardner-Alfred has failed to identify sufficient evidence to create a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586. It is not necessarily fatal to Gardner-Alfred's claim that she has not always adhered to what she claims to be her religious beliefs. "A finding of sincerity does not require perfect adherence to [the] beliefs expressed ..., and even the most sincere practitioner may stray from time to time." *Moussazadeh*, 703 F.3d at 791–92. It is also not fatal to her claim that the religion Gardner-Alfred claims to belong to, the Temple of the Healing Spirit, is not a conventional one. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *See Thomas*, 450 U.S.

at 714; *see also Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 447 ("Our commitment to precious First Amendment freedoms is tested when unpopular organizations seek refuge within its scope.... ISKCON advocates a philosophy alien to our Western traditions.... They are entitled to the First Amendment freedoms we all enjoy, and considerations of comfort or convenience cannot prevail."); *see also* Laurence Tribe, Note, *Toward a Constitutional Definition of Religion*, 91 HARV. L. REV. 1056, 1059 (1978) ("Freedom of religious choice is assured by the clause's proscription of all favoritism —even the most subtle—in matters of belief.").

In this case, however, Gardner-Alfred has failed to "provide concrete evidence," *Hussein*, 134 F. Supp. 2d at 596, to support her claim. She offers only a "conclusory assertion" that her professed religious belief was anything more than one adopted for the purpose of avoiding what Gardner-Alfred independently (and not on the basis of religion) believed to be an inconvenient or dangerous obligation, and one which was abandoned after it was invoked to avoid that obligation. *Id.*

Although Gardner-Alfred claimed to have been a member of the Temple of Healing Spirit for twenty years, she offers nothing other than her statement to support that assertion. She was not able to recall any other member of the Temple of Healing Spirit. Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30. She could not say when she attended Temple of the Healing Spirit events. Although she claimed to have attended events remotely, she was unable to offer an internet link through which she accessed Temple of the Healing Spirit events. Dkt. No. 97-4; Dkt. No. 164 ¶ 30; Dkt. No. 171-2 ¶ 30. She could not identify how many meetings she attended in person, where she attended them (other than a home in Brooklyn), or anyone who attended with her, including how many people attended. *Id.* The vaccine exemption letter does not provide evidence that Gardner-Alfred's purported religious views were genuinely held; the evidence is overwhelming that Gardner-Alfred solicited the vaccine exemption letter on the eve of the Vaccination Policy and for the purpose of obtaining an exemption. She paid for the letter and an identical letter was available to anyone else who requested it, whether they were members of the Temple of the Healing Spirit or subscribed to its views. Dkt. No. 164 ¶¶ 22–23; Dkt. No. 171-2 ¶¶ 22–23. Therefore, the vaccination exemption letter does not provide evidence that the views Gardner-Alfred espouses were anything other than conveniently held ones adopted only for the purpose of avoiding having to receive the Covid-19 vaccine. Dkt. No. 164 ¶ 25; Dkt. No. 171-2 ¶ 25. [12] There is no evidence that Gardner-Alfred

*Gardner-Alfred v. Federal Reserve Bank of New York, Slip Copy (2023)*

adopted her views until "the incident in question." *Hussein,* 134 F. Supp. 2d at 597.

 **\*16** Further, Defendant has adduced substantial undisputed evidence that Gardner-Alfred repeatedly, both before and after objecting to the Vaccination Policy, "act[ed] in a manner inconsistent with [her] belief." *Int'l Soc'y for Krishna Consciousness,* 650 F.2d at 441. She claims a religious objection to undergoing "invasive" "Western" medical procedures but there is no evidence that she forewent any such procedures either before or after she was asked to take the Covid-19 vaccine; it is undisputed that she voluntarily chose to undergo invasive Western medical procedures before and after she submitted her request for an accommodation. Dkt. No. 164 ¶ 33; Dkt. No. 171-2 ¶ 33; *see Bob,* 2016 WL 6952259 at \*8 (granting summary judgment for failure to identify a genuine issue of fact regarding sincerity where plaintiff's "work schedule makes plain plaintiff's willingness to work full shifts on Fridays"); *Sherr,* 672 F. Supp. at 96 (granting summary judgment against plaintiffs where plaintiffs had subjected their son to many medical procedures that they later claimed violated their religious beliefs). Gardner-Alfred has offered no explanation for why, if her religion permitted her to undergo those treatments, it forbade her to take the Covid-19 vaccine. Nor has she offered any other reason why if her religion forbade invasive Western medical treatment, she nonetheless underwent these treatments. *See Bailey,* 2003 WL 22232967, at \*15 (granting summary judgment where plaintiff did not offer any explanation for why, after working on the weekends for several years, the plaintiff sought religious accommodation to forgo work on Sundays).

Finally, this is not a case in which sincerity can be inferred from evidence that the plaintiff engaged in the claimed religious practice notwithstanding adverse personal consequences to her from doing so. To the contrary, in her view, Plaintiff could "materially gai[n] by fraudulently hiding secular interests behind a veil of religious doctrine." *Int'l Soc'y for Krishna Consciousness,* 650 F.2d at 441. Gardner-Alfred generally opposed the vaccine on non-religious grounds; it is undisputed that Gardner-Alfred has purchased medical supplements from Gary Null, the individual that hosted the secular anti-vaccination seminar attended by Diaz. Dkt. No. 164 ¶ 35; Dkt. No. 171-2 ¶ 35. She exchanged messages with Diaz regarding what were claimed to be the harmful side effects to the vaccine. Dkt. Nos. 163-16, 163-17. Gardner-Alfred viewed the Covid-19 vaccine as something

to be avoided and not as something that—but for religion—should be embraced.

Thus, Gardner-Alfred necessarily would have the Court accept the argument that a claim can survive a motion for summary judgment based solely on a plaintiff's conclusory and self-serving testimony that she had a religious belief and that it was held sincerely. But, confronted with evidence from the moving party, the non-moving party who bears the burden of proof cannot satisfy that burden with conclusory assertions. *See Hussein,* 134 F. Supp. 2d at 596–97. No reasonable jury thus would be able to conclude that her claimed religious beliefs were anything other than contrived.

### D. Defendant Is Entitled to Summary Judgment on Diaz's Claims

Defendant also argues that no reasonable jury could find that Plaintiff Diaz's objection to the Covid-19 vaccine was grounded in sincerely held religious beliefs. Dkt. No. 165 at 15–19. Defendant argues that Diaz's claims fail on two related grounds: First, that Diaz's beliefs were not sincerely held, and second, that they were intellectually motivated rather than religious in nature. *Id.* at 18. Defendant points to undisputed evidence that Diaz had a general objection to the Covid-19 vaccine, that before seeking a religious accommodation she sought a medical exemption, and that she engaged in acts inconsistent with her claimed beliefs. *Id.* at 18–19. There is no dispute that Diaz is Catholic and genuinely subscribes to the views of the Catholic Church. Dkt. No. 164 ¶ 39; Dkt. No. 171-2 ¶ 39. Her claim to having been a victim of religious discrimination, however, turns upon the sincerity of her belief in "[t]he specific religious practice" rather than "the general scope of applicable religious tenets." *Tagore,* 735 F.3d at 328.

As with Gardner-Alfred, there is undisputed evidence that Diaz would have a motive to "fraudulently hid[e] secular interests behind a veil of religious doctrine." *Int'l Soc'y for Krishna Consciousness,* 650 F.2d at 441. Diaz has demonstrated a secular interest in avoiding the vaccine. When Diaz first learned of the Vaccination Policy, she sought exemption from her doctor on medical grounds, and not initially on religious grounds. Dkt. No. 164 ¶ 46; Dkt. No. 171-2 ¶ 46. Diaz submitted her accommodation request days after attending a secular anti-vaccination webinar featuring materials entitled "White Paper—Experimental Covid Vaccines," and "Review of Ivermectin Efficacy." Dkt. No. 164 ¶ 44; Dkt. No. 171-2 ¶ 44. Diaz does not dispute that she subscribed to at least eight newsletters, which sent her several hundred emails, from sources opposing the vaccine on

secular grounds. Dkt. No. 164 ¶ 50; Dkt. No. 171-2 ¶ 50. Diaz sent emails to others containing secular concerns about the Covid-19 vaccines, including an email to Gardner-Alfred in which the letters of "Delta" and "Omicron" were rearranged to spell "Media Control." Dkt. No. 164 ¶ 52; Dkt. No. 171-2 ¶ 52.

**\*17** There also is evidence of Diaz acting in a manner inconsistent with her claimed religious views. *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441. Diaz concedes that she has on many occasions taken medications and received injections without first checking whether they contain or were made or manufactured with aborted fetal cell lines. Dkt. No 164 ¶ 56; Dkt. No. 171-2 ¶ 56. Over the course of ten years, spanning both before and after she sought an exemption from the Vaccination Policy, Diaz filled and refilled prescription medications roughly forty times without ever inquiring into whether the prescription medications were manufactured with or contained aborted fetal cells. Dkt. No 164 ¶¶ 55, 56; Dkt. No 171-2 ¶¶ 55, 56. Diaz testified at deposition "that 'because [she doesn't] know' if something was made using aborted fetal cell lines, '[she] can take it.' " Dkt. No 164 ¶ 56 (quoting Dkt. No. 163-6); Dkt. No 171-2 ¶ 56 (same). Also at deposition, however, Diaz could not recall being aware of any actual connection between aborted fetal cell lines and Covid-19 vaccines when she made her initial religious accommodation request purportedly due to concerns about the use of aborted fetal cell lines in the development, testing, and manufacturing of Covid-19 vaccines. Dkt. No 164 ¶ 57; Dkt. No. 171-2 ¶ 57. That Diaz did not even inquire—and has no memory of ever learning—whether a medication she was taking was manufactured with or contains aborted fetal cells undermines her claim to have a genuine religious objection to the taking of the Covid-19 vaccine on the grounds that it is manufactured with or contains aborted fetal cells. She offers no explanation why, if she has a genuine religious objection to the vaccine because of its content, and not because of its perceived side effects or for some other political reason, she never asked before or after about the content of any other medication —and did not even ask about the content of the Covid-19 vaccine. *See* Hussein, 134 F. Supp. 2d at 596–97 ("Hussein has made no effort to explain why, if his religion prevented him from shaving, he had never worn a beard before. He does not contend, for example, that he had just converted to his religion. Finally, within three months, he shaved his beard, an undisputed fact that also undercuts his claim of religious necessity.").

Diaz further does not dispute that the views that she now claims to hold are different from those held by the church of which she claims to be a member. When Diaz sought exemption to the Vaccination Policy, she sought the advice and support of her pastor, first calling him and then following up with an email asking for his help. Dkt. No 164 ¶ 47; Dkt. No. 171-2 ¶ 47. The pastor advised her that "it is not possible for a Catholic to claim an exemption from the vaccination on religious grounds," and that she could seek only "a personal exemption on grounds of conscience." Dkt. No. 164 ¶ 48; Dkt. No. 171-2 ¶ 48; Dkt. No. 163-11. "A showing of sincerity does not necessarily require strict doctrinal adherence to standards created by organized religious hierarchies." *Moussazadeh*, 703 F.3d at 791; *see also* Martinelli v. Dugger, 817 F.2d 1499, 1503–04 (11th Cir. 1987), *abrogated on other grounds by* Harris v. Chapman, 97 F.3d 499 (11th Cir. 1996). "Sincere religious belief cannot be subjected to a judicial sorting of the heretical from the mainstream." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 261 (5th Cir. 2010). However, Diaz's belief that her religion barred her from taking a vaccine made with aborted human fetal cells appears to have been newly adopted only in response to the demand that she take the Covid-19 vaccine. She bases her objection on the letter she received from the Colorado Catholic Conference, an organization with which she had no prior affiliation and has no current affiliation. Dkt. No. 164 ¶ 47; Dkt. No. 171-2 ¶ 47. The letter is available for download from the internet from anyone who seeks it. There is no evidence that she held the views that she now holds at any time either before or after Defendant required her to take the Covid-19 vaccine. Diaz has demonstrated that her convictions with respect to the Covid-19 vaccine are strongly held, but she has not demonstrated that they are religious. *See* Mason v. Gen. Brown Cent. School Dist., 851 F.2d 47, 52 (2d Cir. 1988) ("Everyone makes basic choices about where to live, what to eat, and how to raise children. Merely because these decisions are important, and may be supported by strong conviction, does not render them religious.").

In the end, Diaz's claim fails on the same grounds that Gardner-Alfred's claim fails. The Court does not adopt a standard requiring that one always agrees with the leaders of their religious institution, always follow the dictates of their religion without fail, and always adopts religious views without regard to secular or intellectual sentiments, for one's religious beliefs to be found sincere. Many religions were founded based on the views of dissidents. The Romans "drove to stamp out Christianity as a disturber of its pagan unity, the Inquisition [tried to stamp out the views of dissidents] as a

means to religious and dynastic unity." *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641 (1943). More recent examples abound. *See, e.g.*, Brett G. Scharffs, *The Journey from Persecution to Inclusion: A Case Study of the Church of Latter-Day Saints in America*, 97 NOTRE DAME L. REV. REFLECTION 264 (2022). Even those are known to sometimes stray from their religious obligations may hold their views sincerely. *See Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) ("[A] sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"). Religious objections are not necessarily inconsistent with intellectual objections. *Thomas*, 450 U.S. at 714; *see also Callahan v. Woods*, 658 F.2d 679, 684 ("But where, as here, the court has found that the allegedly religious belief is sincerely held, the presence of longstanding secular objections does not refute the finding of sincerity ....").

**\*18** In this case, however, Diaz offers no evidence other than her own say-so to support the notion that she has a sincere religious objection to the Covid-19 vaccine. Her argument therefore would have the Court adopt a rule of law that whenever someone with a political objection to a rule wraps that objection in religious garb, she is entitled to a jury trial and—if she prevails—is entitled to an accommodation. She does not cite any law that would support such an extreme proposition. In *Eatman v. United Parcel Service*, 194 F. Supp. 2d 256, plaintiff brought a claim against his former employer under Title VII for allegedly discriminating against his religious beliefs by failing to accommodate his choice to wear his hair in dreadlocks. *Id.* at 267–68. The defendant challenged the plaintiff's claim by arguing that his decision to wear dreadlocks was "not a religious act but a personal choice." *Id.* at 268 (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998)). The court granted summary judgment on the claim in favor of the defendant because of plaintiff's admission that wearing dreadlocks was a "personal choice" and "not a mandate" of his religion, concluding that it was "not enough that Eatman also considers his locks a 'testament' or an 'outward expression' of his commitment to Protestantism and the principles of Nubianism." *Id.* at 269 (citations omitted). Put differently, the court dismissed the objection to the challenged policy because it did not originate in, and was not required by, the plaintiff's faith, even if the plaintiff did consider the objection to be an expression of his religious faith. *Id.* The same result follows here.

## II. Defendant Is Entitled to Summary Judgment Against Diaz on the Alternative Grounds that Adherence to the Vaccination Policy Does Not Violate Her Articulated Views

Defendant further argues that it is entitled to summary judgment against both Diaz and Gardner-Alfred on the grounds that the Vaccination Policy does not substantially burden or conflict with their views, even if they were rooted in religion. Dkt. No. 165 at 19–22.

That argument is without merit as to Gardner-Alfred. Her views appear to have been designed for the purpose of generating a conflict with the Vaccination Policy. She has framed those views as opposition to "the invasive techniques of traditional Western medicine," Dkt. No. 163-3 at ECF p. 12; Dkt No. 164 ¶ 16; Dkt. No. 171-2 ¶ 16; Dkt. No. 171-7 at ECF p. 3, which would include a vaccine that invades the body. She further stated that her religion forbids her from receiving any Covid-19 vaccines and taking Covid-19 tests. In response to the Vaccination Policy, she solicited and paid for a statement that "the practice of Vaccination (et.al [sic]) is contrary to My sincere and conscientiously held Religious Beliefs and Convictions, and violates the Free Exercise of these Principles." Dkt. No. 163-6 at ECF pp. 9, 16.

The argument has merit, however, with respect to Diaz. Diaz was deposed in this case and given numerous occasions to articulate her views; those views were that she opposed any vaccine or medicine that was manufactured with or contains the cells of a human fetus. Dkt. No. 163-6 at ECF pp. 18, 46. She also had the opportunity to present any evidence that articulated a different view; she was asked specifically whether taking a vaccine or medication that did not contain and was not manufactured with fetal cells would violate her religion. Dkt. No. 163-6 at ECF p. 46. She answered no. *Id.* It is not disputed that the Moderna and Pfizer vaccines do not contain human fetal cells. Dkt. No. 164 ¶ 58; Dkt. No. 171-2 ¶ 58; *see also* Dkt. No. 171 at 2 ("[I]t is true that the Pfizer and Modern vaccines were not themselves manufactured with fetal cell lines."). The Court does not doubt that there are others for whom taking a vaccine that was developed with the benefit of research from human fetal cells would violate a sincerely held religious view. On the evidence presented, however, no reasonable jury could find that a requirement that Diaz take either the Moderna or Pfizer vaccine would violate Diaz's views.

### A. Burden On, or Conflict With, Religious Beliefs

Even if a reasonable juror could find that Plaintiffs' objections to the vaccines were rooted in her sincere religious beliefs, Plaintiffs must also show under each of the three claims that their sincerely held beliefs are "burdened" by or in "conflict" with the government policy. The Constitution and the two statutes ask almost the identical question— is the complaining plaintiff required to take action that violates her religious beliefs or forego from action compelled by her religious beliefs. A challenged action imposes a "substantial burden" under RFRA when it gives the religious practitioner the choice between (1) engaging in conduct that seriously violates her religious beliefs or (2) facing serious consequences. *See Holt*, 574 U.S. at 361 (explaining the substantial burden standard under RLUIPA, a sister statute of RFRA, which "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA' " (and stating that these protections "are no less than the guarantee of the Free Exercise Clause" (quoting *Gonzales*, 546 U.S. at 436)). In the Free Exercise context, a challenged policy is considered to have burdened the plaintiff's religious beliefs where it "[puts the plaintiff] to the choice of curtailing [her] mission or [taking actions] inconsistent with [her] beliefs." *Fulton*, 141 S. Ct. at 1876. Plaintiffs challenging a policy under Title VII must show that their religious beliefs "conflict with employment requirements" and that "they were disciplined for failure to comply with the conflicting employment requirement." *Knight*, 275 F.3d at 167 (citing *Philbrook*, 757 F.2d at 481). A policy that disciplines employees whose religious beliefs "conflict with employment requirements" within the context of Title VII necessarily places a "burden" on them within the context of RFRA and the First Amendment because it forces them to choose between engaging in the conduct that goes against their religious beliefs or facing serious consequences, such as termination of their employment. Thus, if a policy creates a "burden" in the Free Exercise context, it also creates a "substantial burden" under RFRA and a "conflict" under Title VII.

**\*19** When analyzing whether a challenged policy imposes a burden on or conflicts with a claimant's religious beliefs, courts employ an objective test. *Catholic Health Care System v. Burwell*, 796 F.3d 207, 217 (2d Cir. 2015), *judgment vacated on other grounds by* 578 U.S. 993 (2016). "Whether a law substantially burdens religious exercise ... is a question of law for courts to decide, not a question of fact." *Priests for Life v. U.S. Dept. of Health and Human Services*, 772 F.3d 229, 247 (D.C. Cir. 2014). A policy imposes a burden on a claimant where it "forces them to engage in conduct that their religion forbids or ... prevents them from engaging in

conduct their religion requires." *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001). Put differently, "a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program." *Thomas*, 450 U.S. at 716.

**B. The Vaccination Policy Does Not Require Diaz to Violate Her Claimed Religious Views**
Defendant argues that Diaz cannot as a matter of law demonstrate a substantial burden or conflict between her claimed religious views and the Vaccination Policy. Dkt. No. 165 at 20. Defendant points to the fact that Diaz testified that if a vaccine was not made with aborted fetal cell lines and her doctor recommended that she take that vaccine, she would have no issue with doing so. *Id.* According to Defendant, because Diaz's doctor recommended that she take the vaccine, and because Diaz proffered no evidence that the Pfizer or Moderna vaccines contain or are manufactured with aborted fetal cell lines, there is no conflict with her religious views. *Id.* Defendant argues that Diaz's claimed objection to the Vaccination Policy is "based on demonstrably false and unsupported factual assumptions that the vaccines contain aborted fetal cell lines or were manufactured using them." *Id.* at 21.

Diaz responds that a reasonable jury could find that her sincerely held religious beliefs do conflict with the Vaccination Policy. Dkt. No. 171 at 16. Diaz argues that because aborted fetal cell lines were used at the testing phase of the research and development of the Pfizer and Moderna vaccines, the Vaccination Policy conflicted with her sincerely held religious beliefs. *Id.* at 16–17. Diaz claims that at minimum, her stated concern with aborted fetal cell lines, combined with the use of aborted fetal cell lines in the research and development of the Pfizer and Moderna vaccines, are sufficient to create a genuine issue of material fact that must be resolved by a jury at trial. *Id.* at 16.

On a motion for summary judgment, however, it is not sufficient for the non-moving party to rest on the allegations of her complaint. *See* Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ...."); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (holding that once the moving party demonstrates that there are no genuine issues of material fact, the non-moving party "must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor").

Nor can the non-moving party defeat summary judgment by arguments of counsel in an opposition brief. *See, e.g.,* Gottlieb, 84 F.3d at 518 ("In order to defeat a summary judgment motion ... the opposing party is required to come forward with materials envisioned by the Rule .... [It] cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements ....." (internal citation omitted)). The evidence is undisputed that Diaz does not have a religious (or other) objection to vaccines that do not contain or were not manufactured with aborted fetal cell lines. Dkt. No. 163-6 at ECF p. 46; Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41. Further, Diaz testified that she does not object to medication if she does not know whether the medication contains or is manufactured with aborted fetal cells. Dkt. No. 163-6 at p. 18. Put differently, her only religious objection is to the ingestion of vaccines that contain or are manufactured with aborted fetal cell lines. Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40.

**\*20** Specifically, "Diaz explained at deposition that her [religious] objection is to vaccines that 'contain,' 'are manufactured with' or are 'produced with' aborted fetal cell lines." Dkt. No. 164 ¶ 40 (quoting Dkt. No. 163-6); Dkt. No. 171-2 ¶ 40 (Diaz's Rule 56.1 statement, confirming that the assertion is "[u]ndisputed"). Diaz's testimony was given under oath. Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40. Diaz testified that if a medication was not made with aborted fetal cell lines and her doctor recommended it, she would take it and that she has no objection to vaccines " 'that don't contain aborted fetal cell lines' or 'are not manufactured with aborted fetal cell lines.' " Dkt. No. 164 ¶ 41 (quoting Dkt. No. 163-6); Dkt. No. 171-2 ¶ 41 (Diaz's Rule 56.1 statement, confirming that the assertion is "[u]ndisputed"). She testified that the Covid-19 vaccine violated her religious beliefs because that "the COVID vaccine is produced with aborted fetal cell lines." Dkt. No. 163-6 at ECF p. 5. Diaz stated:

Q. If [a vaccine] wasn't made with aborted fetal cell lines, and your doctor recommended it, would you take it?

A. Yes.

...

Q. Ms. Diaz, do you object to all vaccines?

A. No.

Q. So which vaccines do you not object to?

A. The ones that don't contain aborted fetal cell lines.

Q. Right. The ones that are not manufactured with aborted fetal cell lines?

A. Yes.

*Id.* at ECF pp. 45–46; Dkt. No. 164 ¶ 41; Dkt. No. 171-2 ¶ 41. [13] If Diaz had a broader, religiously-based objection to the Vaccination Policy, she had the opportunity at her deposition or later in a declaration to express that view. She did not do so.

Diaz's objection to the Vaccination Policy thus was based at best on a mistaken understanding—an understanding that she could have cleared up by asking the question or doing any basic research. Two of the Covid vaccines—the Pfizer and Moderna vaccines—indisputably do not contain, and are not manufactured with aborted fetal cell lines, Dkt. No. 164 ¶ 59; Dkt. No. 171-2 ¶ 59. Diaz does not contend otherwise. The expert report of Dr. Clare Rock included as an exhibit to Defendant's declaration in support of the motion for summary judgment, Dkt. No. 163-1, is undisputed on this point:

> **\*21** The mRNA Covid-19 vaccines produced by Pfizer and Moderna are neither manufactured with nor contain aborted fetal cell lines. They do not use any fetal cell cultures in order to manufacture or produce the vaccine. In other words, the mRNA vaccines themselves do not contain any aborted fetal cells or fetal cell cultures, nor are they manufactured or produced with such cells or cell cultures.

Dkt. No. 164 ¶ 58. [14] Aborted cell lines may have been used in the testing phase for those vaccines but once the vaccine was shown to be effective no aborted cell lines were used. *Id.* The Vaccination Policy could be satisfied by the taking of the Pfizer and Moderna vaccine. Dkt. No. 161-2.

This case is similar to *Watkins-El v. Department of Education*, 2016 WL 5867048 (E.D.N.Y. Oct. 7, 2016). There, the court denied a plaintiff's request for a preliminary injunction against a local immunization requirement in part because plaintiff had based "his opposition on the assertion that these vaccines contain 'money cells, pork derivatives, and aborted human fetuses,' which Plaintiff's religion dictates he cannot

consume," but that "[p]laintiff present[ed] no evidence that these vaccines in fact contain the substances to which he object[ed]." *Id.* at *3 (internal citation omitted). Similarly, in *Pollard v. United States Parole Commission*, 2016 WL 4290607 (S.D.N.Y. Aug. 11, 2016), the court likewise held that a requirement that a parolee wear a GPS monitoring device that must be periodically charged did not substantially burden the parolee's religious beliefs—which prohibited him from inserting a plug into an outlet or swapping out batteries during the Sabbath—because the monitoring device's charge could last for more than a full day. *Id.* at *12 ("The Court accepts [petitioner's] statement that during the Sabbath, which lasts 25 hours, the tenets of his Jewish faith prohibit him from either inserting a plug into an outlet to charge the batteries that power his location monitor or swapping out those batteries for previously charged ones.... The question posed by a RFRA challenge, however, is whether the GPS monitoring condition 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' There is no indication that it does." (internal citation omitted)). The same conclusion follows here.

Plaintiff Diaz has not created a genuine issue of fact regarding the burden imposed on her by the challenged policy, and therefore does not state a *prima facie* claim under RFRA, Title VII, or the First Amendment, and summary judgment is appropriate with regard to her claims.

### III. Defendants Are Not Entitled to Summary Judgment on Grounds of Fraud Upon the Court and Unclean Hands

Defendant argues that the Court should grant summary judgment in its favor for the "additional, independent reason that their conduct in pursuing these claims constitutes a fraud on this Court and unclean hands." Dkt. No. 165 at 32. Defendant argues that Gardner-Alfred "testified falsely many times under oath on the core issues in this case: before an Administrative Law Judge in an unemployment hearing on May 20, 2022; at her deposition in this action on February 6, 2023; and before this Court on May 9, 2023." *Id.* at 33. Defendant also argues that Diaz "brought suit based on demonstrably false religious premises, then hid the evidence that her objections were in fact secular by speciously claiming that her *hundreds* of relevant emails were 'spam,' " thereby forfeiting her right to have her claim decided on the merits. *Id.* at 34 (quoting Dkt. No. 149 at 16). For purposes of completeness, the Court addresses this argument and rejects it.

**\*22** It is accurate that the Court found that Gardner-Alfred testified falsely. Dkt. No. 149 at 25. The evidence also supports that Diaz hid evidence that undercut her claims. *Id.* at 29. Defendant has moved only under Rule 56, however, and Rule 56 is an improper vehicle for Defendant to request dismissal for the kinds of litigation misbehavior Defendant identifies. Rule 56 is directed to the question whether discovery has resulted in any genuine issue of material fact for trial. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. If there exist such genuine issues, the motion is properly denied; if there do not exist such factual issues, the motion is properly granted. *See* Fed. R. Civ. P. 56(a). Rule 56 does provide a limited avenue for courts to impose sanctions "[i]f satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay ...." Fed. R. Civ. P. 56(h). In such cases, "[a]n offending party or attorney may ... be held in contempt or subjected to other appropriate sanctions." *Id.* But Defendant here does not base their request for dismissal in an argument that Plaintiffs submitted an affidavit or declaration in bad faith in connection with their memorandum of law in opposition to Defendant's summary judgment motion. The bulk of the evidence on summary judgment was offered by Defendant and it is that evidence that shows that the views of the Plaintiffs were not genuinely held but were contrived to avoid an inconvenient civic obligation. The motion is denied for that reason alone.

Instead, Defendant could have made a separate motion asking the Court, in the exercise of its inherent authority, to dismiss the case based on Plaintiffs' litigation conduct. *Id.* In addition to the powers conferred upon courts expressly by rule and by statute, federal courts also have inherent power to sanction parties for bad faith conduct during litigation. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 46, 51 (1991) ("Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute or the Rules are up to the task, the court may safely rely on its inherent power."). Fraud upon the court occurs "when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," in which case the party has "forfeited his right to have his claim decided on the merits." *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). But Defendant has already moved for relief based on much of the same conduct it invokes to ask for dismissal here and the Court rejected the notion that the Amended Complaint should be dismissed, instead

imposing sanctions. *See generally* Dkt. No. 149. Defendant does not identify any further conduct by Plaintiffs, occurring subsequent to the Court's order on Defendant's motion for sanctions, that would lead to the drastic result of dismissal here. Dkt. No. 165 at 33–34. Accordingly, while the Court finds that Plaintiffs have not presented evidence from which a reasonable jury could return a verdict for either of them on any of their claims, it declines to also order dismissal for litigation misconduct.

**CONCLUSION**

Because the Court concludes that no reasonable jury could find that Gardner-Alfred or Diaz has made out a *prima facie* claim under RFRA, the First Amendment, or Title VII, the court need not proceed to the other issues raised by Plaintiffs and Defendant. Accordingly, Defendant's motion for summary judgment is GRANTED.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 6214863

---

### Footnotes

1    The FRBNY extended Plaintiffs' temporary accommodation to February 25, 2022, based on a new launch date of its Flexible Work Model of February 28, 2022. Dkt. No. 24-13 at ECF pp. 59, 60, 62.

2    In her response to Defendant's Rule 56.1 statement, Gardner Alfred denies the allegation that she purchased the materials, stating that she testified that she made a "cash donation" to the Temple of Healing Spirit, but "not a required payment." Dkt. No. 171-2 ¶ 22. The underlying testimony from Gardner-Aldred is that she paid money in exchange for the letter. Dkt. No. 163-3 at ECF pp. 46–47. It is immaterial to the Court's decision whether Gardner-Alfred characterizes her payment for the package as a donation or a required payment.

3    Defendant has submitted evidence of posts from "Dr. Phil Valentine's Official Forum" on Facebook that advertised vaccination exemption documents for purchase, including (1) a post from February 18, 2014 that states that the package has been available for nearly 30 years, provides a telephone number to call for information about acquiring the package, and states: "Do not become party to a 'science' that is nothing more than an on-going genocidal campaign of medical experimentation"; (2) an August 2014 post that states that there is "proof" that vaccines are "BIO-WEAPONS form the arsenals of those in the Parasitic Elite sponsoring eugenics-based programs," and provides a telephone number for information about the vaccination exemption package; and (3) a February, 22 2016 post that offers the vaccination exemption package in response to an inquiry for paperwork to avoid taking a vaccine. Dkt. No. 159 ¶ 4.

4    According to Gardner-Alfred, the tradition of her ancestors was "[l]iving a more holistic, traditional, healing, meditation, natural way of living." Dkt. No. 171-7 at ECF p. 4.

5    Gardner-Alfred testified to attending services in person in Brooklyn, "[s]ometimes a home," but she did not recall the last time she attended a service in person other than that it would "a long time ago, years ago." Dkt. No. 163-3 at ECF p. 7.

6    At deposition, Gardner-Alfred could not recall how many virtual services she participated in and whether it was more than five. Dkt. No. 163-3 at ECF p. 6. She testified that at meetings, "[w]e just talk about, you know, uplifting spirituality, you know, reconnecting." *Id.* at ECF p. 5. She could not recall how many people attended the in-person meetings or how many she attended. *Id.* at ECF p. 8.

7   Gardner-Alfred testified that taking the prescription eye drops which involved foreign manmade material did not violate her religious beliefs because "[a]t the time, I thought it was something that was necessary." Dkt. No. 171-7 at ECF p. 14.

8   The eight newsletters are Children's Health Defense, Lawrence B. Palevsky's Holistic Child Health Newsletter, Freedom Angels, The Daily Wire, The Epoch Times, The Daily Shapiro, Connecting Consciousness, and Warren Horak—Lion Brands. Dkt. No. 164 ¶ 50, Dkt. No. 171-2 ¶ 50.

9   Diaz points to evidence that fetal cell lines were used in the testing of MRNA vaccines during their research and development phase. Dkt. No. 171-2 ¶ 58. But Diaz testified that her objection was to vaccines that contain fetal cell material. Dkt. No. 164 ¶ 40; Dkt. No. 171-2 ¶ 40. She admits that the Pfizer and Moderna vaccines were not themselves manufactured with fetal cell lines. Dkt. No. 171 at 2.

10  Though Rule 56.1 replies are not categorically impermissible, *see Cap. Recs., LLC v. Vimeo, LLC*, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts ... [but] the Rule does not prohibit such replies."), the Court notes that Defendant did not seek leave to submit such a reply and did not give the Court an opportunity to fashion a fair process for the submission of such a reply, for example by giving Plaintiffs the ability to respond, *see, e.g., id.* (permitting the plaintiffs to submit a Rule 56.1 reply but noting that "[t]he Court is sympathetic ... to [the d]efendants' concerns about the potential unfairness of doing so" and permitting the defendants "to submit either a reply in further support of their own Rule 56.1 statement or a sur-reply to [the p]laintiffs' reply").

11  Even the cases cited by Plaintiffs do not support the notion that summary judgment is never available on the sincerity of a plaintiff's professed religious beliefs. In *Tagore v. United States*, 735 F.3d 324, the Fifth Circuit held that a plaintiff proffered sufficient evidence to create a genuine issue of material fact regarding the sincerity of her practice of wearing "a kirpan with a 3-inch blade," when (1) the plaintiff testified to holding a belief that her religion required such practice; (2) "[s]he adduced voluminous evidence from the Sikh community ... that kirpans are mandated to be worn by the religion's adherents and ... most Sikhs ear kirpans with blades longer than 2.5 inches"; (3) she testified to a regular and uninterrupted practice of wearing her kirpan; and (4) she "was willing to sacrifice her government employment for the sake of wearing a religiously significant symbolic kirpan." *Id.* at 328–29. The court held: "Tagore's actions, the independent evidence of Sikh practices, and the government's acknowledgement [that some Sikhs believe a kirpan must be worn at all times] create a genuine issue of material fact as to her sincere belief in wearing a 3-inch bladed kirpan." *Id.* at 329. And, in *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, the question was not the quantum or quality of evidence a plaintiff would need to adduce to forestall summary judgment, but the evidence the plaintiff would need to adduce to be entitled to summary judgment and foreclose the defendant's right to challenge plaintiff's sincerity at trial. *Id.* at 55–57.

12  In addition, Valentine's statement in the vaccination exemption letter would not be admissible for its truth.

13  Elsewhere in her deposition testimony, Diaz was asked about medications that she took before and after she objected to the Vaccination Policy, and whether those medications violated her claimed religious beliefs. Dkt. No. 163-6 at ECF p. 18. When asked about one of her medications, "[i]f you knew that it was manufactured with aborted fetal cell lines, you wouldn't take it, right?" *Id.* Diaz responded, "Yes." *Id.* She was then asked, "[b]ut because you don't know, you can take it, right?" *Id.* Diaz again responded, "Yes." *Id.* It is also an undisputed fact that before and after Diaz sought exemption from the Vaccination Policy, she filled and refilled prescription medications without ever inquiring into whether the prescription medications were manufactured with or contained aborted fetal cells. Dkt. No 164 ¶¶ 55, 56; Dkt. No 171-2 ¶¶ 55, 56.

Later in her deposition, however, Diaz testified that she did not remember knowing whether any of the Covid-19 vaccines were manufactured with or contained aborted fetal cell lines when she objected to them:

Q. Did you consider, back in 2021, when you made your accommodation request whether there was a vaccine that wasn't produced with aborted fetal cell lines?

A. I can't remember.

Q. Okay. So you don't know, sitting here today, whether the Pfizer vaccine was produced with aborted fetal cell lines?

A. I can't remember.

Q. And you don't whether the Maderna [sic] vaccine was?

A. I can't remember.

Q. And you don't remember whether the Johnson & Johnson vaccine was?

A. I can't remember.

Q. Did you research the vaccines before you made your religious accommodation request?

A. I can't remember.

Q. Did you know anything about the vaccines before you made your religious accommodation request?

...

A. I can't remember.

Q. You can't remember whether you knew anything about them?

A. No.

Dkt. No. 63-6 at ECF pp. 4–5. To the extent that Diaz conceives of her religious objection to the Covid-19 vaccines as an objection to vaccines that *she knows* are manufactured with or contain aborted fetal cells, the Vaccination Policy still does not substantially burden or conflict with that belief because Diaz did not know whether the vaccines were manufactured with or contained aborted fetal cells.

14    In her Rule 56.1 response, Diaz disputes this assertion on the grounds that fetal cell lines were used in the testing of the mRNA vaccines. Dkt. No. 171-2 ¶ 58. However, that response fails to identify any evidence to call into question the assertion in Defendant's Rule 56.1 statement that the Covid-19 vaccines were not manufactured with and do not contain aborted fetal cell lines. The assertion is thus deemed admitted. *See Rhee*, 2023 WL 3319532, at *4.

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 6107644
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

Jacqueline V. HUES and Oulton A. Hues, Jr., Plaintiffs,

v.

FEDERAL INSURANCE
COMPANY, et al., Defendants.

Case No. 2:15-cv-84
|
Signed 10/16/2015

**Attorneys and Law Firms**

Jerome L. Skinner, Skinner Law Offices, Milford, OH, Paul R. Borth, Barnett & Borth, LLC, Glenview, IL, for Plaintiffs.

Robert James Kent, Bowles Rice LLP, Parkersburg, WV, Edward P. Perrin, Jr., Jennifer R. Poe, Hallett & Perrin, P.C., Dallas, TX, for Defendants.

OPINION AND ORDER

JAMES L. GRAHAM, District Judge

 *1 This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., by plaintiffs Jacqueline V. Hues and Oulton A. Hues, Jr., against Federal Insurance Company ("Federal"). The Chubb Group of Insurance Companies ("Chubb"), also named as a defendant in the complaint, was voluntarily dismissed by plaintiffs. Federal is the claims administrator of the Battelle Memorial Institute Group Accident Insurance Plan ("the Plan"), an ERISA benefit plan. The Plan benefits are financed through the Voluntary Accident Insurance Program ("the Policy"), an insurance policy issued by Federal. Oulton A. Hues, Sr., was an employee of Battelle Memorial Institute ("Battelle"), and was a participant in the Plan and an insured person under the Policy. Jacqueline V. Hues, his wife, and Oulton A. Hues, Jr., his son, were named as beneficiaries under the Policy.

Plaintiffs allege that on January 15, 2012, Oulton Hues, Sr., was killed when the small aircraft he was in, piloted by Robert Walker, crashed into Cape Cod Bay near Brewster, Massachusetts. Plaintiffs filed a claim for benefits under the accidental death terms of the Policy, and Chubb provided

them with a copy of the Policy. Complaint, ¶¶ 29, 31. While considering the claim, Chubb raised the issue of whether the aircraft pilot or crew member exclusion in the Policy applied. Under this exclusion, the Policy did not apply to the death of "an Insured Person riding as a passenger in...any aircraft while acting or training as a pilot or crew member" with the exception of "any passengers who temporarily perform pilot or crew functions in a life threatening emergency." Complaint, ¶ 34; Doc. 1-1, p. 28. Plaintiffs provided information and argument disputing the application of the exclusion, contending that the deceased was acting as a certified flight instructor during the flight. Complaint, ¶¶ 35-36.

By letter dated November 27, 2015, Chubb advised plaintiffs that their claim for benefits was being denied. Doc. 1-4, p. 6. The letter noted that the Policy was a "part of Battelle Memorial Institute ERISA benefits plan[.]" Doc. 1-4, p. 6. The letter advised that the claim was being denied because Chubb had found that the deceased was acting as a licensed pilot or crew member during the flight. Doc. 1-4, pp. 7-8. Chubb stated that it was willing to review any additional information that was not previously provided, and asked that any such information be provided within sixty days. The letter also stated,

> [P]lease be advised since the coverage provided under the Policy is part of an ERISA plan benefit, you have the right to appeal our determination that no coverage is provided under the Policy for this claim. Under this process, you have 60 days from your receipt of this letter to advise Chubb that you are appealing this decision. At the time you submit any notice of appeal, you may also submit written comments, documents, records and other information relating to the claim.

 *2 * * *

Any information provided with a notice of appeal shall be considered without regard to whether the information was submitted or considered in conjunction with the initial claim. With respect to any appeal, the Plan Administrator, or its designees, may hold a hearing or otherwise ascertain such facts as it deems necessary and shall render a decision which shall be binding on both parties. In deciding the appeal, no deference will be given to the decision denying your claim and the appeal shall be decided by an individual who did not decide the initial claim and is not a subordinate of anyone that decided the initial claim. A decision on an

appeal will be made within 45 days of receiving a notice of appeal and any additional information provided.

Doc. 1-4, p. 9.

Plaintiffs did not pursue an appeal under the terms of the Plan. They filed their complaint in the instant case on January 13, 2015, seeking a declaratory judgment determining their right to benefits under the policy, and the recovery of benefits due under the policy. See 29 U.S.C. § 1132(a)(1)(B). This matter is now before the court on Federal's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted.

## I. Standards Under Rule 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded allegations in the complaint as true, and determine whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Bishop v. Lucent Technologies, Inc., 520 F.3d 516, 519 (6th Cir. 2008); Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005). While the complaint need not contain detailed factual allegations, the "[f]actual allegations must be enough to raise the claimed right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must create a reasonable expectation that discovery will reveal evidence to support the claim. Campbell v. PMI Food Equipment Group, Inc., 509 F.3d 776, 780 (6th Cir. 2007). A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Id. "[A] motion for dismissal pursuant to Rule 12(b)(6) will be granted if the facts as alleged are insufficient to make a valid claim or if the claim shows on its face that relief is barred by an affirmative defense." Riverview Health Institute LLC v. Medical Mutual of Ohio, 601 F.3d 505, 512 (6th Cir. 2010).

**\*3** In evaluating a motion to dismiss, the court may consider a document or instrument which is attached to the complaint, or which is referred to in the complaint and is central to the plaintiff's claim. Weiner v. Klais & Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997); see also Nixon v. Wilmington Trust Co., 543 F.3d 354, 357 (6th Cir. 2008)( court may consider a document not formally incorporated by reference in a complaint when the complaint refers to the document and the document is central to the claims); Bassett v. National Collegiate Athletic Ass'n 528 F.3d 426, 430 (6th Cir. 2008)(court may consider exhibits attached to complaint and motion to dismiss which are central to the claims). Where the plaintiff fails to attach a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading. Greenberg v. Life Ins. Co. of Virginia, 177 F.3d 507, 514 (6th Cir. 1999); Weiner, 108 F.3d at 89. The court may also consider extrinsic materials which merely "fill in the contours and details" of a complaint. Yeary v. Goodwill Indus-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997). Several exhibits, including the Policy, are attached to the complaint. As plaintiffs have referred to the Plan in their complaint, defendant has attached a copy of the Summary Plan Description ("SPD") to its motion to dismiss. See Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan, 555 U.S. 285, 304 (2009)(summary plan description is a plan document).

## II. Exhaustion of Administrative Remedies

### A. Requirement of Administrative Exhaustion

Defendant argues that it is entitled to judgment because plaintiffs failed to exhaust their administrative remedies under the Plan. Plaintiffs did not plead in their complaint that they exhausted their administrative remedies, nor do they dispute that they failed to file an appeal from the denial of their claim by defendant; rather, plaintiffs argue that their failure to do so should be excused. ERISA's administrative scheme requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court. Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991). The decision whether to apply the exhaustion requirement is committed to the discretion of the district court. Costantino v. TRW, Inc., 13 F.3d 969, 974 (6th Cir. 1994). Exhaustion and review by plan administrators allows plan fiduciaries to efficiently manage their funds, to correct their errors, to interpret plan provisions, and to assemble a factual record which will assist the court in reviewing the fiduciaries' actions. Ravencraft v. UNUM Life Ins. Co. of America, 212 F.3d 341, 343 (6th Cir. 2000)(citing Makar v. Health Care Corp. of Mid-Atlantic, 872 F.2d 80, 83 (4th Cir. 1989)).

### B. Estoppel

Plaintiffs argue that the defendant should be estopped from arguing for dismissal based on their failure to exhaust their appeal remedies under the Plan. The Plan SPD provides, "This administrative appeal process must be completed before you begin any legal action regarding your claim." Doc. 6-1, p. 29. Plaintiffs note that the decision letter stated that "since the coverage provided under the Policy is part of an ERISA plan benefit, you have the right to appeal our determination" and "you have 60 days from your receipt of this letter to advised Chubb that you are appealing this decision." Plaintiffs argue that the letter did not advise them that an appeal was required under the Plan as a prerequisite for seeking judicial review of the decision. However, it is well established in the Sixth Circuit that "permissive language in an administrative-review provision does not entitle a plaintiff to forego such administrative review and instead file suit in federal court." Hill v. Blue Cross and Blue Shield of Michigan, 409 F.3d 710, 721 (6th Cir. 2005); see also Baxter v. C.A. Muer Corp., 941 F.2d 451, 454 (6th Cir. 1991)("The **4** fact that permissive language was used in framing the administrative review provision makes no difference.").

Although plaintiffs made no allegations in their complaint about not having a copy of the SPD, they now argue that defendant should be estopped from requiring administrative exhaustion because defendant did not furnish them with a copy of the SPD. Only a plan administrator has the duty under ERISA to furnish plan materials such as the SPD. Gore v. El Paso Energy Corp. Long Term Disability Plan, 477 F.3d 833, 842-844 (6th Cir. 2007); see also 29 U.s.c. § 1024(b)(4)("The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description[.]"). The plan administrator is "the person specifically so designated by the terms of the instrument under which the plan is operated." 29 U.S.C. § 1002(16)(A). The SPD identifies Battelle as the sponsor and administrator of the Plan. Doc. 6-1, p. 3. Defendant, as the claims administrator, had no obligation to provide plan documents.

Even assuming that plaintiffs did not have a copy of the SPD, ignorance of a claim procedure does not defeat the exhaustion requirement. Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133 n. 2 and 134 (2d Cir. 2001). In Meza v. General Battery Corp., 908 F.2d 1262 (5th Cir. 2000), the plaintiff argued that the failure to exhaust should be excused because he did not have the SPD and had no notice of the appeal procedures. Id. at 1278. The court held that plaintiffs seeking ERISA plan benefits are bound by the plan's administrative

procedures and must use them even if they have no notice of what those procedures are. Id. at 1279. The court noted that the policies underlying the exhaustion requirement, including upholding Congress' desire that ERISA trustees be responsible for their actions, not federal courts, and providing a sufficiently clear record of administrative action, require claimants, "at the very least, to make some effort to learn of the procedures applicable to them." Id. See also Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corp., 215 F.3d 475, 480 (7th Cir. 2000)(rejecting argument that exhaustion should be excused because plaintiff did not have the SPD; plaintiff had the duty to seek the necessary information, and he knew or should have known that the plan required him to file a claim). This view is supported by the language of § 1024(b)(4), which requires the plan administrator to furnish plan documents "upon written request of any participant or beneficiary[.]"

Here, the Policy states that it was issued for Battelle, identifies Battelle as the policyholder, and provides an address for Battelle. Doc. 1-1, pp. 3-4. The denial letter advised plaintiffs that the Policy was part of the Battelle ERISA benefits Plan. Plaintiffs do not allege that defendant prevented them in any way from obtaining Plan documents from Battelle. See McGowin v. ManPower Int'l, Inc., 363 F.3d 556, 559 (5th Cir. 2004)(because plaintiff did not request benefit plan documents and had not shown that she was prevented from obtaining them, she could not assert that she was denied meaningful access). The letter also advised plaintiffs that they had a right to appeal the denial of their claim "since the coverage provided under the Policy is part of an ERISA plan benefit[.]" Plaintiffs have pleaded no facts showing why they could not have contacted Battelle for additional information concerning the Plan and the appeal procedures. Even assuming that plaintiffs did not have a copy of the SPD, plaintiffs have pleaded no facts showing why this precluded them from pursuing the administrative appeal remedies of which they were aware.

**5** In their complaint, plaintiffs also note the Policy provision regarding arbitration. That provision states that the insurer, the insured or a beneficiary "may make a written demand for arbitration." Doc. 1-2, p. 17. In such a case, a panel of three arbitrators is convened to consider the claim. The Policy further states:

> Arbitration is not a pre-condition to commencement of an action at law

or in equity by an Insured Person to recovery on the policy. An Insured Person may exercise his or her right to commence an action at law or in equity to recover on the policy at any time and does not have to wait until arbitration is completed.

Doc. 1-2, p. 17. Plaintiffs cite this provision as support for their belief that they did not have to exhaust their appeal rights under the Plan. However, the above provision refers exclusively to arbitration as a separate remedy, and contains no reference to the appeal procedures applicable in the event that the claims administrator denied the claim. Plaintiffs do not allege that they requested arbitration in this case.

The court finds that plaintiff's allegations regarding why they failed to pursue an administrative appeal are insufficient to excuse exhaustion of administrative remedies based on an estoppel theory.

C. Futility

Plaintiffs also contend that exhaustion of administrative remedies should be excused in this case because an appeal would have been futile. Failure to exhaust administrative remedies is excused "'where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate.'" Coomer v. Bethesda Hospital, Inc., 370 F.3d 499, 505 (6th Cir. 2004)(quoting Fallick v. Nationwide Mutual Ins. Co., 162 F.3d 410, 419 (6th Cir. 1998)). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." Fallick, 162 F.3d at 419. A plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision. Coomer, 370 F.3d at 505. The mere denial of the initial claim is not sufficient to show futility. Evans v. Laborers' District Council and Contractors' Pension Fund of Ohio, 602 F.App'x 608, 616 (6th Cir. 2015). Dismissal for failure to exhaust administrative remedies is warranted where plaintiff fails to allege any factual basis for the claim of futility. See Coomer, 370 F.3d at 505; Weiner v. Klais & Co., Inc., 108 F.3d 86, 91 (6th Cir. 1997).

The administrative futility doctrine has mainly been applied in two scenarios: (1) when the plaintiff's suit is directed to the legality of the plan, not to a mere interpretation of it; and (2) when the defendant lacks the authority to make the decision sought by plaintiff. Dozier v. Sun Life Assurance Co. of Canada, 466 F.3d 532, 535 (6th Cir. 2006). Futility has also been recognized where multiple claims are so similar that the denial of one claim which was exhausted forecloses eligibility for relief on the other, or demonstrates with certainty that the unexhausted claim will also be denied. Id. at 535-36. None of those circumstances is present in the instant case.

Plaintiffs allege that exhaustion should be excused because, although they took an active role in the investigation of the circumstances surrounding their claim, they possessed no additional information to furnish during the appeal process, and they were certain that the claim would be denied on appeal. Complaint, ¶ 45. Plaintiffs have cited no authority for the proposition that their active involvement in the investigation of their claim should excuse their failure to appeal. The fact that plaintiffs extensively participated in the claims process is not an unusual circumstance. Insurance policies, like the policy in the instant case, typically place the burden on the claimant to give the insurer proof of loss. See Doc. 1-2, p. 20. For example, in the case of disability claims, the claimant must usually take a proactive approach in securing and furnishing doctors' opinions, medical records and other documents to the claims administrator in order to obtain a disability finding. The fact that plaintiffs did all they could to provide the defendant with information during the claims process in this case does not demonstrate that an appeal would be futile.

*6  Plaintiffs note language in the letter advising them that defendant would review "any additional information you may have that was not previously provided that you believe may impact our decision." Doc. 1-4, p. 9. Plaintiffs allege that they had no further information to provide for an appeal. However, the plaintiffs' right to appeal is discussed in a separate paragraph, and there is no language in that paragraph which requires the production of new information as a prerequisite for an appeal. In addition, defendant notes that plaintiffs have attached exhibits to their complaint which were not provided to the claims administrator, including the May 23, 2013, final report of the National Transportation Safety Board ("NTSB"), issued six months after the denial of plaintiff's claim, and the affidavit of David B. Hooper, a certified flight instructor, dated January 9, 2015. At the very least, plaintiffs could have filed an appeal and urged the decision maker to wait for the issuance of the final NTSB report. Plaintiffs' conclusory allegations concerning their belief that an appeal would be

denied are also insufficient to establish futility. See Malaney v. AT & T Umbrela Benefit Plan No. 1, No. 2:10-cv-401, 2010 WL 5136206 at *5-6 (S.D.Ohio Dec. 9, 2010); Barix Clinics of Ohio, Inc. v. Longaberger Family of Companies Group Medical Plan, 459 F.Supp.2d 617, 622 (S.D.Ohio 2005).

Regardless of whether new information could have been provided for an appeal, the fact that an appeal would be heard by a different decision maker also undercuts plaintiffs' futility argument. The decision letter advised plaintiffs that in an appeal, no deference would be given to the prior decision, and that the appeal would be decided by an individual who did not decide the initial claim and who was not a subordinate of anyone that decided the initial claim. Doc. 1-4, p. 9. Where an appeal will be heard by a different decision maker, courts have declined to hold that an appeal would be futile. See Laird v. Norton Healthcare, Inc., 442 F.App'x 194, 201 (6th Cir. 2011); Willard v. Ohio Operating Engineers Pension Plan, 942 F.Supp.2d 748, 755 (S.D.Ohio 2013); Simpson v. American Electric Power Service Corp., No. 2:05-cv-852, 2006 WL 2128937 at *3 (S.D.Ohio July 27, 2006).

Plaintiffs have failed to allege any factual basis for futility in their complaint sufficient to excuse their failure to exhaust their administrative appeal remedies under the plan, see Coomer, 370 F.3d at 505, and have not shown that "a clear and positive indication of futility can be made." Fallick, 162 F.3d at 419. Plaintiffs' failure to exhaust administrative remedies cannot be excused under the futility doctrine.

D. Dismissal With or Without Prejudice

The court concludes that dismissal for failure to exhaust administrative remedies is warranted in this case. The remaining issue is whether this case should be dismissed with or without prejudice. The plaintiffs were informed on November 27, 2012, that they were required to file an appeal within sixty days of the denial of their claim, that is, by January 26, 2013. Plaintiffs filed their complaint in this case on January 13, 2015, almost two years past this deadline. The Sixth Circuit has noted that sixty days was a "reasonable time constraint imposed by the plan for administrative review" of the denial of a claim. See Garst v. Wal-Mart Stores, Inc.,

30 F.App'x 585, 593 (6th Cir. 2002). The Sixth Circuit has also affirmed the dismissal with prejudice of an unexhausted ERISA claim. See Baxter, 941 F.2d at 454 n. 1. In Ravencraft, 212 F.3d at 344, the Sixth Circuit held that the district court should have exercised its discretion to dismiss without prejudice, citing Makar v. Health Care Corp. of Mid-Atlantic, 872 F.2d 80, 83 (4th Cir. 1989). However, in Gayle v. United Parcel Service, 401 F.3d 222, 230 (4th Cir. 2005), the Fourth Circuit clarified its previous decision in Makar, noting that dismissal without prejudice was appropriate whenever a claim can still be brought, as was the case in Makar, but that dismissal with prejudice was required where the claimant's plan remedies were time-barred. See also Bird v. GTX, Inc., No. 2:08-cv-2852-JPM-cgc, 2010 WL 883738 at *4 (W.D.Tenn. March 5, 2010)(dismissing with prejudice where time for appeal under the plan had expired).

*7 This court has concluded, based on the allegations in the complaint and related documents, that plaintiffs have failed to plead facts sufficient to show that they exhausted the administrative remedies provided by the Plan or that exhaustion should be excused, and that this case should be dismissed for failure to exhaust Plan remedies. However, plan trustees have been known to waive time limits for pursuing an appeal. See, e.g., Hammonds v. Aetna Life Ins. Co., No. 2:13-cv-310, 2015 WL 1299515 at *4 (S.D.Ohio March 23, 2015). This court cannot say definitively that the claims administrator in this case would reject plaintiffs' reasons for not filing a timely appeal as opposed to waiving the time limits, and plaintiffs should have the opportunity to make those arguments to the administrator. Therefore, the court will dismiss this action without prejudice.

III. Conclusion

In accordance with the foregoing, defendant's motion to dismiss for failure to exhaust administrative remedies (Doc. 6) is granted, and this action is dismissed without prejudice.

All Citations

Not Reported in Fed. Supp., 2015 WL 6107644

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2788833
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Western Division.

Joseph LETA, Sr., et al., Plaintiffs,
v.
HAMILTON COUNTY DEPARTMENT OF
JOB & FAMILY SERVICES, et al., Defendants.

Case No. 1:22-cv-511
|
Filed April 5, 2023

**Synopsis**
**Background:** Parents and grandparent of children placed in temporary foster care brought § 1983 action against county job and family services agency and other county entities and defendants, foster care agency and provider, and others, asserting various claims under First, Fourth, and Fourteenth Amendments, arising from children being vaccinated without their consent. Defendants moved to dismiss.

**Holdings:** The District Court, Susan J. Dlott, J., held that:

[1] it was not clearly established that parents who have lost temporary custody of their children retain substantive due process right to access and control their children's medical decisions, including right to decline vaccinations;

[2] agency employees and county were not liable on parents' § 1983 substantive due process claim;

[3] non-government defendants could not could be deemed state actors for purposes of parents' due process claims;

[4] parents failed to plausibly allege that vaccination of their children without their consent while children were placed in temporary foster care violated parents' right to free exercise of religion;

[5] parents and grandparent were not "seized" within meaning of Fourth Amendment when they were escorted by police from medical office during children's medical appointment; and

[6] even if parents and grandparent were "seized," defendants were not liable for seizure.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (44)

**[1]** **Federal Civil Procedure** 🔑 Claim for relief in general

A plaintiff must allege facts sufficient to state a plausible claim even when he alleges the necessary facts are within the head or hands of the defendants. Fed. R. Civ. P. 8(a).

**[2]** **Federal Civil Procedure** 🔑 Nature and Purpose

A plaintiff may not use the discovery process to obtain necessary facts after filing suit.

**[3]** **Civil Rights** 🔑 Nature and elements of civil actions

Section 1983 provides a cause of action against any person who, acting under the color of state law, violates the constitutional rights of another. 42 U.S.C.A. § 1983.

**[4]** **Civil Rights** 🔑 Liability of Public Employees and Officials

Suing a public official in his official capacity under § 1983 for acts performed within the scope of his authority is equivalent to suing the governmental entity. 42 U.S.C.A. § 1983.

**[5]** **Civil Rights** 🔑 Liability of Public Employees and Officials
**Civil Rights** 🔑 Complaint in general

Generally, plaintiffs suing public officials under § 1983 must designate in which capacity they are suing the officials, and if they do not, by

operation of law, the officials are deemed sued in their official capacities. 42 U.S.C.A. § 1983.

**[6]    Federal Civil Procedure** 🔑 Immunity

Although qualified immunity is affirmative defense to liability under § 1983, dismissal on basis of qualified immunity is appropriate when validity of such defense is apparent from face of complaint. 42 U.S.C.A. § 1983.

**[7]    Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Doctrine of "qualified immunity" provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known.

**[8]    Public Employment** 🔑 Qualified immunity

When applicable, qualified immunity provides government officials immunity from suit, not simply defense to liability.

**[9]    Civil Rights** 🔑 Government Agencies and Officers
**Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To determine whether qualified immunity applies to shield a government official from liability, courts must ask whether government official's conduct violated constitutional right, and if yes, whether specific right violated was clearly established.

**[10]    Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Qualified immunity from liability is applicable unless a government official's conduct violated clearly established constitutional right.

**[11]    Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

A government official is entitled to qualified immunity if his conduct violated constitutional right, but that right was not clearly established at time of violation.

**[12]    Civil Rights** 🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The inquiry into whether a constitutional right was "clearly established," for qualified immunity purposes, must be undertaken in light of the specific context of the case, not as a broad general proposition.

**[13]    Civil Rights** 🔑 Government Agencies and Officers

Courts can examine either prong of the qualified immunity analysis first.

**[14]    Civil Rights** 🔑 Municipalities and counties and their officers

Parents of children placed in temporary foster care failed to demonstrate that it was clearly established that parents who have lost temporary custody of their children retain substantive due process right to access and control their children's medical decisions, including right to decline vaccinations, and thus, individual county officials who were involved in children's placement in foster care and decision to vaccinate children while in foster care were entitled to qualified immunity on parents' § 1983 substantive due process claim, in the absence of authority holding that parents' claimed right existed. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[15]** **Constitutional Law** 👈 Parent and Child Relationship

A parent's fundamental liberty interest in the care, custody, and control of their children includes a substantive due process right to direct the medical care of their children. U.S. Const. Amend. 14.

**[16]** **Constitutional Law** 👈 Protection of Children; Child Abuse, Neglect, and Dependency

Parental substantive due process rights in the care, custody, and control of their children are not absolute, and if parental control falters, the state must play its part as parens patriae. U.S. Const. Amend. 14.

**[17]** **Constitutional Law** 👈 Parent and Child Relationship

Limitations on parents' substantive due process rights to control over their children are particularly salient in the context of medical treatment. U.S. Const. Amend. 14.

**[18]** **Infants** 👈 Health, Safety, and Morals

A state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.

**[19]** **Civil Rights** 👈 Liability of Public Employees and Officials

Parents of children placed in temporary foster care failed to establish that county job and family services agency employees were personally involved in any alleged denial of their parental rights to access and control of their children's medical care while children were in foster care, and thus, agency employees were not liable on parents' § 1983 substantive due process claim, where parents failed to allege that agency employees were present for children's medical

appointment or were involved in decision to vaccinate children at medical appointment. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[20]** **Civil Rights** 👈 Governmental Ordinance, Policy, Practice, or Custom

Parents of children placed in temporary foster care failed to identify any specific policies or practices of county job and family services agency, or to explain how conduct of any decisionmaker at agency led to violation of parents' constitutional rights, and thus, county was not liable on parents' § 1983 substantive due process claim alleging denial of their parental rights to access and control of their children's medical care while children were in foster care. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[21]** **Civil Rights** 👈 Vicarious or respondeat superior liability in general

Respondeat superior is not available as a theory of recovery under § 1983. 42 U.S.C.A. § 1983.

**[22]** **Civil Rights** 👈 Persons Liable in General

Each defendant's liability under § 1983 must be assessed individually, based on his or her own actions. 42 U.S.C.A. § 1983.

**[23]** **Civil Rights** 👈 Vicarious liability and respondeat superior in general; supervisory liability in general

A supervisor is liable under § 1983 only if she encouraged, participated in, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. 42 U.S.C.A. § 1983.

**[24]** **Federal Civil Procedure** 👈 Claim for relief in general

Whether a complaint raises the plausibility of an inference of wrongdoing depends on a host of considerations, including common sense and

the strength of competing explanations for the defendant's conduct. Fed. R. Civ. P. 8(a).

**[25]  Civil Rights** 🔑 Liability of Municipalities and Other Governmental Bodies

A county can be liable under § 1983 only where the county itself causes the constitutional violation at issue. 42 U.S.C.A. § 1983.

**[26]  Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

Plaintiffs seeking to hold a county liable under § 1983 must identify a governmental policy or custom that caused the plaintiff's injury. 42 U.S.C.A. § 1983.

**[27]  Civil Rights** 🔑 Color of Law

Liability under § 1983 is predicated on acts occurring under color of state law. 42 U.S.C.A. § 1983.

**[28]  Civil Rights** 🔑 Private Persons or Corporations, in General

The "public function test" for determining whether a private actor's actions are fairly attributable to the state, as require to hold the private actor liable under § 1983, requires that the private actor exercise powers which are traditionally exclusively reserved to the state. 42 U.S.C.A. § 1983.

**[29]  Civil Rights** 🔑 Private Persons or Corporations, in General

The "state compulsion test" for determining whether a private actor's actions are fairly attributable to the state, as require to hold the private actor liable under § 1983, requires proof that the state significantly encouraged or somehow coerced the private actor, either overtly or covertly, to take a particular action so that the choice is really that of the state. 42 U.S.C.A. § 1983.

**[30]  Civil Rights** 🔑 Private Persons or Corporations, in General

The "nexus test" for determining whether a private actor's actions are fairly attributable to the state, as require to hold the private actor liable under § 1983, requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state. 42 U.S.C.A. § 1983.

**[31]  Civil Rights** 🔑 Cooperation with state actor

Private persons may be held liable under § 1983 if they willfully participate in joint action with state agents. 42 U.S.C.A. § 1983.

**[32]  Civil Rights** 🔑 Questions of Law or Fact

Whether or not private actors' conduct was sufficient to transform them into state actors, such that the private actors may be held liable under § 1983 is a question of law. 42 U.S.C.A. § 1983.

**[33]  Civil Rights** 🔑 Cooperation with state actor

Parents of children placed in temporary foster care failed to plausibly allege that physicians employed by medical office conspired or acted in joint concert with any state actor, such that physicians could be deemed state actors for purposes of parents' § 1983 claim alleging that physicians violated their substantive due process rights by denying their access to and control of their children's medical care, by excluding them from children's medical appointment or having police escort parents from medical office; parents did not allege that physicians were present at medical office on day of appointment, had direct communication with any state actor about appointment, or directed or approved of decision to exclude parents from appointment or remove them from medical office. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[34]** **Civil Rights** 🗝 Cooperation with state actor

Parents of children placed in temporary foster care failed to plausibly allege that foster agency or foster caregiver conspired or acted in joint concert with any state actor, such that physicians could be deemed state actors for purposes of parents' § 1983 claim alleging that physicians violated their substantive due process rights by denying their access to and control of their children's medical care, by having children vaccinated, excluding them from children's medical appointment, or having police escort parents from medical office; parents did not allege that foster agency or foster caregiver communicated with state actors about having children vaccinated at appointment, prevented parents from going into exam room with children, or were involved in decision to call police. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[35]** **Constitutional Law** 🗝 Parental rights in general

**Health** 🗝 Vaccination and immunization

**Infants** 🗝 Care of child; services and treatment

Parents failed to plausibly allege that vaccination of their children without their consent while children were placed in temporary foster care violated parents' right to free exercise of religion; parents failed to allege any facts explaining nature of their religious beliefs, whether beliefs were sincerely held, or in what respect the vaccination of children conflicted with those religious beliefs, and parents failed to allege factual basis to infer that defendants knew that parents withheld consent for vaccinations based on religious beliefs. U.S. Const. Amend. 1.

**[36]** **Constitutional Law** 🗝 Beliefs protected; inquiry into beliefs

Plaintiff cannot establish claim for violation of free exercise of religious rights without first establishing that (1) the belief or practice asserted is religious in person's own scheme of things, and (2) belief is sincerely held. U.S. Const. Amend. 1.

**[37]** **Civil Rights** 🗝 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To extent that parents of children placed in temporary foster care may have had right, as non-custodial parents, to withhold consent for vaccination of their children for religious reasons, such right was not clearly established at time that children were vaccinated, and thus, individual government officials involved in vaccination decision were entitled to qualified immunity on parents' § 1983 free exercise claim. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[38]** **Civil Rights** 🗝 Cooperation with state actor

Parents of children placed in temporary foster care failed to plausibly allege that physicians employed by medical office, foster agency, or foster caregiver conspired or acted in joint concert with any state actor, such that they could be deemed state actors for purposes of parents' § 1983 claim alleging that vaccination of their children violated parents' right to free exercise of religion, where parents did not allege that physicians, foster agency, or foster caregiver communicated with state actors about having children vaccinated at appointment. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

**[39]** **Arrest** 🗝 Particular cases

Parents and grandparent of children placed in temporary foster care were not "seized" within meaning of Fourth Amendment when they were escorted by police from medical office during children's medical appointment and were not free to remain there; medical office private property, and police officers did not use force or otherwise restrain parents' or grandparents' freedom or threaten them with arrest. U.S. Const. Amend. 4.

[40]    **Arrest** 🔑 What Constitutes a Seizure or Detention

A "seizure" within the meaning of the Fourth Amendment can occur in one of two ways: (1) use of force with the intent to restrain, or (2) show of authority with acquisition of control. U.S. Const. Amend. 4.

[41]    **Arrest** 🔑 What Constitutes a Seizure or Detention

Usually, the test for if a Fourth Amendment seizure has occurred is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. U.S. Const. Amend. 4.

[42]    **Civil Rights** 🔑 Persons Liable in General
**Civil Rights** 🔑 Liability of Public Employees and Officials

Assuming that parents and grandparent of children placed in temporary foster care were "seized" within meaning of Fourth Amendment when they were escorted out of medical office during their children's medical appointment, neither county job and family services agency employees nor medical office personnel could be held liable under § 1983 based on agency caseworker's decision to direct medical office personnel to call police to remove parents and grandparent; agency employees had no authority to require medical office personnel to call police, or to require police officers to remove or escort parents and grandparent from medical office premises, and there was no evidence that agency employees or medical office personnel acted in concert with police. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[43]    **Civil Rights** 🔑 Governmental Ordinance, Policy, Practice, or Custom

Assuming that parents and grandparent of children placed in temporary foster care were "seized" within meaning of Fourth Amendment when they were escorted out of

medical office during their children's medical appointment, county job and family services agency caseworker's decision to direct medical office personnel to call police to remove parents and grandparent from medical office during children's medical appointment was insufficient to subject county to liability under § 1983, where parents and grandparent failed to plead facts supporting inference that county had policy to use police officers to exclude parents from medical appointments for children placed in foster care, or that directing medical office personnel to call for police intervention fell within caseworker's alleged final decisionmaking authority for day-to-day communications with medical providers. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

[44]    **Civil Rights** 🔑 Cooperation with state actor

Assuming that parents and grandparent of children placed in temporary foster care were "seized" within meaning of Fourth Amendment when they were escorted out of medical office during children's medical appointment, decision by medical office personnel to call police to remove parents and grandparent, allegedly at direction of agency caseworker, did not constitute concerted action with police who removed parents and grandparents from medical office, and thus, medical office personnel were not state actors subject to liability under § 1983. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Thomas W. Condit, Cincinnati, OH, for Plaintiffs.

Jerome A. Kunkel, Zachary Kyle Garrison, Joseph Jonathan Prem, Hamilton County Prosecutor's Office, Civil Division, Cincinnati, OH, for Defendants Hamilton Job & Family Services, Hamilton County, Ohio Board of County Commissioners, Sandi Webster, Samantha Fleckenstein, Bailee Brown.

Alice A. Jones, Jennifer Orr Mitchell, Dinsmore & Shohl LLP, Cincinnati, OH, for Defendants Trihealth, Inc., Bethesda

Family Practice Center, Constance Zimmer, Loraine A. Stephens, Kaitlyn Steffenmeier, Richard A. Okragly, Jr.

Benjamin G. Stewart, Laura Elizabeth Gates, Keathing Muething & Klekamp PLL, Cincinnati, OH, for Defendant Necco.

Michael T. Mann, Cincinnati, OH, for Defendant Cheryl Sakhi.

Order Granting Motions to Dismiss and Denying as Moot Joint Motion for Protective Order

Susan J. Dlott, United States District Judge

**\*1** Plaintiffs Joseph Leta, Sr., Nicole Leta, and Sherriden Weil filed suit against thirteen different governmental and non-governmental entities and individuals asserting violations of their constitutional rights after their children were vaccinated without their consent while in temporary foster case. Pending before the Court are (1) the Motions to Dismiss filed separately by the Hamilton County Defendants, [1] Defendant Necco, LLC, the TriHealth Defendants, [2] and Defendant Cheryl Sakhi (Docs. 11–14) and (2) Defendants' Joint Motion for Protective Order Staying Discovery (Doc. 25). All thirteen Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted, and the non-governmental Defendants argue that they cannot be held liable as state actors for violating constitutional rights. Additionally, Defendants move to stay all discovery until the Motions to Dismiss are adjudicated.

For the reasons that follow, the Court **GRANT** the Motions to Dismiss and **DENY AS MOOT** the Joint Motion for Protective Order.

## I. BACKGROUND

### A. Factual Allegations
The factual allegations in the First Amended Complaint are taken as true for purposes of the Rule 12(b)(6) motions.

#### 1. Leta Children Placed in Foster Care
Plaintiffs Joseph Leta and Nicole Leta ("the Letas" or "the parents") are the married parents of five children referred to as JL1, NL1, AL, NL2, and JL2 ("the Leta children"). (Doc.

7 at PageID 30, 33.) Plaintiff Sherriden Weil is the maternal grandmother of the Leta children. (*Id.* at PageID 31.)

On January 10, 2020, JL2 (age 3) woke up from a nap and snuck out of the family's house while Nicole Leta and the other Leta children were in other rooms. (*Id.* at PageID 33.) A neighbor reported JL2's "escape" to the Delhi Township, Ohio police, who reported the situation to Defendant Hamilton County Job and Family Services ("JFS"). (*Id.*) The Hamilton County, Ohio Juvenile Court subsequently removed the Leta children from their home and placed them in the interim custody of JFS. (*Id.*) JFS then assigned the children to multiple foster homes. (*Id.*) [3] Three Leta boys—JL, AL, and JL2—were living with Defendant Cheryl Sakhi, a foster caregiver with Defendant Necco, a foster care agency with whom JFS contracted, by March 2020. (*Id.* at PageID 34.)

#### 2. Police Called When Letas and Weil Attend Their Children's Medical Appointment
**\*2** On September 2, 2020, Defendant Bailee Brown, the JFS caseworker assigned to the Leta family in their Juvenile Court case, informed Joseph Leta that his sons were scheduled for medical appointments the next day at Defendant Bethesda Family Practice Center ("BFPC"), and the parents could attend. (*Id.*) BFPC is a medical practice owned and operated by Defendant TriHealth, Inc. (*Id.* at PageID 32.) Foster caregiver Sakhi called BFPC and warned the staff there could "be trouble" if the parents attended the appointments. (*Id.* at PageID 34.) The Letas had never spoken to Sakhi previously. (*Id.*)

The Letas and Weil introduced themselves at the front desk of the BFPC medical office when they arrived the next day. (*Id.*) Joseph Leta asked who would be permitted with the children in the exam room given the COVID-19 protocols in effect. (*Id.* at PageID 35.) When told only two adults would be permitted, Joseph Leta suggested that it be Nicole Leta and Sakhi. (*Id.*) Sakhi then arrived with the three Leta boys and her own 18-year-old daughter. (*Id.*) Sakhi's daughter was holding JL2. (*Id.*) JL2 reached out to his mother, and Nicole Leta reached out to take him from the teenager. The teenager pulled away and twice told Nicole Leta not to touch her. (*Id.*) Any physical contact between Nicole Leta and Sakhi's daughter was unintended and incidental to Nicole Leta taking hold of her son. (*Id.*) Sensing there would be trouble about who was permitted in the exam room, Joseph Leta stepped outside to call his attorney, JFS caseworker Brown, and others. He was unable to reach any person for help. (*Id.*) When the Leta

children were called into the exam room, only foster caregiver Sakhi and her daughter were permitted to accompany them. (*Id.* at PageID 36.) A staff member stopped Nicole Leta from following and said that Nicole Leta needed to sign a form. (*Id.*)

Several minutes later, City of Norwood, Ohio police officers arrived at the BFPC medical office and told the Letas and Weil that they had to leave the building. (*Id.*) JFS caseworker Brown later admitted that she directed "TriHealth/BFPC/ [Defendant Constance] Zimmer" to call the police to remove the Letas. (*Id.* at PageID 36.) Zimmer was the practice manager at BFPC. The police were called at JFS's direction even though no police intervention was needed. (*Id.*) The Letas and Weil were sitting silently in the waiting room when the police arrived. (*Id.*) The Letas and Weil cooperated when the police officer escorted them out of the building. (*Id.*) Foster caregiver Sakhi was in contact with foster agency Necco seeking direction and support during this time. (*Id.* at PageID 37.) Sakhi spoke bluntly and critically about the Letas for eight minutes in front of the Leta children. (*Id.*)

### 3. Leta Children Vaccinated Without Parental Consent

During the medical visit on September 3, 2020, two Leta children, AL and JL2, were given several vaccinations without the Letas' consent. (*Id.*) Plaintiffs allege that TriHealth, BFPC, and three physicians with BFPC—Drs. Lorraine Stephens, Kaitlyn Steffensmeier, and Richard Okragly—"individually and jointly, all in joint participation and coordination with" JFS, JFS caseworker Brown and/or JFS section chief Sandi Webster, and foster caregiver Sakhi made the decision to give the vaccines to AL and JL2. (*Id.*)

The Letas submitted an inquiry to JFS about how the vaccinations occurred. They allege the vaccinations had been against their "rights, wishes, and religious beliefs." (*Id.* at PageID 38.) Webster responded in a letter in part as follows: "Our agency attorney indicated your objection to getting your children's vaccination has been heard and ruled upon by the Juvenile Court." (*Id.*) In fact, the Juvenile Court had not ruled on that issue, and the Letas allege that Webster deliberately lied. (*Id.*)[4] "Parents strongly suspect that Defendants JFS, Webster, and/or Brown played a direct role in authorizing vaccinations against Parents' consent, but discovery will be required to determined what occurred in the TriHealth/BFPC/ Zimmer evasive, administrative mess, and who directed the decision-making that day." (*Id.* at PageID 39.)

*3 [1] [2] Medical records from the BFPC indicate three facts about who gave consent for the vaccinations:

(1) there was no indication of consent for vaccination in the September 3, 2020 records;

(2) Foster caregiver Sakhi informed the BFPC treating physician on March 12, 2020 that Nicole Leta *did not* consent to vaccinations; and

(3) Sakhi, acting on behalf of foster agency Necco, gave her written consent for treatment, including vaccinations on March 12, 2020.

(*Id.* at PageID 37–39.)[5]

### B. Procedural History

The Letas and Weil initiated this action on September 2, 2022, and then they filed a First Amended Complaint on October 31, 2022. (Docs. 1, 7.) Plaintiffs allege four claims against the Hamilton County Defendants, the TriHealth Defendants, the foster agency Necco, and the foster caregiver Sakhi collectively:

(1) Denial of parental rights to access to children's medical care as protected by the Due Process Clause;

(2) Denial of parental rights to control children's medical care as protected by Due Process Clause;

(3) Violation of parental rights to religious freedom as protected by the First and Fourteenth Amendments; and

(4) Unreasonable seizure in violation of the Fourth Amendment.

(Doc. 7 at PageID 42–43.) Because the Plaintiffs allege a violation of parental rights in the first three claims, the Court assumes that the first three claims are brought on behalf of the Letas only. The Letas and Weil seek money damages for the alleged constitutional violations under 42 U.S.C. § 1983.

All Defendants moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and for a protective order to stay discovery pending adjudication of the Motions to Dismiss. Plaintiffs opposed all of Defendants' Motions, which are now fully briefed and ripe for adjudication. The Court held oral arguments on March 20, 2023. At that hearing, Plaintiffs moved for the first time to admit the Norwood police officers' bodycam footage into evidence for purposes of the

Motions to Dismiss. Defendants opposed that oral motion and requested the right to supplement the dismissal briefing if the footage is admitted. The Court will deny the motion to admit the bodycam footage as unnecessary and untimely. [6]

## II. STANDARDS GOVERNING MOTIONS TO DISMISS

**\*4** Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, a complaint must comply with Federal Rule of Civil Procedure 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Rule 8(a)).

A complaint must include sufficient facts to state a claim that is plausible on its face and not speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Mere "labels and conclusions [or] a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. A complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014) (citation omitted). However, it "does not need detailed factual allegations" or "heightened fact pleading of specifics." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955. A district court examining the sufficiency of a complaint must accept well-pleaded facts as true, but not legal conclusions or legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–679, 129 S.Ct. 1937; *DiGeronimo Aggregates*, 763 F.3d at 509.

## III. ANALYSIS

[3] The Letas and Weil purport to assert constitutional claims against all Defendants pursuant to 42 U.S.C. § 1983. Section 1983 provides a cause of action against any person who, acting under the color of state law, violates the constitutional rights of another. [7] The Letas allege generally that Defendants violated their due process rights by denying them access to and control of their children's medical care when their children were taken into the medical exam room without them

and administered vaccines without their consent. They also allege that Defendants' administration of the vaccines to their children violated their religious beliefs. Finally, the Letas and Weil allege that Defendants are liable for violating their Fourth Amendment rights because they were seized by the Norwood police officers when they were removed from the BFPC medical office.

[4] [5] [6] Defendants move to dismiss the Letas' and Weil's claims on the basis that Plaintiffs fail to state a claim for a violation of their constitutional rights. The individual Defendants sued in their personal capacities also argue that they are entitled to qualified immunity. [8] Finally, the TriHealth Defendants, Sakhi, and Necco move to dismiss on the grounds that they are not governmental actors, and their actions were not taken under the color of state law for purposes of § 1983 liability.

**\*5** [7] [8] [9] [10] [11] [12] [13] The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity provides immunity from suit, not simply a defense to liability. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). To determine whether qualified immunity applies, courts must ask whether the government official's conduct violated a constitutional right, and if yes, whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232, 129 S.Ct. 808. A defendant is entitled to qualified immunity if his conduct violated a constitutional right, but that right was not clearly established at the time of the violation. *Saucier*, 533 U.S. at 200–201, 121 S.Ct. 2151. The inquiry into whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151. Courts can examine either issue first. *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

## A. Claims for Violation of Parents' Rights to Access and Control Children's Medical Care

### 1. Overview of the Legal Issue

**[14]  [15]**  The Letas allege that Defendants denied them the rights of access to and control of their children's medical care in violation of the Due Process Clause of the Constitution. (Doc. 7 at PageID 42.) "The Supreme Court has called parents' 'care, custody, and control of their children ... perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion)). This includes a fundamental due process right "to direct the medical care of their children[,]" though "case law in this area is sparse." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 415, 419 (6th Cir. 2019).

**[16]  [17]  [18]**  Parental rights are not absolute, however. "[I]f parental control falters, the State must play its part as *parens patriae*." *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). "[L]imitations on parents' control over their children are particularly salient in the context of medical treatment." *Kanuszewski*, 927 F.3d at 419. "[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J. R.*, 442 U.S. 584, 603, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). In fact, the Sixth Circuit stated in 2017 that parents had no constitutional right to an exemption from Michigan's mandatory vaccination program for children. *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (contrasting the lack of constitutional right to an exemption with the fact that Michigan provides a statutory right). Plaintiffs do not point to any caselaw calling that *Nikolao* holding into doubt prior to September 2020. [9]

Ohio regulations require public children services agencies to coordinate comprehensive health care for the children in their care, including appropriate immunizations:

> (A) The public children services agency (PCSA) or private child placing agency (PCPA) *shall coordinate comprehensive health care for each child in its care or custody* who enters into substitute care or has a placement change. In coordinating comprehensive health care, the PCSA or PCPA shall attempt to arrange for health care from the child's existing and previous medical providers as well *as involve the parent, guardian, or custodian in the planning and delivery of health care services.*
>
> * * *
>
> (D) The PCSA or PCPA shall arrange for the following health care pursuant to rule 5160-1-14 of the

Administrative Code and the "Bright Futures" guidelines (rev. 2/2017) for a child who is in substitute care. The guidelines can be reviewed at http://brightfutures.aap.org. *The agency shall ensure:*

> **\*6**  * * *
>
> *(5) Every child entering substitute care receives immunizations appropriate to age and health history.*

Ohio Admin. Code 5101:2-42-66.1 (emphasis added). [10]

Plaintiffs cite the case of *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), for the principle that parental rights "do[ ] not evaporate simply because [the parents] have not been model parents or have lost temporary custody of their child to the State." *Id.* at 753, 102 S.Ct. 1388. That quotation arises, however, in a discussion of the need for procedural due process protections for parents before the final forced dissolution of their parental rights. *Id.* It does not stand for the proposition that parents who have lost temporary custody of their children retain an unfettered constitutional right to direct their children's medical care.

Plaintiffs' attorney conceded that he could not identify any authority holding that parents who have lost temporary custody of their children retain a substantive due process right to access and control their children's medical decisions, including the right to decline vaccinations. In the absence of such clearly established authority, individual Defendants are entitled to qualified immunity on these claims.

### 2. Defendants Are Not Liable

In addition to the fact that individual Defendants are entitled to qualified immunity, the parental right to access and control medical care claims fail on other independent bases.

### a. Hamilton County Defendants

**[19]  [20]  [21]  [22]  [23]**  None of the Hamilton County Defendants—the Hamilton County Board of Commissioners, Hamilton County JFS, Sandi Webster, Samantha Fleckenstein, and Bailee Brown—can be held liable. Brown was the JFS caseworker assigned to the Leta family, Fleckenstein was Brown's supervisor, and Webster was the JFS ongoing section chief and the supervisor of both Brown and Fleckenstein. (Doc. 7 at PageID 31, 40.) However, respondeat superior is not available as a theory of recovery

under § 1983. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Each defendant's liability or a constitutional violation under § 1983 must be assessed individually, based on his or her own actions. *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008). A supervisor is liable only if she encouraged, participated in, authorized, approved, or knowingly acquiesced in the unconstitutional conduct of his subordinates. *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007); *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995).

**\*7** A quick review of the facts alleged against Fleckenstein, Webster, and Brown demonstrate that none can be held liable. Plaintiffs allege that Brown informed the Letas that they could attend the children's medical appointments on September 3, 2020. (Doc. 7 at PageID 34.) They also allege that at an unspecified time, Brown gave a "directive to TriHealth/BFPC/Zimmer to call the police to remove Parents." (*Id.* at PageID 36.) Plaintiffs speculate that "Brown did so only with the approval of, or under the direction of, Defendants Fleckenstein and/or Webster." (*Id.* at PageID 41.) Regarding the decision to vaccinate the children, Plaintiffs broadly allege that that Webster and/or Brown "in joint participation and coordination" with the TriHealth Defendants and foster caregiver Sakhi made the decision to administer several vaccines to AL and JL2. (*Id.* at PageID 37–38.)

**[24]** These facts are not sufficient to state claims against Fleckenstein, Webster, or Brown. Plaintiffs do not allege that any of the JFS employees were present at BFPC on the day of the Leta children's appointments. They do not allege any specific, non-conclusory facts that the JFS employees communicated with the TriHealth Defendants or with foster caregiver Sakhi about vaccinating the children. To be clear, Plaintiffs do not allege that any specific JFS employee directed that the Leta children be vaccinated at the September 3, 2020 medical appointment or even knew that the Leta children would be vaccinated at that appointment. Instead, Plaintiffs admit that it is "not clear" if the TriHealth Defendants relied on the consent of the foster caregiver to administer the vaccine and they only "strongly suspect Defendants JFS, Webster, and/or Brown played a direct role." (*Id.* at 39.) They conclude that "discovery will be required to determine what occurred" and "who directed the decision-making [sic] that day." (*Id.*) These allegations are not "enough to raise a right to relief" against Fleckenstein, Webster, or Brown "above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. [11]

**[25]** **[26]** Likewise, the allegations in the Amended Complaint are not sufficient to state a claim against Hamilton County itself. [12] A county can be "liable under § 1983 only where the [county] itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Respondeat superior is not a sufficient basis for liability. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018; *see also Morgan v. Fairfield Cnty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018) ("[A] municipality is liable only for its own wrongdoing, not the wrongdoings of its employees."). Therefore, plaintiffs seeking to hold a county liable must "identify a [governmental] 'policy' or 'custom'" that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The Sixth Circuit has recognized at least four avenues by which a plaintiff can prove a government's policy or custom:

> **\*8** (1) the [government's] legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.

*Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiffs here attempt to plead *Monell* liability two ways. First, they allege that JFS caseworkers and supervisors have decisionmaking authority for "day-to-day communications with medical providers." (Doc. 7 at PageID 41.) However, Plaintiffs do not make any non-conclusory allegations that Brown, Fleckenstein, or Webster communicated with the TriHealth Defendant medical providers about vaccinating the Leta children at the September 2020 appointment. Second, Plaintiffs allege that the "conduct of JFS Defendants in this case is consistent with long-standing JFS policies, practices, and customs of undermining parental rights and misleading medical provider and foster caregivers to portray parents in a bad light." (*Id.* at PageID 40.) This allegation also is conclusory. It fails to identify any specific policies or practices of JFS and to explain how the "conduct" of anyone at JFS led to a violation of Plaintiffs' constitutional rights.

### b. TriHealth Defendants, Sakhi, and Necco

[27] [28] [29] [30] The remaining Defendants also cannot be held liable on the due process denial of access to and control of medical care claims. The fundamental problem with these claims against the TriHealth Defendants, the foster parent Sakhi, and the foster agency Necco is that none of them are government actors. Liability under § 1983 is predicated on acts occurring under color of state law. Ordinarily, a private actor can be held liable under § 1983 only if their actions are held to be fairly attributable to the state under the public function test, the state compulsion test, or the nexus test:

> The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state." [*Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).*] The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. *Id.* Finally, the nexus test requires a sufficiently close relationship between the state and the private actor so that the action taken may be attributed to the state. *Id.*

*Memphis, Tenn. Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). These tests boil down to a core question: "whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 676 (6th Cir. 2018) (cleaned up).

*9 [31] [32] In this case, Plaintiffs argue that the TriHealth Defendants, Sakhi, and Necco can be held liable as state actors under § 1983 because they conspired with or acted in concert with the Hamilton County Defendants to violate Plaintiffs' rights. "Private persons may be held liable under § 1983 if they willfully participate in joint action with state agents." *Memphis, Tenn. Area Loc. Am. Postal Workers Union*, 361 F.3d at 905. Whether or not private actors' conduct was sufficient to transform them into state actors is a question of law for the Court to determine. *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002).

The case of *Siefert v. Hamilton Cnty.*, 951 F.3d 753 (6th Cir. 2020), is instructive. In *Siefert*, the Sixth Circuit explained that "non-government actors must comply with constitutional commands" when "there is such a close nexus between the State and the challenged action [by the private entity] that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 759–760. The plaintiffs in *Siefert* plausibly alleged that a children's hospital could treated as a state actor for purposes of § 1983 when they asserted that "Children's [Hospital] and the county remained in constant contact, relied on each other for keeping [the minor] at the hospital, and at various times gave the [parents] conflicting statements about who would make the ultimate decision to discharge [the minor]." *Id.* at 760. The Sixth Circuit found that the plaintiffs had alleged "a deep and symbiotic relationship between Children's [Hospital] and the county." *Id.* On the other hand, the Sixth Circuit cautioned that "hospitals and doctors do not become state actors merely because they comply with state statutes." *Id.*

Plaintiffs here have not pleaded sufficient facts to state a plausible claim that the TriHealth Defendants, Sakhi, or Necco acted in concert with the Hamilton County Defendants under the *Siefert* standard. The key distinguishing fact is that the plaintiffs in *Siefert* allege nearly a month of concerted action between the hospital and the county. *Id.* at 764. Here, Plaintiffs offer mostly conclusory allegations about a single visit to the BFPC medical office. "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (citation omitted); *see also Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563–564 (6th Cir. 2011) (same quote).

[33] Significantly, Plaintiffs do not specifically allege that any of the TriHealth physicians—Dr. Stephens, Dr. Okragly, or Dr. Steffensmeier—were present at the medical office on September 3, 2020. Plaintiffs do not allege that any of them had direct communication with any of the Hamilton County Defendants about the Leta children's appointment prior to or during the appointment. Plaintiffs do not allege that any of the physicians directed or approved of the decision to exclude the Letas and Weil from the medical examination room during the Leta children's appointment. Nor do they allege that any of the physicians directed or approved of the decision to call the Norwood police officers. Dr. Stephens, Dr. Okragly, or Dr. Steffensmeier simply cannot be held to have conspired or acted in joint concert with any state actor to have denied the Letas access to their children's medical care.

**\*10** The only specific allegation of communication between any state actor and any TriHealth Defendant is the allegation that the JFS caseworker Brown directed "Defendants TriHealth/BFPC/Zimmer" to call for police intervention. A single conversation about the decision to call the police, presumably following the disturbance in the waiting room between Nicole Leta and Sakhi's teenage daughter, does not give rise to a finding a joint action or plan between the Hamilton County Defendants and the TriHealth Defendants to deny the Letas access to their children's medical care.

 **[34]** Finally, Plaintiffs do not allege that foster caregiver Sakhi or foster agency Necco communicated with the JFS employees about having the children vaccinated at the September 3, 2020 appointment. They do not allege that either Sakhi nor anyone from Necco prevented the Letas from going to the exam room at BFPC with their children, nor do they allege that Sakhi or Necco were involved in the decision to call the police. Moreover, the mere fact that Necco is an agency that contracts with the state to provide child foster services is not sufficient to create state actor status. See *Howell v. Father Maloney's Boys' Haven, Inc.*, 976 F.3d 750, 753 (6th Cir. 2020) ("Across the country, there's near uniformity that foster homes do not count as state actors."). Therefore, Sakhi and Necco cannot be held liable for denying Letas' access to the children's medical care under the color of state law.

As to Plaintiffs' allegation of "joint participation and coordination" between Hamilton County Defendants and the non-governmental Defendants to vaccinate the children, the allegation is conclusory and insufficient. (Doc. 7 at PageID 37.) Plaintiffs admit in the Amended Complaint that it "is not clear" on whose consent the TriHealth Defendants relied to vaccinate the children and that "discovery will be required to determined [*sic*] what happened that day." (*Id.* at PageID 39.) The only consent on record for the vaccinations is a consent for treatment signed by Sakhi six months earlier in March 2020. (*Id.*) A joint decision by the TriHealth Defendants and Sakhi—all private individuals or entities—to vaccinate the children would not be action taken under the color of state law for purposes of § 1983. Again, there are no non-conclusory allegations that any of the TriHealth Defendants discussed with any of the Hamilton County Defendants prior to or during the September 3, 2020 medical appointments the decision to vaccinate the children that day. For all of these reasons, this case is readily distinguishable from *Siefert* and none of the non-governmental actors can be held liable for actions taken under the color of state law.

### 3. Conclusion

The Court will dismiss the medical access and medical control claims against all Defendants.

## B. Claim for Violation of Religious Rights

 **[35]** **[36]** The Letas also allege that Defendants violated their right to free exercise of religion when they vaccinated two Leta children without the Letas' consent. (Doc. 7 at PageID 42–43.) A plaintiff cannot establish a claim for violation of the free exercise of religious rights without first establishing that (1) "the belief or practice asserted is religious in the person's own scheme of things" and (2) the belief "is sincerely held." *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987).

The Letas' claim here is deficient as a matter of law. The Letas do not allege any facts explaining the nature of their religious beliefs, whether the beliefs are sincerely held, or in what respect the vaccination of children conflicts with those religious beliefs. The Letas also do not allege a factual basis for the Court to infer that Defendants knew they withheld consent for vaccinations based on religious beliefs. A person's opposition to immunizations could be based on a host of scientific, religious, or personal beliefs. Plaintiffs allege only that foster caregiver Sakhi informed the treating physician in March 2020 that Nicole Leta did not consent to vaccinations. (Doc. 7 at PageID 39.) Without more, the Letas have not stated a claim for violation of their religious beliefs upon which relief can be granted.

 **\*11** **[37]** **[38]** Additionally, Plaintiffs admit that they have found a "low level of support ... in case law regarding federal constitutional protection for rights of parents objecting on religious grounds to the immunization/vaccination of children." (Doc. 20 at PageID 257.) Rather, as mentioned earlier, the Sixth Circuit stated in 2017 that parents had no constitutional right to exempt their children from Michigan's mandatory vaccination program. *Nikolao*, 875 F.3d at 316. Certainly, the right of non-custodial parents to withhold consent for the vaccination of their children for religious reasons was not well established in September 2020. Therefore, the individual Defendants are entitled to qualified immunity on this claim as well. Finally, as explained in the previous section on the control of medical care claim, the TriHealth Defendants, Sakhi, and Necco cannot be held liable under § 1983 for actions taken under the color of state law as to the decision to vaccinate the children.

For all of these reasons, the Court will dismiss the Letas' free exercise of religion claim.

## C. Claim for Unreasonable Seizure in Violation of Fourth Amendment

### 1. Legal Overview of the Claim

**[39]**  **[40]**  **[41]**  Finally, the Letas and Weil assert that they were unreasonably seized in violation of the Fourth Amendment when Defendants "invoke[d] police intervention during the 09/03/20 medical appointment." (Doc. 7 at PageID 43.) The Supreme Court has held that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022). Usually, the test for if a seizure has occurred is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476–477 (6th Cir. 2022) (citation omitted). In this case, however, the Letas and Weil argue they were seized because they were escorted out of the medical office and were not free to remain there. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 263 (6th Cir. 2015) (Boggs, J. concurring) (stating that street preachers commanded to leave a public event or face arrest were seized). The parties dispute whether the facts alleged here amount to a seizure.

In 2005, the Sixth Circuit opined that "Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action." *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005) (emphasis in the original). The plaintiff in *Bennett* alleged that police officers from the City of Eastpointe escorted him back to the boundary line between Eastpointe and Detroit and then watched to make sure that he crossed the boundary back into Detroit. *Id.* In a more recent case, however, the Sixth Circuit stated that a protester whose repeated questions in violation of established rules contributed to a disturbance at a public meeting on public property was not seized when she was ejected from the meeting. *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 523 (6th Cir. 2019). Relevant factors to consider after

*Youkhanna* include whether force was used, whether the person had "lost the privilege to remain in the [public] space" based on his or her behavior, and whether the person otherwise was free to go where he or she wanted. *Id.*

Plaintiffs have not identified any Sixth Circuit or Supreme Court case holding that officers seized an individual for purposes of the Fourth Amendment when they escort him or her from private property, without the use of force, and do not otherwise restrain the individual's freedom. Here, Plaintiffs allege that JFS caseworker Brown gave a "directive to TriHealth/BFPC/Zimmer to call the police to remove [the Letas]." (*Id.* at PageID 36.) Plaintiffs have not sued the City of Norwood nor the Norwood police officers who escorted the Letas and Weil from the BFPC medical office. Plaintiffs do not allege that the Norwood police officers acted in joint concert with any named Defendants to violate Plaintiffs' rights. Nor do they allege that the police officers used force or explicitly threatened the Letas or Weil with arrest. Instead, they allege only that the officers told Plaintiffs that they had to leave the building, that the Plaintiffs were calm and cooperative, and that the officers then "escorted [Plaintiffs] out of the building." (*Id.* at PageID 36–37.) Plaintiffs do not allege that the officers restricted Plaintiffs' movement in any other way other than making them leave the medical office. The Court finds as a matter of law under the *Youkhanna* precedent that Plaintiffs have failed to state a claim that they were seized for purposes of the Fourth Amendment.

**\*12**  Case law from other Circuit Courts of Appeal also suggests that Plaintiffs were not seized even if the Norwood police required them to leave the BFPC building. *See Peery v. City of Miami*, 977 F.3d 1061, 1071 (11th Cir. 2020) ("The key question is whether a reasonable person can "terminate the encounter" with police. A person who is told to leave one place but 'remains free to go anywhere else that he wishes' can undoubtedly terminate his encounter.") (internal citation omitted); *Laverdi v. Jenkins Twp.*, 49 F. App'x 362, 364 (3d Cir. 2002) ("Although [plaintiff] was escorted from the [public] meeting, he left freely and was never touched by the police officer[,] a far cry from a full-scale arrest. Under these circumstances, the District Court did not err in holding that [plaintiff's] Fourth Amendment rights were not violated."); *Sheppard v. Beerman*, 18 F.3d 147, 153 (2d Cir. 1994) (finding no seizure where a law clerk was escorted out of chambers and the courthouse, but otherwise free to go anywhere else). On the basis of *Youkhanna* and the case law from other Circuits, the Court holds that Plaintiffs have failed to state a claim upon

which relief can be granted that the Norwood police officers seized them in violation of the Fourth Amendment.

### 2. No Defendants Are Liable

[42] Even if the Court were to hold that the Norwood police officer seized Plaintiffs when they escorted them from the BFPC medical building, none of the named Defendants can be held liable for that seizure. The primary allegation is that JFS caseworker Brown directed TriHealth/BFPC/Zimmer to call the police to remove Parents and that she did so under the approval of her supervisors "Fleckenstein and/or Webster." (Doc. 7 at PageID 36, 41.) The JFS employees cannot be held liable under these allegations as persons who caused the violation of Plaintiffs' Fourth Amendment rights even if their removal from the medical office had been a seizure. The JFS employees had no authority to require any TriHealth Defendant to call the police. Nor did they have authority to require Norwood police officer to remove or escort Plaintiffs from the medical office premises. Plaintiffs did not allege that JFS employees or TriHealth Defendants acted in concert with the Norwood police. The JFS employees simply cannot be held liable for the actions of the Norwood police officers two steps removed from Brown's "directive ... to call the police to remove Parents." [13]

[43] Nor has Plaintiff pleaded sufficient facts to establish *Monell* liability against Hamilton County for the seizure. Plaintiffs have not pleaded facts supporting an inference that Hamilton County has a policy to use police officers to exclude parents from medical appointments for children placed in foster care. Plaintiffs allege only that JFS caseworkers and supervisors have final decisionmaking authority for "day-to-day communications with medical providers." (Doc. 7 at PageID 41.) However, instructing medical providers to call for police intervention would not fall into a category of "day-to-day communications with medical providers."

[44] As to the TriHealth Defendants, only TriHealth, BFPC, and/or practice manager Zimmer are alleged to have communicated with JFS caseworker Brown and called the Norwood police. (*Id.* at PageID 36.) This single communication with a state actor, Brown, is not sufficient under the *Siefert* standard to hold these TriHealth Defendants liable for acting under the color of state law, particularly since it was the Norwood police officers, not Brown, who escorted Plaintiffs from the premises. Again, Plaintiffs did not sue the Norwood police officers nor allege that any named Defendants acted in concert with them.

**\*13** Finally, Plaintiffs do not allege that the TriHealth physicians, foster caregiver Sakhi, nor foster agency Necco played any role in calling for police intervention.

### 3. Conclusion

Based on this analysis, the Court will dismiss Plaintiffs' seizure claim.

## IV. CONCLUSION

For the foregoing reasons, the Hamilton County Defendants' Motion to Dismiss (Doc. 11) is **GRANTED**, Defendant Necco's Motion to Dismiss (Doc. 12) is **GRANTED**, the TriHealth Defendants' Motion to Dismiss (Doc. 13) is **GRANTED**, and Defendant Sakhi's Motion to Dismiss (Doc. 14) is **GRANTED**. Additionally, Defendants' Joint Motion for Protective Order Staying Discovery (Doc. 25) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 2788833

## Footnotes

1    The Hamilton County Defendants are the Hamilton County Board of Commissioners, Hamilton County Job and Family Services, Sandi Webster, Samantha Fleckenstein, and Bailee Brown. (Doc. 11 at PageID 49.)

2    The TriHealth Defendants are TriHealth, Inc., Bethesda Family Practice Center, Constance Zimmer, Lorraine Stephens, M.D., Kaitlyn Steffensmeier, M.D., and Richard Okragly, Jr., M.D. (Doc. 13 at PageID 85.)

3    The allegation that the Letas retained rights regarding their children's medical care when they were placed in foster care, including the right to consent to medical vaccinations, is a legal conclusion at the heart of this case that the Court need not accept as true. (*Id.* at PageID 33–34.)

4    At the oral argument hearing, counsel for Hamilton County asserted that the Juvenile Court had adjudicated JFS's authority to have the Leta children vaccinated over the Letas' objection in a prior custody case. That asserted fact, however, is contrary to the well-pleaded allegations in the Amended Complaint and is not relied upon for purposes of the pending Motions.

5    Plaintiffs make several allegations about their efforts to obtain more information or pre-suit discovery about the events that occurred at the medical offices on September 3, 2020. Plaintiffs assert generally that Defendants were not cooperative and would not produce documents without a warrant. These alleged facts are not spelled out here because they are not relevant to the merits of the pending motions.

The Court notes that Plaintiffs suggest that their claims should be permitted to go forward, even when based only on mere speculation, because Defendants were not cooperative in pre-suit discovery efforts. However, a plaintiff must allege facts sufficient to state a plausible claim even when he alleges the necessary facts are "within the head or hands of the defendants." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011). "The plaintiff may not use the discovery process to obtain [necessary] facts after filing suit." *Id.*; *see also Anderson v. Bos. Sci. Corp.*, No. 1:12-CV-00762, 2013 WL 632379, at *3 (S.D. Ohio Feb. 20, 2013) ("[D]iscovery cannot be used as a fishing expedition to uncover the facts necessary to support the causes of action presented in the complaint."). Moreover, discovery as to which individual Defendants took particular actions is not necessary here because, as stated in the Analysis section, Plaintiffs have failed to plead a violation of their clearly established constitutional rights.

6    Plaintiffs did not submit the bodycam footage when they filed the Amended Complaint. Instead, they chose to describe what the bodycam footage showed in their allegations. (Doc. 7 at PageID 36–37.) Defendants based their arguments in the Motions to Dismiss on those written allegations. In their Memoranda in Opposition, Plaintiffs also relied on the allegations pleaded in the Amended Complaint and did not seek to admit the bodycam footage. Defendants filed their Reply briefs again based solely on the written allegations. It would be unfair and contrary to judicial economy to admit the bodycam footage and permit additional briefing at this late date. Moreover, counsel for Plaintiffs did not identify any new, material, or dispositive facts which would be gleaned from the bodycam footage that it had failed to include in the Amended Complaint. For these reasons, the Court will deny the oral motion to admit the police bodycam footage.

7    The statute states as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

8    Plaintiffs do not specify in the First Amended Complaint whether they are suing the individual Defendants in their official capacities, individual capacities, or both. "Suing a public official in his official capacity for acts performed within the scope of his authority is equivalent to suing the governmental entity." *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999) (citing *Ky. v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). "Generally, plaintiffs must designate in which capacity they are suing defendants; if not, by operation of law, defendants are deemed sued in their official capacities." *Id.* Nonetheless, because the individual

Defendants raised arguments on dismissal as if they were sued in both capacities, the Court will make that assumption as well.

Although qualified immunity is an affirmative defense, dismissal on the basis of qualified immunity is appropriate when "the validity of such defense [is] apparent from the face of the complaint." *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021).

9   The Court notes that COVID-19 vaccines had not been approved or administered as of September 2020 in the United States. The caselaw that developed on mandatory COVID-19 vaccinations is not relevant to this discussion.

10  Additionally, Ohio law generally requires a course of vaccinations for school-age children. Ohio Rev. Code § 3313.671(A)(1). There is an exception for a student whose parent or guardian "declines to have the pupil immunized for reasons of conscience, including religious convictions." Ohio Rev. Code § 3313.671(B)(4). The Letas contend that this exception is applicable here, but they failed to allege that Defendants knew they had a religious-based objection to vaccinations. In the key allegation, Plaintiffs allege only that foster caregiver Sakhi informed the treating physician in March 2020 that Nicole Leta did not consent to vaccinations. (Doc. 7 at PageID 39.) They do not specifically allege that Defendants knew their objection to vaccinations was based on a particular religious belief. In fact, Plaintiffs allege neither the nature of their religious beliefs nor how the vaccination of children conflicts with those beliefs.

11  Plaintiffs also want the Court to draw the inference that Brown directed "TriHealth/BFPC/Zimmer" to have the Norwood police remove the Letas from the medical office as part of a conspiracy to exclude the Letas from the medical exam so the children could be vaccinated. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). This conspiracy inference is far-fetched. It would have been simpler for caseworker Brown simply not to have informed the Letas about the medical appointment for their children if the goal was to exclude them. Plaintiffs have pleaded no facts to support the inference that Brown or the Hamilton County Defendants knew the children were going to be vaccinated that day. Moreover, it is just as likely from the sparse facts alleged that Brown directed that the TriHealth Defendants call the police because there had been an incident in the waiting room between Nicole Leta and Sakhi's teenage daughter over JL2 that led the teenager to twice tell Nicole Leta, "Don't touch me," and that caused an "unhappy" Sakhi to "approach[ ] the front desk." (*Id.* at PageID 35.)

12  Though not raised by the Hamilton County Defendants, the Court has previously held that JFS is not *sui juris* and does not have the capacity to be sued. *Lowe v. Hamilton Cnty. Dep't of Job and Family Servs.*, No. No. 1:05cv117, 2008 WL 816669, at *2–3 (S.D. Ohio Mar. 26, 2008).

13  This conclusion is consistent with caselaw holding that individuals who report crimes or call the police for assistance generally cannot be held liable for violation of an arrestee's constitutional rights. *See, e.g.*, *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) ("Providing information to the police ... does not expose a private individual to liability for actions taken under color of law."); *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 88 (D.D.C. 2000) (calling the police for assistance does not establish joint action for the police); *Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005) (stating that "a private party who calls police officers for assistance" cannot be held liable under § 1983 "unless the police officers were improperly influenced or controlled by the private party").

---

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3359607
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Najean LUCKY, Plaintiff,

v.

COBX, CO. d/b/a Emergent Holdings Inc., Defendant.

Case No. 22-12514
|
Signed May 10, 2023

**Attorneys and Law Firms**

Noah S. Hurwitz, Hurwitz Law PLLC, Ann Arbor, MI, for
Plaintiff.

Brandon C. Hubbard, Maureen J. Moody, Scott R. Knapp,
Dickinson Wright PLLC, Lansing, MI, for Defendant.

<u>**ORDER GRANTING DEFENDANT'S
MOTION TO DISMISS [ECF NO. 6]**</u>

Victoria A. Roberts, United States District Judge

## I. INTRODUCTION

**\*1**  Najean Lucky filed this suit against her former
employer COBX, Co. ("Defendant") for allegedly failing to
accommodate her religious accommodation request after the
company mandated that all employees get vaccinated against
COVID-19. Lucky alleges: (1) failure to accommodate under
Title VII of the Civil Rights Act of 1964 ("Title VII") (Count
I); (2) Title VII retaliation (Count II); and (3) retaliation under
the Elliot-Larsen Civil Rights Act ("ELCRA") (Count III).

Before the Court is Defendant's motion to dismiss Counts II
and III. [ECF No. 6]. Because Lucky cannot establish that
her religious accommodation request was the "but for" cause
of her termination as a matter of law, the Court **GRANTS**
Defendant's motion.

## II. FACTUAL BACKGROUND

On November 1, 2021, Defendant announced a mandatory
policy that required all employees to get vaccinated against
COVID-19 by December 8, 2021. The only exception to the
policy was for individuals who received a religious or medical
accommodation. The policy contemplated that if an employee

did not obtain a religious or medical accommodation and
failed to get vaccinated, Defendant would place the employee
on unpaid leave on December 9, 2021 before terminating
the employment. This policy applied to remote employees as
well.

On November 8, 2021, Lucky requested a religious
accommodation. She outlined her religious beliefs and why
she could not get the COVID-19 vaccination. *See* [ECF No.
10-2].

Shortly after the interview, Defendant denied Lucky's request
via email because "the information [she] provided, both
verbally and in writing, [did] not meet the criteria for a
sincerely held religious belief, practice, or observance." [ECF
No. 10-1, PageID.191].

Lucky did not get vaccinated. She believed that she should
not be forced to get vaccinated given her religious beliefs and
her status as a fully remote employee.

On December 9, 2021, Defendant suspended Lucky without
pay. One month later, Defendant terminated Lucky and 250
other employees whose religious accommodation requests
were also denied. Lucky then filed this suit.

## III. LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests
the legal sufficiency of the complaint. *RMI Titanium Co.
v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir.
1996). A court must "construe the complaint in the light
most favorable to the plaintiff, accept its allegations as true,
and draw all reasonable inferences in favor of the plaintiff."
*DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

A complaint must contain sufficient factual matter to "state
a claim to relief that is plausible on its face." *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.
v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on
its face "when the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant
is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550
U.S. at 556). This standard does not "impose a probability
requirement at the pleading stage; it simply calls for enough
facts to raise a reasonable expectation that discovery will
reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at
556.

**\*2** Dismissal under Rule 12(b)(6) is warranted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of the claims that would entitle him or her to relief." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008).

## IV. ANALYSIS

Title VII makes it unlawful for an employer to discriminate against any of its employees because the employee "opposed ... an unlawful employment practice" or participated in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). An "unlawful employment practice" includes employment discrimination on the basis of an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ELCRA operates using the same analytical framework. *See* M.C.L. § 37.2202(1)(a).

To establish a prima facie case of Title VII [and ELCRA] retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer knew of the protected activity; (3) the employer took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). Regarding the "causal connection" element, a plaintiff "must establish that his or her protected activity was a but for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Cntr. V. Nassar*, 570 U.S. 338, 362 (2013); *Hecht v. Nat'l Heritage Academies, Inc.*, 499 Mich. 586, 606 (2016).

To establish retaliation under both statutes, Lucky alleges that (1) her request for accommodation was a protected activity; (2) Defendant knew of her protected activity; (3) Defendant took an adverse action by terminating her; and (4) "but for" her accommodation request, Defendant would not have terminated her. Defendant argues that Lucky cannot establish the "but for" element because her termination would have occurred even without her religious accommodation request. Defendant says that it terminated Lucky not because of her accommodation request, but because she refused to get vaccinated after her accommodation request was denied.

Defendant asserts that Lucky cannot show Defendant terminated her solely because she filed an accommodation request. Defendant is correct, and this argument is dispositive as a matter of law. The Court need not address Defendant's second argument: that a request for accommodation is not a protected activity.

" 'Causation in fact'—i.e., proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim ... and this includes federal statutory claims of workplace discrimination." *Nassar*, 570 U.S. at 346. A plaintiff is required "to show that the harm would not have occurred in the absence of—that is, but for —the defendant's conduct ... and it is thus textbook tort law that an action is not regarded as a cause of an event if the particular event would have occurred without it." *Id.* (internal quotes omitted).

Put differently, *Nassar* holds that to sustain a claim for retaliation, it must be plausible that, but for a request for a religious exemption, the plaintiff would not have been suspended and terminated. *See id.* at 362 ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim ... must establish that his or her protected activity was a but for cause of the alleged adverse action by the employer.").

**\*3** *Hunter v. AFGroup Emerging Markets*, No. 22-CV-990, 2023 WL 372204 (E.D. Wis. Jan. 24, 2023) presents almost the exact facts as Lucky's case. (Indeed, plaintiff's counsel in *Hunter*—Noah S. Hurwitz—is the same attorney who represents Lucky.) Hunter sued his former employer for religious discrimination under Title VII. *Id.* at \*1. In September 2021, Hunter preemptively submitted a request for religious exemption because he feared that his employer would require employees to get the COVID-19 vaccine. *Id.* He was right. In November 2021, Hunter's employer adopted a vaccination policy requiring all employees, including those working remotely, to be vaccinated by December 8, 2021. *Id.*

The policy contemplated that employees whose requests for religious exemption were denied and who did not get vaccinated would be placed on unpaid leave; if they remained unvaccinated, they would be terminated on January 5, 2022. *Id.* Hunter's preemptive request for a religious exemption was denied, and he did not subsequently receive the vaccination. *Id.* His employer placed him on unpaid leave on December 9, 2021, and terminated his employment on January 5, 2022.

The district court granted the employer's motion to dismiss Hunter's Title VII retaliation claim, reasoning that it failed for lack of causation. *Id.* at \*3. "Hunter's request for a religious exemption could not have been the but for cause of his suspension and termination because they would have happened all the same given his refusal to get vaccinated." *Id.*

Like the plaintiff in *Hunter*, Lucky's amended complaint makes clear that she was terminated because she refused the vaccine, not because she requested a religious exemption. *See* [ECF No. 3, PageID.26] ("Employees denied accommodation to the vaccine mandate were forced into the horrible position of *choosing between vaccination or termination* ... Defendant terminated remote employees *who remained unvaccinated* despite those employees posing no discernible risk to their coworkers.") (emphasis added). Despite her assertions otherwise, Lucky's own words, coupled with the terms of Defendant's policy, show that Defendant terminated her because she refused to get vaccinated against COVID-19, not because she requested an accommodation.

And Lucky does not allege that, had she never requested a religious exemption but still refused to get vaccinated, she would have remained employed. Nor does she allege that, had she gotten vaccinated, she still would have been suspended and terminated because she had requested a religious exemption. It was not Lucky's request for accommodation that resulted in her termination, but her failure to get the COVID-19 vaccine *after her request for accommodation was denied*. Lucky cannot, as a matter of law, establish either of her retaliation claims.

Lucky is not left without relief. Though her retaliation claims fail, Lucky may still seek relief through her failure to accommodate claim.

## V. CONCLUSION

The Court **GRANTS** Defendant's motion to dismiss Counts II and III of Lucky's amended complaint.

**IT IS ORDERED.**

**All Citations**

Slip Copy, 2023 WL 3359607

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 7095085
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Najean LUCKY, Plaintiff,

v.

LANDMARK MEDICAL OF
MICHIGAN, P.C., Defendant.

Case No. 23-cv-11004
|
Signed October 26, 2023

**Attorneys and Law Firms**

Brendan John Childress, Noah S. Hurwitz, Hurwitz Law
PLLC, Ann Arbor, MI, for Plaintiff.

Elyse K. Culberson, Jackson Lewis P.C., Southfield, MI,
Patricia Anderson Pryor, Jackson Lewis P.C., Cincinnati, OH,
for Defendant.

**OPINION AND ORDER**
**GRANTING MOTION TO DISMISS**

Bernard A. Friedman, Senior United States District Judge

 **\*1**  This matter is before the Court on a motion to dismiss
filed by defendant Landmark Medical of Michigan, P.C.
("Landmark"). (ECF No. 9). [1] Plaintiff Najean Lucky has
filed a response, and Landmark has replied. (ECF Nos. 11,
12). The Court does not believe oral argument will aid in the
resolution of this matter and will not hold a hearing. E.D.
Mich. LR 7.1(f)(2). For the reasons that follow, the motion is
granted.

I. Background
In the operative amended complaint, Lucky urges that
Landmark violated the law when it recruited her for
employment but then rejected her application upon her
disclosure that she was not vaccinated against COVID-19.
(ECF No. 8, PageID.85).

Lucky alleges that Landmark, a national in-home medical
care company, has "an inflexible vaccine mandate that
obligates employees and job-applicants to be vaccinated

from COVID-19 regardless of work location, remote
status, or responsibilities." (*Id.*, PageID.85-86). Lucky
states that for her part, she "is a non-denominational
Christian" and "seeks to make all decisions, especially those
regarding vaccination and other medical decisions, through
prayer." (*Id.*, PageID.86). She asserts that "God spoke to [her]
in her prayers and directed her that it would be wrong to
receive the COVID-19 vaccine." (*Id.*, PageID.87). Urging
that her refusal to receive the vaccine stems from a deep
religious conviction, she states that this is "demonstrated and
epitomized by her willingness to not work for an employer
unless they accommodated her religious beliefs to not receive
the COVID-19 vaccination." (*Id.*). Lucky further urges that
"[a]s a non-denominational Christian, [she] does not always
subscribe to the religious tenets share[d] by all Christians,
and instead [her] religious beliefs arise from her scriptural
interpretation and private prayer and communications with
God." (*Id.*).

Lucky alleges that she "is not just 'anti-vaccination,' " but
that "she prayed to God specifically about the COVID-19
vaccine and was directed by her God that she would suffer
spiritual harm if she received the COVID-19 vaccine." (*Id.*,
PageID.88). [2] Lucky notes also that her "religious spirituality
and faith in God, not any secular non-religious beliefs,
are responsible for her refusal to receive the COVID-19
vaccine." (*Id.*, PageID.88).

Lucky asserts that in February 2022, she was recruited by
Landmark's Talent Acquisition Manager via LinkedIn for a
Behavioral Health Care Manager position. (*Id.*). She says that
after confirming her interest in the position and submitting her
resume, she was interviewed three days later by Landmark's
Talent Acquisition Consultant. (*Id.*). Lucky states that the
interviewer spoke positively about Lucky's potential within
the company, discussed a starting salary, and informed her that
the responsibilities of the position were to be performed half
in-person and half remotely. (*Id.*).

 **\*2**  Lucky asserts that after these exchanges, the interviewer
asked if Lucky was vaccinated from COVID-19. (*Id.*). Lucky
says that she "expressed that she has sincerely held *bona
fide* religious beliefs precluding vaccination" and that "[t]his
statement prompted [the Talent Acquisition Consultant] to
end the interview." (*Id.*, PageID.89). Lucky also notes that
the interviewer "stated that she has 'spoken with ten other
potential candidates that had been turned down for not being
vaccinated.' " (*Id.*). Lucky asserts that the interviewer "then
claimed that [Landmark] was not accepting any religious or

medical accommodations to its COVID-19 vaccine mandate, affirmatively denying Plaintiff's employment without any further discussion." (*Id.*). [3]

The amended complaint includes a single cause of action for violation of Title VII (Religious Discrimination – Failure and Refusal to Hire). (ECF No. 8, PageID.91). [4]

Landmark has now filed a motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. (ECF No. 9). Specifically, Landmark argues that the amended complaint "fails to allege a sincerely held religious belief that conflicted with [Landmark's] vaccination requirement and required accommodation." (*Id.*, PageID.103).

Lucky in response urges that the present case is not a traditional failure to accommodate claim and so the traditional analysis cannot apply here "because [Landmark] immediately rejected [Lucky's] job application the instant she asked for a religious accommodation." (ECF No. 11, PageID.196). Lucky urges that because "[s]he never had an opportunity to provide her sincerely held religious beliefs or establish why they prevented her from COVID-19 vaccination," this is "discrimination in its purest form" and Landmark "refused to hire [Lucky] because of her religion." (*Id.*). Lucky also argues that her amended complaint "extensively pleads the manner in which Plaintiff's religiosity precluded her from vaccinating against COVID-19." (*Id.*, PageID.205).

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is properly granted if the complaint fails to allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court construes the complaint in the light most favorable to the plaintiff, presumes the truth of all factual assertions, and draws every reasonable inference in favor of the plaintiff. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008). But "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up).

## III. Analysis

**\*3** Notwithstanding Lucky's assertion that this is not a traditional failure to accommodate claim, (ECF No. 11, PageID.196), the parties seem to agree on at least the first element of the claim before the Court. *See* (Amend. Compl.) (ECF No. 8, PageID.92, ¶ 51) (identifying the following as the first element of a *prima facie* religious discrimination case: that the plaintiff "hold[s] sincere religious beliefs that conflict with an employment requirement") (citing *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363 (6th Cir. 2015)); (Mot. Dismiss) (ECF No. 9, PageID.105) ("[t]o bring any claim of religious discrimination, Plaintiff must allege a sincerely held religious belief that conflicts with an employment requirement") (citing *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007)); (Resp. Mot. Dismiss) (ECF No. 11, PageID.202) (identifying as the first element of a claim for refusal to hire that the plaintiff "(1) holds a sincere religious belief that conflicts with an employment requirement") (citing *EEOC v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 693 (M.D. Tenn. 2020)).

Landmark's motion to dismiss urges that, even assuming the truth of all of the allegations in the complaint, Lucky has failed to plead facts supporting this element – that Lucky has a sincerely held religious belief that conflicts with an employment requirement. (ECF No. 9). The Court agrees.

### A. *Cases cited by Lucky are materially distinguishable.*

Lucky argues that her amended complaint "extensively details how Plaintiff's sincere religious beliefs preclude COVID-19 vaccination." (ECF No. 11, PageID.202). She further cautions that "[f]ederal courts are reluctant to rule that an individual's beliefs are not religious in nature" and analogizes to three cases in which, she says, courts rejected an employer's efforts to dispute the sincerity of the employee's beliefs. (*Id.*, PageID.205-06). The comparison is unavailing, however, because the cases are factually dissimilar.

In *Keene v. City & County of San Francisco*, No. 22-16567, 2023 WL 3451687 (9th Cir. May 15, 2023), plaintiffs "sw[ore] that they [were] Christians who 'believe in the sanctity of life.' " *Id.* at \*2. They retired when their employer denied a religious exemption from its COVID-19 vaccine mandate, "as they swore that they could not receive a vaccine 'derived from murdered children' without violating their religious beliefs." *Id.* The Ninth Circuit reversed the district court's decision to deny a preliminary injunction and remanded, noting in doing so that "[a] religious belief need not be consistent or rational to be protected under Title VII,

and an assertion of a sincere religious belief is generally accepted." *Id.*

In *Jackson v. New Jersey Juvenile Justice Commission*, No. 19-17950, 2023 WL 22497 (D.N.J. Jan. 3, 2023), plaintiff was a practicing Muslim employed as a senior correctional police officer. *Id.* at *1. When selected for a random drug test, plaintiff was unable to produce a urine sample and ultimately refused to consume additional water, a position he related to his fast during the holy period of Ramadan. *Id.* at *3-4. Although there was evidence that Ramadan had ended on the day in question and that the tenets of Islam required him to accordingly *break* his fast, in denying summary judgment the court rejected the defendant's argument that plaintiff had failed to establish a *bona fide* religious belief because his individual practices conflicted with the central tenets of Islam. *Id.* at *4, 10. Instead, the court indicated that it could "look to whether beliefs are sincerely held and whether they are, in the plaintiff's own scheme of things, religious" but could not "inquire whether the plaintiff correctly perceived the commands of his faith." *Id.* at *10 (cleaned up).

Finally, in *EEOC v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684 (M.D. Tenn. 2020), the EEOC alleged that defendant supermarket interviewed an individual, Usher, for a part-time position, at the conclusion of which the interviewer told Usher that he would have to cut his hair to work there. *Id.* at 689. Usher contended that his practice of Rastafarianism included maintaining his hair in dreadlocks – a practice he traced to the Lion of Judah and Leviticus – and asserted that the supermarket refused his request for a religious accommodation to its grooming policy. *Id.* at 689-90, 700. In denying summary judgment, the district court rejected defendant's argument that, as a matter of law, Usher's stance on dreadlocks could not constitute a sincere religious belief because Usher had conceded that it was possible to be a member of his religion without wearing dreadlocks and had further conceded that he personally did not follow all Rastafarian beliefs. *Id.* at 700. Rather, the court held that "judging the sincerity of a person's religious beliefs is a 'quintessential fact question.' " *Id.*

\*4 Each of these cases involved a clearly identified religious practice or belief (respecting the sanctity of life by rejecting vaccines derived from fetal tissue; observing a fast during Ramadan; maintaining dreadlocks in conformity with Leviticus) and a distinct conflict with an employment requirement. Here, however, the Court is presented only with the nebulous claim that, as a "non-denominational

Christian," Lucky "seeks to make all decisions, especially those regarding vaccination and other medical decisions, through prayer"; that "God spoke to [her] in her prayers and directed her that it would be wrong to receive the COVID-19 vaccine"; and that she "does not always subscribe to the religious tenets share[d] by all Christians" but that her "religious beliefs arise from her scriptural interpretation and private prayer and communications with God." (ECF No. 8, PageID.86-87). Unlike the cases cited by Lucky, here she has not identified any particular religious practice or belief that is in conflict with an employment requirement.

### B. *Cases cited by Landmark more closely align with the facts of this case.*

The Court finds that the instant case is more akin to the cases identified by Landmark.

In *Blackwell v. Lehigh Valley Health Network*, No. 5:22-cv-03360, 2023 WL 362392 (E.D. Penn. Jan. 23, 2023), plaintiff was a nurse who had received a religious accommodation to defendant's COVID-19 vaccine mandate which allowed her to submit to regular COVID-19 screening tests in lieu of vaccination. *Id.* at *1. When plaintiff was informed that the tests would occur via nasal swab in the presence of her manager, she objected on the grounds that "observance of her religious beliefs forbids insertion of an unwanted foreign object[ ] into her body." *Id.* at *2. Although she offered to take a saliva test instead, and although she submitted an email challenging the factual and scientific basis for defendant's testing requirement, she was ultimately terminated. *Id.* In granting defendant's motion to dismiss, the district court recognized that it did not have authority to question the centrality of particular beliefs or practices of faith but noted that "the very concept of ordered liberty precludes this Court from allowing any person a blanket privilege to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* at *4 (cleaned up). Because plaintiff had "fail[ed] to plead any additional information about the religious nature of her beliefs," and in reviewing the factual and scientific objections raised in her email, the court concluded that "the basis for Plaintiff's belief is political, sociological, or philosophical – and not religious." *Id.* at *8 (cleaned up). Applying Third Circuit precedent, the court further found that "although sincerely held, Plaintiff has not sufficiently pleaded that her applicable belief is religious." *Id.*

Plaintiff's Complaint and the attachments thereto fail to plead any information as to the nature of Plaintiff's

"religious beliefs" that "forbid insertion of an *unwanted* foreign object into her body." ... Plaintiff's belief that she is forbidden from doing something Plaintiff herself deems "*unwanted*" is, absent further pleading regarding the religious nature of the belief, akin to asserting "a blanket privilege ... for avoiding all unwanted obligations."

*Id.* (cleaned up).

Lucky is correct in her observation that the court in *Blackwell* ultimately determined that the plaintiff's belief was political, sociological, or philosophical rather than religious and that here Lucky has specifically pled that her "religious spirituality and faith in God, not any secular non-religious beliefs, are responsible for her refusal to receive the COVID-19 vaccine." (ECF No. 8, PageID.88); (ECF No. 11, PageID.213). While true, the Court finds that the "blanket privilege" in *Blackwell* is meaningfully similar to the blanket privilege asserted here and that the same concerns apply. The *Blackwell* plaintiff alleged she was forbidden from doing something she herself deemed unwanted; Lucky alleges that her religious beliefs arise from her own scriptural interpretation and private prayer and communication with God and that God spoke to her in her prayers and instructed her not to receive the vaccine. *Blackwell*, 2023 WL 362392, at *8; (ECF No. 8, PageID.87). [5]

**\*5** In *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458 (M.D. Pa. 2022), the named plaintiff received a religious accommodation to her employer's vaccine mandate, was told that she must instead take a COVID-19 test twice a week, and unsuccessfully sought a further religious exemption from this requirement on the grounds that

> I am a Christian and hold a sincere religious belief that I have a God given right to make my own choices regarding what is good or bad for me. The Bible says that man has free will and I am using my free will, granted to me by God, to reject the testing conditions placed on my approved religious exemption. I work from home and [am] required to test twice weekly using the at home kit – Quick Vue SARS Antigen Test. Per the information on the packaging, it states: The QuickVue SARS Antigen

> Test has not been FDA cleared or approved but has been authorized by the FDA under an Emergency Use Authorization (EUA). I believe it is not an emergency for Geisinger to require an employee who works from home, with zero patient/employee contact to test in this with manner with a product that is not FDA approved. This violates my sincerely held religious belief and I believe testing in this manner is a bad choice for my health and body. I believe there are chemicals/ carcinogens associated with the swab and testing material. I'm afraid of the side effects and potential future health risks these chemicals may cause with this repetitive use. I believe this testing is toxic and it's only EUA approved, therefore I do not want to be part of an experiment.

*Id.* at 461-63 (alterations in original). She sued her former employer alleging religious discrimination, but the district court granted defendant's motion to dismiss, finding that her stated beliefs about testing were medical and not religious. *Id.* at 465. Again relying on Third Circuit precedent, the court held that "Finkbeiner's statement—which centers on her free will and belief that Covid-19 vaccines and tests are harmful and unnecessary—fails to establish sincere religious opposition under this framework." *Id.* As in *Blackwell*, the court noted that

> her belief that she has a "God given right to make [her] own choices"—which, implicitly, her employer must unfailingly respect—would amount to "a blanket privilege" and a "limitless excuse for avoiding all unwanted ... obligations." Though fungible enough to cover anything that Finkbeiner trains it on, this belief "is an 'isolated moral teaching' ... not a comprehensive system of beliefs about fundamental or ultimate matters."

*Id.* at 465-66 (footnotes omitted). The court also noted that her statement "reinforce[d] that her opposition stems from her medical beliefs." *Id.* at 466.

Lucky objects to the comparison to *Finkbeiner* on the same grounds that she objected to *Blackwell*. (ECF No. 11, PageID.214). However the Court finds the same

Lucky v. Landmark Medical of Michigan, P.C., Slip Copy (2023)

qualified comparison to be appropriate. Moreover here, as in *Finkbeiner*, Lucky's own statement indicates that her stance on COVID-19 relies on more than just her purported religious beliefs. Finkbeiner's request for an accommodation to defendant's testing requirement urged that as someone who worked from home, she would have no patient or employee contact. *Finkbeiner*, 623 F. Supp. 3d at 463. Similarly here, Lucky urges that "[t]he risk of Plaintiff spreading or contracting COVID-19 through the nature of her employment is somewhat alleviated by the fact she would be a partially remote employee." (ECF No. 8, PageID.91).

**\*6** In *Ellison v. Inova Health Care Services*, No. 1:23-cv-00132, 2023 WL 6038016 (E.D. Va. Sept. 14, 2023),[6] one of the plaintiffs sought an exemption from his employer's vaccine mandate on the grounds "that the Christian Bible requires him to treat his body as a temple of the Holy Spirit." *Id.* at \*5 (cleaned up). Similar to Lucky's claim here, he asserted that "it is a God-given responsibility and requirement for him to protect the physical integrity of his Body. And he further explained that he does so by praying over every decision he makes concerning his body or his health." *Id.* (cleaned up). In granting the motion to dismiss, the district court found that the plaintiff had failed to establish a sincere religious objection under Third Circuit precedent. *Id.* Plaintiff's "belief that if, after his prayer, God answers and interdicts his participation, amounts to the type of blanket privilege that undermines our system of ordered liberty. Certainly, if taken to its logical extreme, [plaintiff's] claim would serve as a limitless excuse for avoiding all obligations." *Id.* (cleaned up).

Lucky objects to the comparison to *Ellison* as it relies on the aforementioned Third Circuit precedent, *Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981). (ECF No. 11, PageID.215). Lucky urges that "*Africa* examined the 'religious in nature' question in a different backdrop[,] a prisoner alleging a violation of the First Amendment" and she notes that the three-part test laid out in *Africa* "has not been adopted by the Sixth Circuit and is not binding." (*Id.*, PageID.215-16). The Court agrees that *Africa* is not binding but finds that the cited cases which rely upon it provide a helpful comparison in this instance. Moreover, Lucky's objection to any reliance on *Africa* is undermined by her own citation to the case elsewhere in her brief. (ECF No. 11, PageID.205) (quoting *Africa*).

Defendant next draws the Court's attention to *Griffin v. Massachusetts Department of Revenue*, No. 22-cv-11991,

2023 WL 4685942 (D. Mass. July 20, 2023). *Pro se* plaintiff Griffin was terminated from her employment when she refused to be vaccinated against COVID-19 and was denied a religious exemption to the requirement. *Id.* at \*1-2. Griffin alleged that her decision not to be vaccinated was a sincerely held religious belief as, in her words, she had "closely contemplated with God and ha[d] been shown that [she] should not receive the COVID-19 vaccine." *Id.* at \*1 (cleaned up). She had "not alleged that she [was] a member of any specific church or faith, or other form of organized religion." *Id.* The court "assume[d] that plaintiff believes in God in her own individualized way, and that she [held] that belief sincerely," but nevertheless granted the motion to dismiss because "[s]he was not ... terminated because she believes in God; she was terminated because she refused to be vaccinated." *Id.*

In short, plaintiff is entitled to practice her religion in her own individualized way, without undue interference or discrimination. Nonetheless, courts are empowered to screen claims of religious discrimination that arise out of *bona fide*, facially neutral employment requirements, where the claim of religious practice appears to be entirely *ad hoc* or otherwise without a plausible factual basis.

...

[Plaintiff's] statements are nothing more than a bare representation that the basis of plaintiff's objection to vaccination derives from a religious belief. Plaintiff does not describe her religious beliefs or principles in any meaningful way, or how they relate to vaccines generally, or the COVID-19 vaccine specifically. Put another way, she does not allege that her religion requires her to observe certain medical limitations that include a refusal to take vaccines, or certain types of vaccines. And there is no specific indication as to how her beliefs or principles have affected other medical decisions in the past. In short, it does not appear that her opposition to the COVID-19 vaccine in particular derives from a religious belief about vaccines in general, or indeed any preexisting principle of any kind. Instead, she describes her belief as a result of a personal practice of "praying on it" when faced with difficult life decisions.

**\*7** ...

Again, while plaintiff is entitled to practice her own individualized form of faith, she is not entitled to a virtually automatic exception from the vaccination requirement, based solely on her own representation that it violates her

religious principles on an *ad hoc* basis. The complaint must allege some plausible set of facts from which it may be reasonably inferred *both* that she believes in or practices a particular form of religion *and* that her religion has a specific tenet or principle that does not permit her to be vaccinated. It is true that, unlike the plaintiff in [a different case], she stated that her objections derive from a belief in God, rather than skepticism over the efficacy or health impacts of the vaccine. But her unadorned declaration that God had "shown" her that she should not receive the vaccine, without more, is insufficient to establish a plausible basis to infer that the beliefs or practices of her religion prevent her from being vaccinated against COVID-19.

*Id.* at *6-7 (cleaned up) (footnote omitted).

Here Lucky asserts that she has cured the defects that were identified by the court in *Griffin* because her amended complaint is "far more detailed than the *pro se Griffin* plaintiff's complaint because Plaintiff's Amended Complaint describes the specific tenets of Plaintiff's religion that preclude her from vaccination." (ECF No. 11, PageID.215). The Court disagrees. Fundamentally, Lucky's amended complaint asserts that she is a non-denominational Christian that seeks to make all decisions through prayer and that God instructed her through prayer not to receive the COVID-19 vaccine. *See* (*id.*). Contrary to Lucky's assertion, this does *not* amount to significantly more than "a bare representation that the basis of plaintiff's objection to vaccination derives from a religious belief." *Griffin*, 2023 WL 4685942, at *7. She "does not describe her religious beliefs or principles in any meaningful way, or how they relate to vaccines generally, or the COVID-19 vaccine specifically." *Id.* The comparison to *Griffin* is apt and fatal to her claim.

The Court is mindful that it is not in a position to "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). And as the Supreme Court has said in a different context, determining what constitutes a "religious" belief or practice is a "difficult and delicate task" and must "not ... turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others." *Thomas v. Rev. Bd. Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). Here, however, Lucky's complaint fails to provide allegations from which it can reasonably be inferred that "that she believes in or practices a particular form of religion and that her religion

has a specific tenet or principle that does not permit her to be vaccinated." *Griffin*, 2023 WL 4685942, at *7 (emphasis omitted). That is, the complaint does not contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" because it "offers labels and conclusions" and only "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up).

C. *Lucky's alternative argument against dismissal fails to address the motion before the Court.*

**\*8** Lucky further argues that her amended complaint should not be dismissed because "[Landmark] terminated [Lucky's] job application immediately after [Lucky] informed [the interviewer] that she possessed religious beliefs, but before she could share her religious beliefs." (ECF No. 11, PageId.202); *see also* (*id.*, PageID.204) ("Defendant should not be allowed to retroactively challenge Plaintiff's religiosity because Defendant did not afford Plaintiff the opportunity to explain the specific conflict between her sincere religious beliefs and Defendant's COVID-19 vaccine requirement during her interview"). Lucky does not provide any explanation as to how this would alter or answer the question before the Court. The motion to dismiss attacks what was pled in the complaint, not whether Lucky could or would have provided more information about her alleged religious objection to the vaccine during the interview. Regardless of whether Lucky explained the conflict between her views and the vaccine requirement during the interview, her views do not amount to a sincerely held religious belief that conflicts with an employment requirement. Put differently: the instant motion to dismiss is addressed to the first element of a religious discrimination claim: whether Lucky had a sincerely held religious belief that conflicted with an employment requirement. What she told her prospective employer goes to the second element of the claim, whether she informed the employer about the conflict. *See* (ECF No. 11, PageID.202).

D. *The Court need not reach Landmark's alternative argument in support of dismissal.*

In its reply brief, Landmark urges that Lucky cannot show she was treated differently than any other unvaccinated individual and thus her claim "fails regardless of whether she can assert a sincerely held religious belief that conflicted with the vaccine requirement." (ECF No. 12, PageID.300-02). The Court need not address this argument given its finding that Lucky has failed to plead that she held a religious belief that conflicted with an employment requirement.

Lucky v. Landmark Medical of Michigan, P.C., Slip Copy (2023)

In sum: both sides agree that Lucky was required to plead the existence of a sincerely held religious belief that conflicted with an employment requirement. The Court finds that Lucky failed to do so. Accordingly, it is hereby,

ORDERED that defendant's earlier motion to dismiss (ECF No. 6) is DENIED AS MOOT.

IT IS FURTHER ORDERED that defendant's second motion to dismiss (ECF No. 9) is GRANTED. Plaintiff's amended complaint (ECF No. 8) is DISMISSED.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 7095085

## Footnotes

1 Landmark previously filed a motion to dismiss, (ECF No. 6), subsequent to which plaintiff amended her complaint, (ECF No. 8). Accordingly, the earlier motion to dismiss, (ECF No. 6), which is directed to a now-superseded pleading, is denied as moot.

2 She also notes, however, that she has made a "decision not to have *any vaccinations*" and that this decision "is based on her religious beliefs that she should not have *any vaccination* enter her body such that her body would be defiled, because her body is a temple." (ECF No. 8, PageID.86) (emphases added).

3 Lucky also notes that "[t]he risk of Plaintiff spreading or contracting COVID-19 through the nature of her employment is somewhat alleviated by the fact that she would be a partially remote employee" and urges that she "could have tested for COVID-19 daily." (*Id.*, PageID.91).

4 These parties have been before this Court once before on the matter. In 22-cv-11827, Lucky sued Landmark under Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"). This Court granted Landmark's motion to dismiss because the ELCRA does not include a claim for failure to accommodate religious beliefs, the cause of action pled in that complaint. (22-cv-11827, ECF No. 12). However, because Lucky had indicated that she intended to amend her complaint to assert claims under Title VII of the Civil Rights Act of 1964 upon receiving a right to sue letter from the Equal Employment Opportunity Commission, the Court's dismissal was without prejudice to file any such claims. (*Id.*, PageID.131, 135). In the present matter, Lucky states that after filing charges of religious and disability discrimination, on February 24, 2023, she received a right to sue letter from the Equal Employment Opportunity Commission. (23-cv-11004, ECF No. 8, PageID.85-86).

5 Lucky also urges that the comparison to a "blanket privilege" is misplaced "because Plaintiff is not just 'anti-vaccination' " but "[r]ather, Plaintiff prayed to God specifically about the COVID-19 vaccine and in return, God instructed Plaintiff to refrain from vaccinating against COVID-19 because she would suffer spiritual harm." (ECF No. 11, PageID.208). The Court notes that while Paragraph 21 of the Amended Complaint denies that plaintiff is "anti-vaccination," this is undermined by Paragraph 12 of the Amended Complaint which asserts that plaintiff has taken a "decision not to have *any vaccinations*" and that this decision "is based on her religious beliefs that she should not have *any vaccination* enter her body such that her body would be defiled, because her body is a temple." (ECF No. 8, PageID.86, 88) (emphases added).

6 This amended opinion superseded the decision cited by defendants, *Ellison v. Inova Health Care Services,* No. 1:23-cv-00132, 2023 WL 4627437 (E.D. Va. July 19, 2023).

McGrath v. Liberty Life Assurance Company of Boston, Not Reported in Fed. Supp. (2018)

2018 Employee Benefits Cas. 110,345

2018 WL 1547103
United States District Court, C.D. Illinois,
Springfield Division.

Mark A. MCGRATH, Plaintiff,

v.

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON, Defendant.

Case No. 17-cv-03095
|
Signed March 29, 2018

**Attorneys and Law Firms**

Kevin L. Linder, Linder Law Office, Springfield, IL, for
Plaintiff.

Jason M. Kuzniar, Alexis E. Pool, Wilson Elser Moskowitz
Edelman & Dicker LLP, Chicago, IL, for Defendant.

### OPINION

SUE E. MYERSCOUGH, UNITED STATES DISTRICT
JUDGE

**\*1** Before the Court is Defendant Liberty Life Assurance
Company of Boston's Motion to Dismiss Plaintiff's Complaint
Pursuant to Fed. R. Civ. P. 12(b)(6) (d/e 5). Defendant's
motion is GRANTED. Plaintiff Mark A. McGrath's
Complaint is DISMISSED WITHOUT PREJUDICE.

### I. BACKGROUND

The majority of the following facts come from Plaintiff's
Complaint (d/e 1). The Court accepts these facts as true
in ruling on a motion to dismiss. Tamayo v. Blagojevich,
526 F.3d 1074, 1081 (7th Cir. 2008). Additional facts come
from the benefit denial letter, dated April 21, 2005, sent by
Defendant to Plaintiff, a copy of which is attached as Exhibit
A to Defendant's memorandum of law in support of its motion
to dismiss. Although not attached to Plaintiff's Complaint,
the benefit denial letter is referenced in the Complaint, see
Complaint, ¶ 13, and is a document critical to the Complaint.
Therefore, the Court can consider the denial letter in ruling on
Defendant's motion to dismiss. See Phillips v. Prudential Ins.
Co. of Am., 714 F.3d 1017, 1019-20 (7th Cir. 2013).

Plaintiff, a supply chain manager for Safran USA from
September 1996 through December 2013, was a participant of
the Safran USA Long Term Disability Plan (Safran Plan). The
Safran Plan was underwritten and administered by Defendant.

On October 26, 2013, Plaintiff's medical impairments
prevented him from performing his work activity. Plaintiff
applied to Defendant for disability benefits and received said
benefits from April 25, 2014, to April 21, 2015. [1] In addition,
Plaintiff applied for Social Security disability benefits.
On August 11, 2014, the Social Security Administration
determined that Plaintiff was disabled under sections 216(i)
and 223(d) of the Social Security Act beginning on October
26, 2013. Although Defendant was aware of the Social
Security Administration's decision, Defendant sent Plaintiff a
benefit denial, dated April 21, 2015. The benefit denial letter
stated that Defendant had determined that disability benefits
were not payable to Plaintiff beyond April 21, 2015. Benefit
Denial Letter (d/e 6-1), at 1. The denial letter also stated that
any written request for review of Defendant's decision had to
be sent within 180 days of Plaintiff's receipt of the letter. Id.
at 6.

Plaintiff did not send a request for an administrative review to
Defendant within 180 days of the April 21, 2015, denial. After
the administrative review deadline had passed, Plaintiff's
attorney contacted Defendant and requested a voluntary
administrative review. Defendant's representative could not
guarantee the review requested.

On April 6, 2017, Plaintiff filed a Complaint (d/e 1), asserting
a claim under the Employee Retirement Income Security Act
of 1974 (ERISA). Plaintiff seeks the payment of disability
benefits by Defendant pursuant to the terms of the Safran
Plan. On April 21, 2017, Defendant filed its Motion to
Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P.
12(b)(6), arguing that Plaintiff's Complaint must be dismissed
because Plaintiff failed to exhaust his administrative remedies
before filing this suit. Plaintiff did not file a response to
the motion to dismiss.

### II. JURISDICTION

**\*2** As Plaintiff's ERISA claim is one by a plan participant
to recover benefits due to him under the terms of a disability
plan offered by his employer, this Court has subject matter
jurisdiction over the claim. See 29 U.S.C. § 1132(e)(1).

Additionally, the Court has subject matter jurisdiction over Plaintiff's ERISA claim because it is based on federal law. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausibility means alleging factual content that allows a court to reasonably infer that the defendant is liable for the alleged misconduct. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007). A plaintiff's complaint must suggest a right to relief, "raising that possibility above a speculative level." Kubiak v. City of Chicago, 810 F.3d 476, 480 (7th Cir. 2016). "[A] plaintiff is not required to plead facts in the complaint to anticipate and defeat affirmative defenses." Independent Trust Corp. v. Stewart Information Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012). However, if the plaintiff's complaint "sets out all of the elements of an affirmative defense, dismissal under Rule 12(b)(6) is appropriate." Id.

When faced with a Rule 12(b)(6) motion to dismiss, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016). However, "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011).

### IV. ANALYSIS

The text of 29 U.S.C. § 1132, which provides for civil actions to redress violations of ERISA, "does not address whether a claimant must exhaust [his] administrative remedies before filing suit in federal court." Gallegos v. Mount Sinai Med. Ctr., 210 F.3d 803, 807 (7th Cir. 2000). However, the Seventh Circuit has "interpreted ERISA as requiring exhaustion of administrative remedies as a prerequisite to bringing suit under the statute." Edwards v. Briggs & Stratton Ret. Plan, 639 F.3d 355, 360 (7th Cir. 2011); Zhou v. Guardian Life Ins. Co. of Am., 295 F.3d 677, 679 (7th Cir. 2002) ("As a pre-requisite to filing suit, an ERISA plaintiff must exhaust his

internal administrative remedies."). Dismissal is warranted if a plaintiff has failed to exhaust administrative remedies. Greene v. Meese, 875 F.2d 639, 643 (7th Cir. 1989).

"[A]n ERISA claimant's failure to file a timely administrative appeal from a denial of benefits is one means by which a claimant may fail to exhaust [his] administrative remedies." Edwards, 639 F.3d at 362 (internal quotation marks omitted). "[C]ourts may excuse a failure to exhaust administrative remedies where there is a lack of meaningful access to review procedures, or where pursuing internal plan remedies would be futile." Schorsch v. Reliance Standard Life Ins. Co., 693 F.3d 734, 739 (7th Cir. 2012) (internal quotation marks omitted).

Here, Plaintiff freely admits that he did not exhaust his administrative remedies before filing his Complaint. The benefit denial letter informed Plaintiff that a request for an administrative review had to be sent in writing to Defendant within 180 days of Plaintiff's receipt of the letter. But Plaintiff did not request an administrative review within that 180-day period. Complaint, ¶ 13. In addition, Plaintiff's Complaint contains no factual allegations suggesting that Plaintiff had no access to meaningful administrative review or that his pursuit of administrative review would have been futile. Although Plaintiff's attorney contacted Defendant after the review deadline to request a voluntary administrative review and was told that review could not be guaranteed, Defendant's failure to assent to Plaintiff's request does not amount to a lack of access to review procedures. See Ames v. Am. Nat. Can Co., 170 F.3d 751, 756 (7th Cir. 1999).

**\*3** Because Plaintiff has failed to exhaust his administrative remedies, his Complaint must be dismissed. However, the Court's dismissal of Plaintiff's Complaint is WITHOUT PREJUDICE so that Plaintiff has an opportunity to plead additional facts relevant to the issue of whether Plaintiff is excused from exhausting administrative remedies.

### V. CONCLUSION

For the foregoing reasons, Defendant Liberty Life Assurance Company of Boston's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (d/e 5) is GRANTED. Plaintiff Mark A. McGrath's Complaint (d/e 1) is DISMISSED WITHOUT PREJUDICE. Plaintiff is given 21 days from the date of this Opinion to file an amended

McGrath v. Liberty Life Assurance Company of Boston, Not Reported in Fed. Supp. (2018)

2018 Employee Benefits Cas. 110,345

complaint. If Plaintiff does not file an amended complaint within the time allotted, this case will be CLOSED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1547103, 2018 Employee Benefits Cas. 110,345

## Footnotes

1    Although Plaintiff alleges that he received disability benefits until April 24, 2016, see Complaint, ¶¶ 8, 10, the benefit denial letter from Defendant notes that benefits would not be paid beyond April 21, 2015. See Benefit Denial Letter (d/e 6-1), at 1. Plaintiff acknowledges that the denial of his benefits occurred on April 21, 2015. See Complaint, ¶ 13.

---

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2455681
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Megan PASSARELLA, Plaintiff,
v.
ASPIRUS, INC., Defendant.
Sandra Dottenwhy, Plaintiff,
v.
Aspirus, Inc., Defendant.
Cynthia Clutter, Plaintiff,
v.
Aspirus Wausau Hospital, Inc., Defendant.

22-cv-287-jdp, 22-cv-342-jdp, 22-cv-392-jdp
|
Signed March 9, 2023
|
Filed March 10, 2023

## Attorneys and Law Firms

Gregory M. Erickson, Mohrman, Kaardal & Erickson, Minneapolis, MN, for Plaintiff.

Chad R. Levanetz, Ruder Ware, L.L.S.C., Green Bay, WI, Nicole L. Stangl, Ruder Ware, Wausau, WI, for Defendant.

## OPINION and ORDER

JAMES D. PETERSON, District Judge

**\*1** Plaintiffs Megan Passarella, Sandra Dottenwhy, and Cynthia Clutter were health care workers at hospitals managed by Aspirus, Inc. Plaintiffs refused to comply with Aspirus's rule requiring employees to be vaccinated against COVID-19 and they were terminated. Plaintiffs filed these three suits contending that they were entitled to a religious exemption under Title VII of the 1964 Civil Rights Act. They also say that Aspirus violated the Americans with Disabilities Act by requiring regular COVID tests.

Aspirus moves to dismiss the suits for failure to state a claim. Aspirus contends that plaintiffs' Title VII claims fail because they object to the vaccine mandate as a matter of medical judgment rather than religious conviction. Aspirus contends that plaintiffs' ADA claims based on their objections

to COVID testing fail because they failed to exhaust those claims. Dkt. 5. [1]

The court will decide the motions in one order because all three cases are about Aspirus's vaccine mandate, plaintiffs are represented by the same counsel, and the parties make similar arguments in each case. As for the Americans with Disabilities Act claims, none of the plaintiffs exhausted their administrative remedies prior to filing suit. The ADA claims will be dismissed without prejudice.

The court will dismiss Passarella's and Dottenwhy's Title VII claims because their exemption requests show that their objections to the COVID vaccine were based on their medical judgment that the vaccine was unsafe. The court will not dismiss Clutter's Title VII claim at the pleading stage because she has alleged that her objection to the vaccine requirement is grounded in a sincere religious conviction. Clutter's case will proceed, but solely on her Title VII claim.

## BACKGROUND

### A. Scope of the pleadings

Both sides have submitted documents outside the complaint, which raises the question whether it is appropriate to consider those documents in deciding Aspirus's motions to dismiss. A court may consider documents outside the complaint in deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) without converting it into a motion for summary judgment if the documents are referred to in the complaint, concededly authentic, and central to the plaintiff's claim. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). The materials may be provided by either party, so long as they meet these three requirements. *See* 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."). The rule "prevents a plaintiff from evading dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proves his claim has no merit." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)) (cleaned up).

**\*2** The parties have submitted similar materials in all three cases, specifically the plaintiffs' religious exemption requests and appeals, as well as the charges plaintiffs filed with the Equal Employment Opportunity Commission (EEOC). Each

plaintiff refers to her exemption request and her EEOC charge in her complaint, and the documents are central to their claims. *See Stoetzer v. First State Bank of Bloomington,* No. 21-cv-1138-JES-JEH, 2022 WL 386018 (C.D. Ill. Feb. 8, 2022) (considering EEOC charge at motion to dismiss stage); *Egelkrout v. Aspirus, Inc.,* No. 22-cv-118-bbc, 2022 WL 2833961 (W.D. Wis. July 20, 2022) (same). And no party has contested the authenticity of any of the exhibits submitted on the motion. *See Hecker,* 556 F.3d at 582. So the court will consider those materials in deciding the motions to dismiss.

## B. Factual background

The court draws the following facts from plaintiffs' complaints, their exemption requests, and their EEOC charges. When deciding a Rule 12(b)(6) motion to dismiss, the court must accept all of the plaintiff's plausible factual allegations as true and draw all reasonable inferences in her favor. *Roberts v. City of Chicago,* 817 F.3d 561, 564 (7th Cir. 2016).

### 1. Aspirus's COVID-19 policies

Defendant Aspirus, Inc. is a non-profit health system that operates hospitals, clinics, and pharmacies in Wisconsin and the upper peninsula of Michigan. [2] Plaintiffs were employed at Aspirus hospitals in Wisconsin. In August 2021, Aspirus began requiring employees who had not been vaccinated against COVID-19 to submit to bi-weekly testing for the virus. All plaintiffs complied with the testing requirement.

A few months later in November 2021, Aspirus notified its employees that it would require them to be vaccinated against COVID as a condition of employment. Employees who did not receive the vaccine would be terminated in December. Aspirus allowed employees to request a religious exemption from the vaccination requirement. Aspirus told employees that requests "including non-religious rationale anywhere in the submission will likely result in denial." Dkt. 1, ¶ 19. Aspirus's examples of non-religious rationale included the vaccine's "adverse impact on fertility" and a "lack of safety or efficacy information." *Id.* Each plaintiff submitted a religious exemption request.

### 2. Plaintiffs' religious exemption requests and appeals

#### a. Sandra Dottenwhy

Plaintiff Sandra Dottenwhy was employed as a pharmacy technician. Dottenwhy sought an exemption from the vaccination requirement. Her explanation was:

Description of beliefs:

I am asserting my rights as a Christian to be exempt from taking this vaccine. I feel it was developed in a rush. I don't trust the information and long-term effects. Therefore I believe this is not right for me to put this vaccine into my body. I also feel that it's my body and no one has the right to tell me what to do with my personal being. I have prayed about this and have asked GOD for guidance, and believe that HE is with me on this decision.

No. 22-cv-342, Dkt. 8-1. Her request was denied.

Dottenwhy appealed, stating:

> So if it's my body my choice when it comes to abortion, WHICH I AM TOTALLY AGAINST. Why isn't it my body my choice when it comes to a vaccine, WHICH I AM TOTALLY AGAINST. In my opinion this vaccine was developed too quickly. Not enough time for deep study. I have prayed long and hard about this and I am fearful of the effects. The Bible says: My body is a temple of the Holy Spirit and to present my body as a living sacrifice, Holy and acceptable to God. I have read through Title VII of the Civil Rights Act of 1964, and I pray you would not go against my rights as a Christian and employee that has served your organization and the community for 18 years.

**\*3** No. 22-cv-342, Dkt. 8-2. The appeal was denied.

#### b. Megan Passarella

Plaintiff Megan Passarella worked at Aspirus as a registered nurse. Passarella requested an exemption from the vaccination requirement, which was denied. Passarella

doesn't say what she wrote in her initial exemption request, and the parties didn't submit a copy of the request to the court.

Passarella appealed. With her appeal, Passarella submitted a five-page letter stating that her religious beliefs prevented her from receiving the vaccine. Dkt. 1-1. Passarella began with the doctrinal basis for her request. She said that as a Christian, she believes that God dwells within her body. Thus her body is a temple, which she must use to glorify God and protect from defilement. She entrusts her body to God, who is her ultimate healer and protector. Turning specifically to the COVID vaccine, she said:

> After prayerful consideration, I don't feel at peace about receiving the COVID vaccine. I believe that I must trust God with my body (His temple) and that he will provide for me and protect me as he has already proven time and time again during my life.... Although, I have received other vaccines, in which my "sincerely held belief" might be brought into question, to which I would respond, I have made shrewd decisions regarding the vaccines I put into my body. One example of this is the Gardasil vaccine. I have not received this vaccine, as there is plenty of evidence of adverse, debilitating injuries resulting from receiving the vaccine. Although it comes highly recommended by physicians, it goes against my conscience to receive it; therefore, I abide by that, as I know it is a message from God. James 4:17 states that failing to obey our conscience is a sin. Therefore, this means receiving the vaccine would not be acting in accordance with God. It would be a sin for me to receive it.

Dkt. 1-1, at 3. Passarella's appeal was denied.

### c. Cynthia Clutter

Plaintiff Cynthia Clutter worked for Aspirus as a CT technician. She sought an exemption, stating:

> Description of beliefs:

> I am seeking an exemption from the Covid-19 vaccination based upon my informed moral conscience and best judgment. Vaccination is not a universal obligation. Religious leaders of all faiths agree. Mandating me to take the vaccination imposes the judgments of others upon my own moral conscience, which is contrary to my sincerely held beliefs.

> ....

> Consistency rationale:

> I oppose all vaccines. My children are not vaccinated. My husband has never been vaccinated. My son is not circumcised. We are the way God made us. It is my right [as] an American and a Christian to remain that way. I feel forcing one to get a vaccine again[st] their will is a complete violation of my rights.

No. 22-cv-392, Dkt. 11-1. Her request was denied.

Clutter appealed, stating, in pertinent part:

> Explanation of appeal:

> The voice of God lives inside me failing to obey is a sin. I am obligated to follow his commands and the words of the Bible[.] My consciences come from God and failing to obey is a sin. There are many vers[es] in the Bible that can be quoted supporting my beliefs.... My religious beliefs are sincerely held and must be followed. I want to preserve my religious claims and that is what prevents me from taking the COVID shot.

**\*4** No. 22-cv-392, Dkt. 11-2. Aspirus denied her appeal.

### 3. Plaintiffs's terminations and EEOC charges

Plaintiffs did not receive the vaccine after their requests for exemptions were denied. Aspirus terminated plaintiffs' employment on December 6, 2021. Plaintiffs filed charges of religious discrimination against Aspirus with the EEOC, alleging that they had been fired for failing to comply with the vaccination requirement. None of the EEOC charges included allegations about the COVID testing requirement. *See* Dkt. 6-1 (Passarella); No. 22-cv-342-jdp, Dkt. 8-3 (Dottenwhy;) No. 22-cv-392-jdp, Dkt. 11-3 (Clutter). The EEOC issued

plaintiffs right-to-sue letters, and plaintiffs sued Aspirus in this court.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

The court begins with plaintiffs' claims based on religious discrimination under Title VII, and then turns to their claims under the Americans with Disabilities Act.[3]

**A. Title VII religious discrimination claims**
Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees and job applicants based on their religion. 42 U.S.C. § 2000e-2(a). The law requires employers to provide reasonable accommodations for the religious practices of employees, unless any reasonable accommodation would pose an undue burden on the employer. *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 448 (7th Cir. 2013).

To make out a prima facie case of religious discrimination based on the failure to accommodate, a plaintiff must show that: (1) the observance or practice conflicting with an employment requirement is religious in nature; (2) that she called the religious observance or practice to her employer's attention; and (3) that the religious observance or practice was the basis for her discharge. *Porter v. City of Chi.*, 700 F.3d 944, 951 (7th Cir. 2012). Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to show that any reasonable accommodation would impose an undue burden on defendant. *Id.*

The issue at this point in the case is whether plaintiffs have adequately pleaded their prima facie case. Aspirus moves to dismiss plaintiffs' claims on the ground that plaintiffs have not alleged the first element, that they hold a religious belief that conflicts with the vaccination requirement. Aspirus contends that plaintiffs asked to be excused from the vaccination requirement out of concern for the safety of the vaccine, which is a matter of personal judgment, not a religious belief or practice.

Religion is, at least initially, defined broadly under Title VII:

> The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [sic] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

**\*5** 42 U.S.C. § 2000e(j). The definition goes on to narrow the concept by incorporating the requirements that any religious accommodation must be reasonable and not impose any undue burden. But the accommodation requirements are not at issue at this point in this case. So, for purposes of Aspirus's motion, the court construes the concept of religion broadly.

A belief is religious if it is: (1) "religious in the person's own scheme of things"; and (2) sincerely held. *Adeyeye*, 721 F.3d at 448 (internal quotation marks omitted). A belief is religious in a person's own scheme of things if it "occup[ies] a place parallel to that filled by God in traditionally religious persons." *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005). Such beliefs "deal[ ] with issues of ultimate concern," such as "matters of the afterlife, spirituality or the soul, among other possibilities." *Adeyeye*, 721 F.3d at 448 (internal quotation marks omitted). A plaintiffs' assertion that "[her] belief is an essential part of a religious faith must be given great weight." *Id.* (quoting *United States v. Seeger*, 380 U.S. 163, 184 (1965)). The court does not concern itself with the truth or validity of religious belief, nor does it matter whether the belief is part of a mainstream religion or an idiosyncratic one. *Id.* Nevertheless, the court must distinguish between religious belief and other matters of personal conviction, because only religious beliefs warrant the heightened protection of the First Amendment or Title VII. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972).

The EEOC has issued guidance consistent with these principles. According to the EEOC, "objections to a COVID-19 vaccination requirement that are purely based on ... nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. Equal

Opportunity Employment Commission (last updated July 12, 2022). [4] However, a religious belief that "overlap[s]" with a political view is still protected by Title VII, so long as the view "is part of a comprehensive religious belief system and is not simply an isolated teaching." *Id.*

### 1. Plaintiffs Passarella and Dottenwhy

Passarella and Dottenwhy sought exemptions on similar grounds, so the court will consider their claims together.

In Dottenwhy's request for exemption, No. 22-cv-342, Dkt. 8-1, she claims a right to refuse the vaccine "as a Christian," and she says that she has prayed over the matter and believes that God supports her decision. But her request is predicated fundamentally on her concerns with the safety of the vaccine and her right to bodily integrity. In her appeal, she says that her body is a temple of the Holy Spirit. But she did not articulate any religious belief that would prevent her from taking the vaccine if she believed it was safe.

Passarella's request for exemption is not in the record. But in her appeal, she sought an exemption for reasons similar to those given by Dottenwhy. Passarella gave a more elaborate explanation of how her commitment to her own health is a matter of religious conviction. Her belief that her body is a temple means that she must live a healthful life and not do anything to harm her body. But, as with Dottenwhy, there is no religious belief that would prevent Passarella from taking the vaccine if she believed it was safe. Indeed, Passarella says that she has not refused all vaccines. Rather, she makes "shrewd" decisions about vaccine safety and refuses those she believes pose undue risk.

 **\*6** The court concludes that Dottenwhy and Passarella refused the vaccine based on their personal judgments about vaccine safety and not for religious reasons. They couched their requests in religious terms, claiming that their decisions had been ratified by prayer. But the use of religious vocabulary does not elevate a personal medical judgment to a matter of protected religion.

The court is not aware of any on-point decision of the Seventh Circuit Court of Appeals. But the reasoning of *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania,* 877 F.3d 487, 492 (3d Cir. 2017), is instructive. Fallon, the plaintiff, was terminated from his position as a health care worker after he refused the flu vaccine. He alleged religious discrimination. Although he was not a member of a mainstream religion, he claimed

spiritual commitments that led him to believe that he should not harm his own body and that the flu vaccine might do more harm than good. The court held that Fallon's beliefs were not truly religious ones and that his judgment about the flu vaccine was itself simply a medical judgment. The Third Circuit affirmed the district court's dismissal of the complaint for failure to state a claim. *Id.* at 492. Passarella and Dottenwhy beliefs about the COVID vaccine are, like Fallon's beliefs about the flu vaccine, medical judgments about the safety of the vaccine, not matters of religious belief.

Plaintiffs point out that Fallon did not belong to any mainstream religion and the Third Circuit did not regard any of his beliefs to be religious ones. That is a fair point, although this court does not take that distinction to be essential to *Fallon's* holding. Even if Fallon's overall belief system had been systematic enough and profound enough to constitute a religion, his belief about the flu vaccine was still just a medical judgment about the effectiveness of the vaccine.

District courts in the Third Circuit have applied the reasoning of *Fallon* to adherents of mainstream religions, dismissing cases where requests for religious exemptions were based on medical judgments. In *Finkbeiner v. Geisinger Clinic,* the plaintiff asked for an exemption from a COVID testing requirement because "I am a Christian and hold a sincere religious belief that I have a God given right to make my own choices regarding what is good for bad for me." No. 4:21-CV-01903, 2022 WL 3702004, at \*2 (M.D. Pa. Aug. 26, 2022). She objected to COVID tests because she was "afraid of the side effects and potential future health risks these chemicals may cause." *Id.* The court concluded that the plaintiff's statements showed that "her opposition stems from her medical beliefs." *Id.* at \*4. Likewise, in *Blackwell v. Lehigh Valley Health Network*, the court concluded that the plaintiff's belief that COVID testing was ineffective was not religious because it "challenged the factual and scientific basis" for the employer's testing requirement. No. 5:22-cv-03360-JMG, 2023 WL 362392, at \*7 (E.D. Pa. Jan. 23, 2023).

Passarella makes an additional argument for why her claim should not be dismissed. At the same time Passarella was working for Aspirus as a nurse, she was pursuing a master's degree to become a family nurse practitioner. As part of the program, Passarella began a student clinical rotation at the same hospital where she worked. Aspirus also required clinical students to receive the COVID vaccine. Passarella sought and received a separate exemption from Aspirus's

vaccine requirement in her capacity as a clinical student. Passarella says this amounts to an admission from Aspirus that her beliefs are religious and sincerely held.

**\*7** The court is not persuaded. Aspirus's decision to grant Passarella's request as a student is not a judicial admission that her beliefs are religious for the purposes of a lawsuit under Title VII. Passarella still has the burden to plead facts to show that her beliefs are religious, rather than personal, political, or medical. What matters is the content of her request, not whether Aspirus approved similar requests under different circumstances. Passarella provides no authority that Aspirus is estopped from arguing that an employee's beliefs are not religious because it approved other exemption requests for other categories of individuals.

Because the pleadings show that Passarella and Dottenwhy's objections to the COVID vaccine are medical, not religious, their claims will be dismissed with prejudice.

### 2. Plaintiff Clutter

Clutter's exemption request is subtly different from those of Passarella and Dottenwhy. Clutter initially phrased her exemption request as a matter of "moral conscience" and "best judgment" and she expressed her opposition to all vaccines. A blanket opposition to all vaccines might simply be a medical judgment about the safety of vaccines, no more worthy of protection as a religious belief than Passarella and Dottenwhy's objection to the COVID vaccine.

But Clutter's exemption request provided a religious basis for her anti-vaccine beliefs:

> I oppose all vaccines. My children are not vaccinated. My husband has never been vaccinated. My son is not circumcised. We are the way God made us. It is my right [as] an American and a Christian to remain that way.

No. 22-cv-392, Dkt. 11-1. The religious basis for Clutter's anti-vaccine beliefs is not thoroughly explained. She does not, for example, describe herself as a strict Christian Scientist who relies entirely on prayer, forswearing all medical intervention. With the benefit of discovery, Aspirus may yet be able to show that Clutter's anti-vaccine beliefs are really a matter of medical judgment, politics, or some other personal conviction. But on a motion to dismiss, where the court must credit the allegations in the complaint, Clutter has adequately pleaded that her objection to the COVID vaccine is a religious one, rooted in her belief that she must remain as God made her.

Clutter has alleged that she has a religious belief that conflicts with Aspirus's vaccination requirement, so the court will deny Aspirus's motion to dismiss her Title VII claim.

### B. ADA claim

The ADA prohibits employers from requiring its employees to undergo medical examinations that are not job-related or consistent with business necessity. 42 U.S.C. § 12112(d)(4) (A). Plaintiffs allege that Aspirus violated this section of the ADA both by subjecting them to COVID-19 testing and by imposing a vaccine requirement. *See* Dkt. 1, ¶ 51. The challenge to the vaccine requirement fails to state a claim because a medical examination is "a procedure or test that seeks information about an individual's physical or mental impairments or health." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 835 (7th Cir. 2005) (quoting EEOC guidance). Aspirus's vaccine mandate does not "seek information" about plaintiffs' health, so it cannot violate subsection 12112(d).

As for the testing claims, Aspirus provides two reasons for why those must be dismissed. First, it contends that § 12112(d) does not cover plaintiffs because they do not allege that they had an actual or perceived disability. But a non-disabled individual may still bring a claim that they were subjected to an unlawful medical examination under this part of the statute. *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 522 (7th Cir. 2015) ("All employees, regardless of whether they have a qualifying disability under the ADA, are protected under [§ 12112(d)])." So the court will not dismiss plaintiffs' ADA claims on that ground.

**\*8** The second reason has more traction. Before bringing a lawsuit under the ADA, a plaintiff must file a charge with the EEOC. *Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018); 42 U.S.C. § 12117(a) (applying Title VII's exhaustion procedures to the ADA). If a plaintiff files suit in federal court, she may bring "only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (internal quotation marks omitted). This requirement serves

two purposes: (1) it gives the EEOC and the employer an opportunity to settle the matter; and (2) it ensures that the employer has adequate notice of the conduct the employee is challenging. *Id.* Aspirus contends that plaintiffs failed to exhaust their administrative remedies with respect to this claim because they did not include that claim in their EEOC charges.

The failure to exhaust administrative remedies is an affirmative defense. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 922 (7th Cir. 2007). Courts "should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). But for reasons explained above, the court has determined that it is appropriate to consider plaintiffs' EEOC charges at the pleading stage. And plaintiffs don't contend that the exhaustion issue should be decided later in the case, presumably because the court has all the information it needs to decide the issue. So the court will consider the issue here. *See Egelkrout*, 2022 WL 2833961 (deciding exhaustion at 12(b)(6) stage).

The decisive question is whether the ADA claims asserted in these cases are like, or reasonably related to, the claims asserted in their EEOC charges. To be reasonably related, the EEOC charge and the complaint "must describe the *same conduct* and implicate the *same individuals*." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (emphasis in original). Here, none of plaintiffs mentioned the testing requirement in their EEOC charge. Instead, the plaintiffs alleged only that they had been fired for failing to comply with Aspirus's vaccination mandate. Thus, the plaintiffs' charges do not describe the same conduct as the ADA claims they assert in their lawsuits. "An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). Because their charges complain only about the vaccine mandate, they did not exhaust any claims about the allegedly unlawful COVID tests.

Plaintiffs contend that, even if their EEOC charges did not exhaust their claims, the claims should not be dismissed because they have filed a second round of EEOC charges related to the testing requirement. Dottenwhy and Clutter have already received their right to sue letters for their second charges, *see* No. 22-cv-342, Dkt. 11-2 (Dottenwhy); No. 22-cv-392, Dkt. 12-1 (Clutter), and Passarella states that she will

receive a second right to sue letter "at some point," Dkt. 9, at 24. Plaintiffs argue that it is more efficient to allow them to proceed on their ADA claims than to make them re-file their ADA claims at a later date. But "[a]n ADA plaintiff must file a charge with the EEOC *before* bringing a court action against an employer." *Whitaker v. Milwaukee County*, 772 F.3d 802, 812 (7th Cir. 2014) (emphasis added); *see also Hill v. Potter*, 352 F.3d 1142, 1145 (7th Cir. 2003) ("Title VII does not authorize the filing of suit until the plaintiff has exhausted his administrative remedies"); *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004) (stating that there can be "no suit under the employment discrimination laws until the parties have had time for administrative conciliation.")

**\*9** Plaintiffs provide no authority that would allow a plaintiff to exhaust an ADA claim after the suit is filed. To the contrary, courts routinely dismiss "suit[s] that begin[ ] too soon, even if the plaintiff exhausts his administrative remedies while the litigation is pending." *Ford*, 362 F.3d at 398 (citing cases applying the Prison Litigation Reform Act and the Federal Tort Claims Act). The court will dismiss plaintiffs' ADA claims without prejudice.

## ORDER

IT IS ORDERED that:

1. Defendant Aspirus, Inc.'s motion to dismiss in case No. 22-cv-287-jdp, Dkt. 5, is GRANTED. Plaintiff Megan Passarella's religious discrimination claim is DISMISSED with prejudice. Plaintiff's claim under the ADA is DISMISSED without prejudice for failure to exhaust her administrative remedies. The clerk of court is directed to enter judgment for defendant and close the case.

2. Defendant's motion to dismiss in case No. 22-cv-342-jdp, Dkt. 7, is GRANTED. Plaintiff Sandra Dottenwhy's religious discrimination claim is DISMISSED with prejudice. Plaintiff's claim under the ADA is DISMISSED without prejudice for failure to exhaust her administrative remedies. The clerk of court is directed to enter judgment for defendant and close the case.

3. Defendant's motion to dismiss in case No. 22-cv-392-jdp, Dkt. 10, is GRANTED in part. Plaintiff Cynthia Clutter's claim under the ADA is DISMISSED without prejudice for failure to exhaust her administrative

remedies. The motion is DENIED as to plaintiff's Title VII claim.

**All Citations**

Slip Copy, 2023 WL 2455681

## Footnotes

1      All citations are to case No. 22-cv-287-jdp except where noted.

2      Aspirus Wausau Hospital, Inc., is the defendant in Clutter's case. But her complaint shows that Aspirus Wausau Hospital is also managed by Aspirus. *See* No. 22-cv-392-jdp, Dkt. 1, ¶¶ 1, 5.

3      In her brief, Dottenwhy states that she has pleaded an age discrimination claim. *See* No. 22-cv-342, Dkt. 11, at 20. But she does not allege that she was discriminated against because of her age in her complaint, and she does not include an age discrimination claim in her causes of action. *See* Dkt. 1, at 9–12. The court concludes that Dottenwhy has not pleaded an age discrimination claim.

4      *Available at* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5486052
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Indianapolis Division.

Mandy VAN GORP, Amber Nikolai,
Megan Barth, Denise Arredondo, Plaintiffs,
v.
ELI LILY & COMPANY, Defendant.

Case No. 1:22-cv-01650-TWP-MKK
|
Signed August 24, 2023

**Attorneys and Law Firms**

Andrew Dutkanych, III, Taylor Jon Ferguson, Biesecker
Dutkanych & Macer, LLC, Indianapolis, IN, for Plaintiffs.

Benjamin M. Ostrander, Pro Hac Vice, Kara Elizabeth
Cooper, Pro Hac Vice, Michael P. Roche, Pro Hac Vice,
Sarah Kreger, Pro Hac Vice, Winston & Strawn, Chicago, IL,
Katharine P. Lennox, Michael Ross Phillips, Peter A. Milianti,
McGuireWoods LLP, Chicago, IL, for Defendant.

---

## ORDER GRANTING DEFENDANT'S
## PARTIAL MOTION TO DISMISS

Tanya Walton Pratt, Chief Judge

**\*1** This matter is before the Court on Defendant
Lilly USA, LLC's ("Lilly") [1] Partial Motion to Dismiss
Amended Complaint (Filing No. 34). Plaintiffs Mandy Van
Gorp ("Van Gorp"), Amber Nikolai ("Nikolai"), Megan
Barth ("Barth"), and Denise Arredondo ("Arredondo")
(collectively, "Plaintiffs") initiated this action after they were
terminated from Lilly for refusing to receive the COVID-19
vaccine on medical and religious grounds. Plaintiffs assert
various discrimination claims under the Americans with
Disabilities Act of 1990, as amended 42 U.S.C. § 12101 et
seq. (the "ADA"), and Title VII of the Civil Rights Act of
1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Lilly moves to
dismiss all of Plaintiffs' claims, except their ADA and Title
VII claims for failure to accommodate. For the following
reasons, the Court **grants** Lilly's Partial Motion to Dismiss.

## I. BACKGROUND [2]

The following facts are not necessarily objectively true,
but as required when reviewing a motion to dismiss, the
Court accepts as true all factual allegations in the Amended
Complaint and draws all inferences in favor of Plaintiffs as
the non-moving party. *See Bielanski v. County of Kane*, 550
F.3d 632, 633 (7th Cir. 2008).

### A. Lilly's COVID-19 Vaccine Mandate

On August 12, 2021, [3] Lilly enacted a COVID-19 Vaccine
Mandate (the "Mandate"), requiring that "every employee be
vaccinated by November 15, 2021" (Filing No. 25 at ¶ 18).
Lilly created a process for requesting medical and religious
accommodations to the Mandate. *Id.* All requests were due
by September 10, 2021, or they would not be considered. *Id.*
at ¶ 19.

### B. Plaintiffs' Accommodation Requests and
### Terminations

Van Gorp was hired by Lilly in 2003 and worked as a Senior
Sales Representative. *Id.* at ¶ 21. Van Gorp suffers from Celiac
Disease. *Id.* at ¶ 22. Despite her condition, Van Gorp was able
to meet the essential functions of her position with Lilly and
met or exceeded Lilly's legitimate performance expectations.
*Id.* at ¶ 23. In early September 2021, Van Gorp submitted
a medical accommodation request under the Mandate and
subsequently submitted a detailed vaccine exemption note
from her doctor at Lilly's request. *Id.* at ¶¶ 25–26. On October
6, 2021, Van Gorp tested positive for COVID-19, and on
October 8, 2021, she requested a vaccine deferral. *Id.* at ¶
27. On October 8, 2021, Lilly denied Van Gorp's medical
accommodation request. *Id.* at ¶ 28. On November 3, 2021,
after recovering from COVID-19, Van Gorp submitted a
religious accommodation request, but Lilly denied the request
as untimely. *Id.* at ¶¶ 29–30. Van Gorp declined to receive
the COVID-19 vaccine and was terminated on November 15,
2021. *Id.* at ¶ 35.

**\*2** Nikolai was hired by Lilly in 2020 and worked as a
Senior Sales Representative. During her employment, she
met or exceeded Lilly's legitimate performance expectations.
*Id.* at ¶ 38. On September 10, 2021, Nikolai submitted a
religious accommodation request. *Id.* at ¶ 40. On September
29, 2021, Lilly temporarily approved her request but stated
that "because Nikolai's responsibilities required her to engage

regularly and/or directly with customers, the accommodation request posed an undue hardship for the Defendant and its customers and would expire after November 15, 2021." *Id.* at ¶ 41. Between September and November 2021, Nikolai attempted to find an alternate position with Lilly, but she was not offered any other position. *Id.* at ¶¶ 45-46. Nikolai declined to receive the COVID-19 vaccine and was terminated on November 15, 2021. *Id.* at ¶¶ 47-48.

Barth was hired by Lilly in 2020 and worked as a Sales Representative. *Id.* at ¶ 50. Barth suffers from telangiectasias and MTHFR gene mutations. *Id.* at ¶ 51. Despite her conditions, she was able to meet the essential functions of her position with Lilly and routinely met or exceeded Lilly's legitimate performance expectations. *Id.* at ¶ 52. In early September 2021, Barth submitted a medical accommodation request and subsequently submitted additional medical information at Lilly's request. *Id.* at ¶¶ 53-54. On October 1, 2021, Lilly denied Barth's medical accommodation request. *Id.* at ¶¶ 55-56. On October 28, 2021, after contracting and recovering from COVID-19, Barth submitted a religious accommodation request, but Lilly denied the request as untimely. *Id.* at ¶¶ 56-58. Barth declined to receive the COVID-19 vaccine and was terminated on November 15, 2021. *Id.* at ¶ 64.

Arredondo was hired by Lilly in 2019 and worked as a Senior Sales Representative. During her employment, she met or exceeded Lilly's legitimate performance expectations. *Id.* at ¶ 66. In early September 2021, Arredondo submitted a religious accommodation request and subsequently submitted additional information at Lilly's request. *Id.* at ¶¶ 67-68. On September 29, 2021, Lilly temporarily approved her request but stated that "because Arredondo's responsibilities required her to engage regularly and/or directly with customers, the accommodation request posed an undue hardship for the Defendant and its customers and would expire after November 15, 2021." *Id.* at ¶ 69. Between September 29, 2021 and November 15, 2021, Arredondo applied for at least two remote positions, but her applications were denied. *Id.* at ¶ 73. During the application process, Arredondo was told that "[t]hose selected for the positions she applied for, 'made the position part of their career path' (i.e., received the vaccine); and ... that if she was not vaccinated by November 15, 202[1], she would, 'not be able to continue' in the interview process for any position she had previously applied to and was qualified for." *Id.* at ¶ 74. She declined to receive the COVID-19 vaccine and was terminated on November 15, 2021. *Id.* at ¶¶ 75-76.

Due to Plaintiffs' sales roles, they did not interact with one of Lilly's facilities or locations on a routine basis. Even if they had, Plaintiffs agreed to abide by Lilly's masking and testing requirements. Throughout 2020 and 2021, Plaintiffs regularly worked without issue or concern from Lilly and Lilly's customers regarding COVID-19. *Id.* at ¶¶ 31, 42, 60, 70. Up until November 15, 2021, Plaintiffs had complied with Lilly's COVID-19 policies, which included providing proof of antibodies, following mask protocols, and completing daily or weekly COVID-19 testing. *Id.* at ¶¶ 32, 43, 61, 72.

## C. Procedural History

Plaintiffs initiated this action on August 19, 2022. On November 23, 2022, they filed an Amended Complaint, which is the operative pleading (Filing No. 25). Plaintiffs allege that Lilly discriminated against Van Gorp and Barth on the basis of their disabilities in violation of the ADA, and discriminated against all Plaintiffs on the basis of their religion. Plaintiffs cite several theories of liability under the ADA and Title VII, including disparate treatment, "regarded as" disabled discrimination, disparate impact, *quid pro quo* harassment, hostile work environment, and failure to accommodate. On January 6, 2023, Lilly moved to dismiss all of Plaintiffs' claims except their failure to accommodate claims.

## II. LEGAL STANDARD

**\*3** Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere

"labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support."). The allegations must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III. DISCUSSION

Plaintiffs' Amended Complaint asserts the following claims. Count I: Title VII – Religious Discrimination (Van Gorp) ADA; Count II: ADA – Discrimination (Van Gorp); Count III: Title VII – Religious Discrimination (Nikolai); Count IV: Title VII – Religious Discrimination (Barth); Count V: ADA – Discrimination (Barth); and Count VI: Title VII – Religious Discrimination (Arredondo). The claims on behalf of Van Gorp and Barth are under theories of disparate treatment, "regarded as" disabled discrimination, and disparate impact. The Title VII claims are under theories of disparate treatment, *quid pro quo* religious harassment, and hostile work environment. Lilly argues Plaintiffs fail to adequately assert claims under any of these theories. The Court will address each theory in turn.

### A. Van Gorp and Barth's ADA Claims

#### 1. Disparate Treatment

The ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Amended Complaint alleges that Lilly discriminated against Van Gorp and Barth "based on [their] actual or perceived disability when [they] were subject to less favorable terms and conditions in [their] employment and when [their] accommodation request[s] for the COVID-19 Mandate [were] denied." (Filing No. 25 at ¶¶ 86, 105.) To prove an ADA claim for disparate treatment, a plaintiff must show: "(1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the

job with or without reasonable accommodation; and (3) the adverse job action was caused by [her] disability." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016).

**\*4** Lilly argues that Van Gorp and Barth fail to satisfy the third element, causation, for three reasons. First, Van Gorp and Barth allege they were terminated because Lilly treated them the same as non-disabled employees with respect to vaccination, not because they were treated less favorably because of their disability. (Filing No. 35 at 9.) Stated differently, Van Gorp and Barth only allege that Lilly failed to accommodate their disability. *See DiFranco v. City of Chicago*, 589 F. Supp. 3d 909, 917 (N.D. Ill. 2022) (dismissing ADA disparate treatment claim as a "repackaged" failure to accommodate claim). Second, Van Gorp and Barth were terminated as a "consequence of" their disability, not "because of" their disability (Filing No. 35 at 10). Under *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194 (7th Cir. 1997), "if an employer fires [an individual] for any reason other than that he is disabled there is no discrimination 'because of' the disability. This is true even if the reason is the consequence of the disability ...." *Id.* at 1196 (concluding that employer did not discriminate by terminating plaintiff for absenteeism, even though absenteeism was a result of plaintiff's heart attack). Lilly contends that Van Gorp and Barth were terminated because they were unvaccinated, so their terminations were not discriminatory even though their refusal to be vaccinated was a consequence of their disability. Third, Lilly contends that in light of public health information regarding COVID-19, Van Gorp and Barth cannot create a reasonable inference that their terminations were motivated by discriminatory intent, rather than health concerns (Filing No. 35 at 12–13).

Lilly's first two arguments are well-taken and supported by ample Seventh Circuit caselaw. [4] However, the Court need not delve into the merits of Lilly's arguments because Plaintiffs' response brief makes no mention whatsoever of their disparate treatment claims. As the Seventh Circuit has stated repeatedly, "[o]ur system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) (citations omitted).

Because Plaintiffs have failed to defend their disparate treatment claims, they have waived any arguments in

opposition. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because [the plaintiffs] did not provide the district court with any basis to decide their claims, and did not respond to the [defendant's] arguments, these claims are waived."); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver."); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1996) (holding argument waived where appellants "failed to develop the argument in any meaningful manner"); *Myers v. Thoman*, No. 09-cv-0544, 2010 WL 3944654, at *4 (S.D. Ind. Oct. 6, 2010) ("The Seventh Circuit has clearly held that a party who fails to respond to points made ... concedes those points."). Accordingly, Van Gorp's and Barth's ADA disparate treatment claims are **dismissed**.

### 2. "Regarded As" Disabled Discrimination

Plaintiffs also allege that Lilly perceived unvaccinated employees as being disabled and discriminated against them on the basis of that perceived disability (Filing No. 25 at ¶ 85). However, in their response brief, Van Gorp and Barth voluntarily dismissed their "regarded as" claims (Filing No. 43 at 2).

### 3. Disparate Impact

Van Gorp and Barth argue that their ADA claims should survive dismissal because they have adequately alleged disparate impact claims (Filing No. 43 at 6). Disparate treatment and disparate impact are separate and distinct claims. Disparate treatment occurs when an employer treats an employee less favorably than others because of a protected characteristic, whereas disparate impact involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *see Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). The two types of claims are not interchangeable. "Because 'the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on a protected class,' courts must be careful to distinguish between these theories." *Raytheon Co.*, 540 U.S. at 54 (internal citations omitted) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 n.2 (1981)).

**\*5** Van Gorp and Barth contend they "have alleged that Lilly implemented a Mandate" which "was neutrally applied

to everyone," so they "have properly plead a disparate impact claim and placed Lilly on notice." (Filing No. 43 at 7.) On reply, Lilly argues that Plaintiffs' Amended Complaint does not sufficiently allege a disparate impact claim, adding that "[g]iven the dearth of allegations" regarding disparate impact, "Lilly was unaware until receipt of the Response that Plaintiffs were attempting to bring such a claim." (Filing No. 47 at 2.)

The Court agrees with Lilly. Identifying a facially neutral policy, without more, is not enough to assert a disparate impact claim. Van Gorp and Barth must also show that the policy disproportionately affected disabled employees, but the Amended Complaint "is devoid of any 'factual content ... tending to show that [the Mandate], or some particular part of it, caused a relevant and statistical disparity between' disabled and non-disabled [employees]." *Roberts*, 817 F.3d at 566 (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014), *cert. denied*, 574 U.S. 875 (2014)); *see Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) ("The plaintiff must ... establish causation by 'offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.' "). "Notably, 'it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.' " *Puffer*, 675 F.3d at 717 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)); *see Adams*, 742 F.3d at 733 ("[T]he amended complaint alludes to disparate impact in wholly conclusory terms. In several places the complaint uses the words 'disproportionate' and 'impermissible impact' and other synonyms, but those are bare legal conclusions, not facts.").

In their response brief, Van Gorp and Barth argue the Mandate disparately impacted disabled employees because "individuals with a disability are more likely to seek an accommodation as (1) they are more likely to suffer an adverse reaction and (2) their medical providers are needed to submit a disability request and therefore said request is unlikely to be without merit or good cause." (Filing No. 43 at 8.) Van Gorp and Barth also assert that they and Robin Clark, a non-party former Lilly employee, were denied medical accommodations, but nine former and current Lilly employees, including Nikolai and Arredondo, were granted temporary religious accommodations. *Id.*

These assertions are not enough to withstand dismissal for three reasons. First, none of these assertions appear anywhere in the Amended Complaint. Second, the assertion that disabled employees are "more likely to seek an accommodation" is conclusory and makes unfounded generalizations about all individuals with disabilities. And third, these assertions are insufficient to allow for any statistical comparison between disabled and non-disabled employees. "A disparate impact theory of discrimination requires the plaintiff to put forth evidence (facts or statistics) demonstrating that the challenged employment practice has a disproportionately negative effect upon members of the protected class." *Anfeldt v. United Parcel Service, Inc.*, No. 15 C 10401, 2017 WL 839486, at *2 (N.D. Ill. Mar. 3, 2017); *see Adams*, 742 F.3d at 733 (affirming dismissal of disparate impact claim on the pleadings; "In a complex disparate-impact case like this one, we would expect to see some factual content in the complaint tending to show that the City's testing process, or some part of it, caused a relevant and statistical disparity between black and white applicants for promotion.").

**\*6** Here, Van Gorp and Barth merely assert that three medical accommodation requests were denied and that nine religious accommodation requests were temporarily approved. Without knowing the number of medical and religious accommodation requests submitted, and the number of those requests approved or denied, it is impossible to know whether disabled employees were disproportionately affected by the Mandate. To illustrate, if only six Lilly employees requested medical accommodations and three were approved (fifty percent), and if eighteen Lilly employees requested religious accommodations and nine were approved (fifty percent), then there would be no disparity between disabled employees and non-disabled employees. The fact that three medical accommodation requests were denied and nine religious accommodation requests were temporarily approved does not show a disparate impact. At most, it shows that employees were more likely to request religious accommodations than medical accommodations, which cuts against Van Gorp and Barth's disparate impact theory.

Van Gorp and Barth do not sufficiently allege that the Mandate impacted disabled employees at a disproportionately higher rate than non-disabled employees, so their ADA disparate impact claims are **dismissed**.

## B. Plaintiffs' Title VII Claims

### 1. Disparate Treatment

"Title VII prohibits employers from 'discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)). To assert a claim for employment discrimination, "a plaintiff must advance plausible allegations that she experienced discrimination because of her protected characteristic." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (affirming dismissal of race, national origin, and age discrimination claims by plaintiff terminated pursuant to company policy because plaintiff did not allege "a link between any aspect of that policy and her contention that the agency discharged her because she is Polish, white, or over 50").

Lilly argues that Plaintiffs have failed to adequately allege that they were terminated because of their religion. The Amended Complaint alleges that Plaintiffs were all terminated pursuant to the Mandate, which "required that *every employee* be vaccinated by November 15, 2021", not because of their religion (Filing No. 25 at ¶ 3 (emphasis added)). Lilly's argument is well-taken and unopposed. *See Kirksey*, 168 F.3d at 1041. Plaintiffs have therefore waived any opposition to this argument, and their religious disparate treatment claims are **dismissed**. *See Goodpaster*, 736 F.3d at 1075; *Bonte*, 624 F.3d at 466; *Bratton*, 77 F.3d at 173 n.1.

### 2. *Quid Pro Quo* Religious Harassment

A violation of Title VII may be predicated on either of two types of harassment: the conditioning of employment benefits upon certain employee conduct ("*quid pro quo*"); and creating a hostile or offensive working environment ("hostile work environment"). *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 57 (1986). *Quid pro quo* cases typically involve sexual harassment—the conditioning of benefits on sexual favors—but Plaintiffs allege Lilly committed *quid pro quo* religious harassment by forcing Plaintiffs to choose between their deeply held religious beliefs against vaccination and keeping their jobs (Filing No. 43 at 12).

In its Motion to Dismiss, Lilly questions whether *quid pro quo* religious harassment is a viable cause of action in the Seventh Circuit. Lilly alternatively argues that Plaintiffs have failed to show that Lilly enacted or enforced the Mandate on the basis of religion. The Court need not discuss whether *quid pro quo* racial harassment claims are viable because, assuming

that they are, Plaintiffs have failed to adequately plead such a claim.

Because *quid pro quo* claims are Title VII claims, and "because Title VII is premised on eliminating *discrimination*," a plaintiff asserting a *quid pro quo* harassment claim must show that she was harassed on the basis of her protected class. *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (emphasis in original). Absent that discriminatory animus, there is no discrimination, and the plaintiff has no cause of action under Title VII. *Cf. Holman*, 211 F.3d at 403 ("Title VII does not cover the 'equal opportunity' or 'bisexual' harasser[—]because such a person is not *discriminating* on the basis of sex. He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)." (Emphasis in original)).

 **\*7**  In the few cases that have allowed *quid pro quo* religious harassment claims to proceed, the plaintiffs adequately showed that the harassment was motivated by religious animus. In *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997), the plaintiff's employer lectured plaintiff about her "sinful life" and "made adherence to [the employer's] set of religious values a requirement of continued employment." *Id.* at 977. In *Venters*, the employer's harassment was undoubtedly motivated by religious animus, and the plaintiff was unmistakably harassed on the basis of her religion. Similarly, in *Erdmann v. Tranquility Inc.*, 155 F. Supp. 2d 1152 (N.D. Cal. 2001), the plaintiff, a homosexual man, was allegedly harassed by his Mormon boss, who told the plaintiff that it is "immoral" to be a homosexual and that plaintiff "should become heterosexual and a Mormon or he would go to hell." *Id.* at 1156–57. In *Erdmann*, the harassment also plainly stemmed from religious animus.

In this case, by contrast, the Mandate applied to "every employee" in response to the COVID-19 pandemic (Filing No. 25 at ¶ 3). There are no factual allegations indicating that Lilly enacted or enforced the Mandate on the basis of any employee's religion or with any discriminatory animus. Allegations that, absent an accommodation, a neutral mandate forced Plaintiffs to choose between their deeply held beliefs and their continued employment does not amount to *quid pro quo* harassment. Instead, these types of allegations fit squarely within a failure to accommodate claim. Plaintiffs' *quid pro quo* religious harassment claims are **dismissed**.

### 3. Hostile Work Environment

To assert a Title VII hostile work environment claim, a plaintiff must allege: (1) she was subject to unwelcome harassment; (2) the harassment was based on her protected characteristic; (3) the harassment was severe or pervasive so as to create a hostile or abusive working environment; and (4) there is basis for employer liability. *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). "Specifically, Title VII is violated when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (citing *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005)).

Lilly argues that Plaintiffs cannot satisfy the second or third elements of their hostile work environment claims. Lilly contends that the Mandate was not severe or pervasive enough to create a hostile work environment, and that the Mandate was not based on Plaintiffs' religion. (Filing No. 35 at 21–22.) Plaintiffs respond that "the requirement that individuals receive the vaccine in contravention of their religious beliefs alone is sufficiently severe to trigger liability" (Filing No. 43 at 13). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury," so the Court declines to address whether the Mandate was sufficiently severe or pervasive at this stage. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

Nevertheless, the Court agrees with Lilly that Plaintiffs fail to allege that the Mandate was based on Plaintiffs' religion. Plaintiffs contend that the "hostile environment of which Plaintiffs complain is clearly premised on their religious beliefs" because "Plaintiffs objected to receiving the vaccine **because of their religion**" (Filing No. 43 at 14 (emphasis in original)). But just because Plaintiffs objected to the Mandate on the basis of their religion does not mean that Lilly enacted or enforced the Mandate on the basis of their religion. In other words, Plaintiffs have not alleged that Lilly acted with discriminatory animus.

 **\*8**  Like their *quid pro quo* claims, Plaintiffs' hostile work environment claims cannot survive without a showing of discriminatory intent by Lilly. *See, e.g., Hall v. City of Chicago*, 713 F.3d 325, 332 (7th Cir. 2013) ("Hall, however, must do more than show Johnson created a hostile work environment: the motive for the alleged mistreatment must be 'sufficiently connected' to Hall's sex. We do not

doubt Johnson harbored animus towards Hall, but we must review the record to determine whether Hall has produced enough evidence from which a jury could infer Johnson was motivated by Hall's gender."). Plaintiffs' hostile work environment claims are therefore **dismissed**.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS** Lilly's Partial Motion to Dismiss Amended Complaint (Filing No. 34). Plaintiffs' claims under Title VII and the ADA for disparate treatment, "regarded as" disabled discrimination,

disparate impact, *quid pro quo*, and hostile work environment are **DISMISSED without prejudice**.[5] Plaintiffs are granted leave of **fourteen (14) days from the date of this Order** to file a Second Amended Complaint concerning their dismissed theories of liability if such filing would not be futile. If nothing is filed by that date, this matter will proceed as to only Plaintiffs' failure to accommodate claims.

**SO ORDERED**.

**All Citations**

Slip Copy, 2023 WL 5486052

## Footnotes

1    Lilly was incorrectly named in the Amended Complaint as Eli Lilly & Company.

2    In their briefs, the parties "dispute" several facts about the COVID-19 pandemic, including the numbers of Americans who tragically died from COVID-19. However, none of these "disputed" facts are relevant to the Motion before the Court, so those facts are not discuss here.

3    The Amended Complaint alleges that events took place "on or about" dates certain. For ease of reading, the Court will refer only to the dates certain.

4    Lilly's third argument is premature. It asks the Court to draw inferences in Lilly's favor about its proffered reason for enacting the Mandate and terminating Plaintiffs, which the Court may not do at this stage.

5    "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed ... [unless] amendment would be futile or otherwise unwarranted." *Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519, 520 (7th Cir. 2015).

---

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.